**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| MATTHEW A. PEQUIGNOT, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  **Civil No. 1:07-cv-00897-LMB-TCB** |
| | ) |
| SOLO CUP COMPANY | ) |
| | ) |
| **Defendant.** | ) |

### CORRECTED BRIEF OF THE UNITED STATES AS INTERVENOR
### DEFENDING THE CONSTITUTIONALITY OF 35 U.S.C. § 292

Pursuant to 28 U.S.C. § 2403 and 28 U.S.C. § 517, and Federal Rule of Civil Procedure

24(a), the Attorney General has exercised his right to intervene in this case on behalf of the United

States in order to defend the constitutionality of 35 U.S.C. § 292 (Section 292).

### INTRODUCTION

The defendant in this action has raised constitutional challenges to the *qui tam* provisions

of Section 292.[1]  The defendant argues that Section 292(b) violates the separation of powers doctrine

and the "take Care" Clause of the Constitution.  See Memorandum in Support of Solo Cup

Company's Motion to Dismiss, pp 11-12, and Reply in Support of Solo Cup Company's Motion to

Dismiss, pp 13-14.  The defendant also argues throughout its briefs that Section 292 does not confer

Article III standing on the relator.

The *qui tam* provisions of Section 292, which were first enacted in 1842, permit private

persons (known as "relators") to file suit under Section 292 for misuse of patent markings.  The

---

[1]  The term "*qui tam*" is an abbreviation of the phrase "*qui tam pro domino rege quam pro se ipso,*" which means "who pursues this action on our Lord the King's behalf as well as his own."  See *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 768 (2000) (citing W. Blackstone, *Commentaries on the Laws of England* \*160 ).

statute provides for a fine of "not more than $500 for every such offense." 35 U.S.C. § 292(a). It states that "[a]ny person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States." *Id*. at 292(b).

For the reasons set out below, the Attorney General urges that defendant's constitutional attack on Section 292 should be rejected.

A *qui tam* case is an unusual hybrid form of suit having significant characteristics of both a private and a public action. On the one hand, a *qui tam* relator is similar in substantial respects to a plaintiff in a private civil action. The relator does not hold a formal position within the United States Government. In his conduct of a *qui tam* case, the relator does not owe primary allegiance to the Government. And, unlike a public official conducting litigation on behalf of the United States, a relator has a personal financial stake in the suit, and the premise behind the *qui tam* mechanism is that a relator will be motivated in substantial part by the desire to further his own private interest.

On the other hand, in other respects, a *qui tam* suit is properly regarded as public rather than private litigation. A *qui tam* complaint does not allege that a relator was personally injured by the defendant's unlawful conduct; rather, the gravamen of a *qui tam* suit is an allegation of wrong done to the Federal Government. And, because the Government is generally entitled to at least half of any recovery in such actions, *qui tam* litigation can immensely benefit the United States financially, as well as provide a deterrent to illegal conduct in the future.

The Supreme Court held in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771-78 (2000), that *qui tam* relators have standing to bring suit in federal courts under Article III of the Constitution because they have received a partial assignment of a

chose in action by Congress.[2]   The Court further explained that "[w]e are confirmed in this conclusion by the long tradition of *qui tam* actions in England and the American Colonies."  *Id.* at 774.  This standing ruling in *Vermont Agency* definitively resolved any question about the status of *qui tam* cases under Article III, and, as we discuss below, its reasoning also strongly supports rejection of a broad constitutional attack against *qui tam* provisions under Article II.

Under Section 292, a *qui tam* suit serves in part to vindicate the interests of the United States in the proper use of patent markings, but the relator remains a private person throughout such litigation.  In our view, nothing in the Constitution prohibits Congress from using its legislative power to authorize private persons to sue for their own interests and to obtain a recovery that will be shared by the relator and the public Treasury.  Moreover, the long pedigree of *qui tam* actions and the adoption of this mechanism by the earliest Congresses and Presidents establishes that *qui tam* provisions are fully consistent with the Framers' conception of the constitutional separated powers doctrine.

Accordingly, as we explain in this brief, the *qui tam* provision in Section 292 in no way on its face violates the constitutional separation of powers doctrine, which is reflected in part through the President's Article II constitutional authority to take care that the laws be faithfully executed. The Executive's prosecutorial discretion does not, as a constitutional requirement, include the power to bar other parties from filing their own suits under statutory schemes that permit enforcement through both governmental and private actions.  Given that the Government has not attempted in any

---

[2]  This legislative partial assignment is made pursuant to Congress' power in the Property Clause of the Constitution (Art. IV, Sec. 3, cl. 2), under which Congress can dispose of the interest of the United States in a chose in action.  "The power of Congress to dispose of any kind of property belonging to the United States is vested in Congress without limitation."  *Alabama v. Texas*, 347 U.S. 272, 273 (1954).

way to take over and dismiss or otherwise restrict or limit the relator's action in this case, the only separation of powers issue posed here is whether a relator filing suit impermissibly impinges on the Executive's prosecutorial discretion.  A *qui tam* suit initiated by a relator pursuant to Section 292(b) could impinge on the Executive's constitutionally assigned functions only if the Constitution categorically forbids the *qui tam* mechanism or requires affirmative authorization from the Executive Branch before the suit can proceed.  As we demonstrate below, the Constitution does neither of those things.

The thrust of the defendant's argument is that the statute is unconstitutional because it provides no express mechanism by which the Executive Branch can intervene in a suit or bring it to a close.  We assume for present purposes that the Constitution would require a court to recognize the authority of the Executive to intervene in or terminate a *qui tam* action in order to uphold Section 292, or that the absence of such authority would present additional constitutional considerations and raise constitutional doubts.  But not only has the Government not sought to exercise its authority to terminate this civil action, it also has not even sought to intervene on the merits of the plaintiff's claim under Section 292.  The possibility that a substantial constitutional issue might be raised in a hypothetical future suit is no reason to declare the statute invalid on its face, or as applied here. If the Government seeks to intervene in a future suit brought under the *qui tam* provisions of Section 292 or to have such a suit terminated, a court might still avoid any constitutional difficulty by construing other relevant statutory and Federal Rule provisions to allow the government to achieve its objective.  But it is both unnecessary and inappropriate for the Court in this case to try to resolve those hypothetical statutory and constitutional issues here where the Government has not sought (and failed) to intervene in or terminate this Section 292 case.  The only question presently before the Court is whether the filing of a *qui tam* suit by a relator without Executive Branch involvement

4

inherently violates Article II.  Because it does not, defendant's constitutional challenge should be rejected.

## ARGUMENT

**I.    THE LONG HISTORY AND USE OF THE *QUI TAM* MECHANISM IN ENGLAND AND THE UNITED STATES CONFIRMS ITS CONSTITUTIONALITY.**

The essence of the *qui tam* mechanism is that a private party may bring suit because of a wrong done to the sovereign, and is entitled to a share of the recovery if the action is successful. Blackstone explained that:

> these forfeitures created by statute are given at large, to any common informer; or, in other words, to any such person or persons as will sue for the same; and hence such actions are called popular actions, because they are given to the people in general.
>
> Sometimes one part is given to the king, to the poor, or to some public use, and the other part to the informer or prosecutor.  But if anyone hath begun action, no other person can pursue it * * *.

J.W. Ehrlich, *Ehrlich's Blackstone* 545 (1959).

Central to any constitutional analysis of *qui tam* provisions is the Supreme Court's observation that "[s]tatutes providing for actions by a common informer, who himself has no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government."  *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 541 n.4 (1943); accord *Marvin* v. *Trout,* 199 U.S. 212, 225 (1905).

In *Vermont Agency*, the Supreme Court explored the development of the *qui tam* mechanism in England, beginning around the end of the 13th century as a common law device, and soon becoming a standard enforcement mechanism in various statutory schemes.  529 U.S. at 774-76.

Earlier, in *C.J. Hendrey Co. v. Moore*, 318 U.S. 133, 137-38 (1943), the Supreme Court had discussed the development in England of the use of *qui tam* procedures for seizures and forfeitures to the Crown of ships or articles used in violation of the law, whereby a *qui tam* relator brought a civil action and received a share of the forfeiture proceeds.  In that opinion, the Court cited and discussed several *qui tam* cases of this type decided by colonial and pre-Constitution courts in America.  *Id.* at 145-48 (citing and discussing *Hammond qui tam v. Sloop Carolina*, a 1735 case in New York, six other New York *qui tam* cases between 1752 and 1772, and *Phile qui tam v. The Ship Anna,* a 1788 Pennsylvania case).

Thus, by the time the Constitution was adopted, statutes authorizing *qui tam* suits were well known in England for several hundred years and also had been utilized by the colonial legislatures. See Note, *The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 83, 94-95.  Indeed, the legal careers of colonial attorneys such as Thomas Jefferson included prosecuting *qui tam* actions, and James Madison would have been quite familiar with these types of cases in Virginia as his older brother retained Jefferson to handle several.  See J. Shestack, *Thomas Jefferson:  Lawyer* (1993), at 18-22.

Significantly for the purposes of the case now before this Court, the Supreme Court in *Vermont Agency* found that "[*q*]*ui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution."  *Id*. at 776.  As the Court noted, "immediately after the framing, the First Congress enacted a considerable number of informer statutes.  Like their English counterparts, some of them provided both a bounty and an express cause of action; others provided a bounty only."  *Id.* at 776-77 (footnotes omitted).

*Qui tam* actions were indisputably a routine feature of early federal legislation.  The First Congress enacted several such statutes, and at least five of them hewed closely to the model

described by Blackstone, and were like Section 292; *i.e.*, they provided for a division of any recovery between the informer and the Government, authorized the informer to file his own suit, and placed no restrictions on the class of persons who could serve as relators.[3]  See *Vermont Agency*, 529 U.S. at 777 n.6 (listing and describing such statutes).[4]

Subsequent early Congresses and Presidents continued to employ this remedial *qui tam* mechanism.[5]  See H. Krent, *Executive Control Over Criminal Law Enforcement: Some Lessons from History,* 38 Am. U. L. Rev. 275, 296-300 (1989) (describing early Congressional use of *qui tam* statutes, and their effect).  Indeed, a law enacted by the Second Congress broadly provided for the award of costs in *qui tam* cases.  See Act of May 8, 1792, ch. 36, § 5, 1 Stat. 277-278.  The Second

---

[3]  See Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 209 (census); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129 (extending census provisions to Rhode Island); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (regulation of seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137-138 (trade with Indians); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 209 (duties on liquor).

[4]  In addition, under another provision in the Constitution, Congress provided for federal court jurisdiction in a way very similar to *qui tam* actions.  Pursuant to Congress' power to "grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water" (Art. I, Sec. 8, cl. 11), early Congresses authorized the President to commission private ships (privateers) to capture enemy vessels and vessels engaged in illegal trade with enemies.  Under the prize statutes, the captor could bring the captured vessel into the jurisdiction of the United States and file an *in rem* action against the ship in federal court.  If the vessel was condemned, the captor was entitled to the ship or its value.  See, *e.g.*, *The Sally*, 12 U.S. (8 Cranch) 382, 384 (1814) (Story, J.); see also *The Nassau*, 71 U.S. (4 Wall.) 634, 640-642 (1866).  As with *qui tam* provisions, the premise of these prize statutes was that important public purposes could be furthered by enlisting the efforts of private persons through the offer of a bounty collected through an action in federal court.

[5]  See Act of February 20, 1792, ch. 7, § 25, 1 Stat. 239 (2d Cong.; Post Office); Act of March 1, 1793, ch. 19, § 12, 1 Stat. 331 (2d Cong.; trading with Indians); Act of March 22, 1794, ch. 11, § 4, 1 Stat. 349 (3d Cong.; foreign slave trade) (applied in *Adams, qui tam* v. *Woods*, 6 U.S. (2 Cranch) 336 (1805); Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474 (4th Cong.; trading with Indians); Act of April 2, 1802, ch. 13, § 18, 2 Stat. 139, 145 (7th Cong.; trading with Indians); Act of April 29, 1802, ch. 36, §§ 3-4, 2 Stat. 171, 172 (7th Cong.; copyright); Act of May 3, 1802, ch. 48, § 4, 2 stat. 189, 191 (7th Cong.; mail carriers); Act of March 26, 1804, ch. 38, § 10, 2 Stat. 283, 286 (8th Cong.; Louisiana slave trade); Act of March 2, 1807, ch. 22, § 3, 2 stat. 426 (9th Cong.; slave trade).

Congress thus regarded the *qui tam* mechanism as a sufficiently well-established feature of federal statutory law to warrant a general provision governing costs in such suits.

*Qui tam* suits were thus a firmly entrenched aspect of American law by the time Section 292 was enacted in 1842, and the False Claims Act was enacted in 1863.  See Act of March 2, 1863 (12 Stat. 696).[6]  The *qui tam* provisions of this latter statute are still commonly used today.  See, *e.g.*, *United States ex rel. Sanders v. North American Bus Industries, Inc.*, 546 F.3d 288, (4th Cir. 2008); *United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 528 F.3d 292, (4th Cir. 2008) *petition for cert. filed* Sept. 5, 2008 (No. 08-304); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008).  In its original version, the False Claims Act authorized *qui tam* suits to be brought and carried on by any person for both himself and the United States; notably, the original False Claims Act made no provision for intervention or control by the Executive Branch over a relator's suit.  See Act of March 2, 1863, at ch. 67, § 6, 12 Stat. 698.

Section 292 (and its antecedents) has been used by *qui tam* relators in many reported decisions through its 166 years of existence.  The earliest reported *qui tam* case under the statute that we have been able to locate is *Nichols v. Newell*, 18 F. Cas. 199 (C.C.D. Mass. 1853), and other reported decisions demonstrate its continued use.  See, *e.g.*, *Winne v. Snow*, 19 F. 507 (D. N.Y. 1884); *London v. Everett H. Dunbar Corp.* 179 F. 506 (1st Cir. 1910); *Sippit Cups, Inc. v. Michael's*

---

[6]  To our knowledge, there are currently three other *qui tam* provisions in the United States Code in addition to the False Claims Act, 31 U.S.C. § 3730(b), and the patent false marking statute at issue here, 35 U.S.C. § 292.  See *Vermont Agency*, 529 U.S. 768 n.1 (discussing 25 U.S.C. § 201 (penalties for violation of laws protecting commercial interests of Native Americans); 18 U.S.C. § 962 (forfeitures of vessels privately armed against friendly nations); 46 U.S.C. § 723 (forfeiture of vessels taking undersea treasure from the Florida coast)).  *Vermont Agency* also identified 25 U.S.C. § 81 (providing cause of action and share of recovery for contracting with Native Americans in an unlawful manner) as being on the books at the time of the decision; however, the *qui tam* provisions of the statute were repealed when Section 81 was amended with the March 14, 2000, enactment of The Indian Tribal Economic Development and Contract Encouragement Act, Pub. L. 106-179.

*Creations, Inc.*, 180 F. Supp. 58 (E.D.N.Y. 1960); and *Brose v. Sears Roebuck & Co.*, 455 F.2d 763 (5th Cir. 1972).

Thus, *qui tam* provisions similar or identical to Section 292 were adopted and used on a regular basis by the legislatures and legal systems in England and the American colonies, and this practice was carried on extensively by the early United States Congresses immediately after the adoption of the Constitution.  This practice confirms that defendant's challenge to the validity of the *qui tam* mechanism in Section 292 must be rejected because the Supreme Court has used precisely this type of historical evidence in upholding statutes against constitutional attack.

## II.     A *QUI TAM* RELATOR UNDER SECTION 292(b) HAS ARTICLE III STANDING.

As already noted, in *Vermont Agency*, the Supreme Court found that a *qui tam* relator under the False Claims Act has Article III standing to sue because he receives "a partial assignment of the Government's damages claim."  529 U.S. at 771-78.  Although the defendant argues at some length that the relator lacks Article III standing, the decision of the Supreme Court in *Vermont Agency* is dispositive of the issue.  The Court first noted that it was "beyond doubt that the [relator's FCA] complaint asserts an injury to the United States — both the injury to its sovereignty arising from violation of its laws . . . and the proprietary injury resulting from the alleged fraud."  529 U.S. at 771. The Court then reasoned that the FCA effects a partial assignment of the Government's claim to the *qui tam* relator, and concluded "that the United States' injury in fact suffices to confer standing on [the relator]."  529 U.S. at 774.  Moreover, the Court was "confirmed in this conclusion by the long tradition of *qui tam* actions in England and the American Colonies," which it then examined in some detail.  529 U.S. at 774-778.  The Court found "this history well nigh conclusive with respect to the [standing] question," 529 U.S. at 777, and concluded that "[w]hen combined with the theoretical

justification for relator standing discussed earlier, it leaves no room for doubt that a *qui tam* relator under the FCA has Article III standing." 529 U.S. at 778. There is nothing in *Vermont Agency* that would indicate that its finding of Article III standing for "any person" who files suit under the *qui tam* provisions of the FCA would not also apply equally to "any person" bringing suit pursuant to subsection 292(b) of the false marking statute.

To the extent that the statutory assignment under Section 292 involves only a sovereign rather a proprietary injury to the Government, the history of *qui tam* statutes is replete with examples of private relators being empowered to bring suit where the Government has suffered no proprietary injury. Indeed, most of the *qui tam* statutes cited by the Supreme Court in its historical discussion of those statutes involved no proprietary injury to the United States. *See Vermont Agency*, 529 U.S. at 776-777, n. 5, 6, and 7 (citing more than 15 early *qui tam* statutes, many of which are noted in footnotes 3 and 5 above).

### III.   THE *QUI TAM* MECHANISM IN SECTION 292 DOES NOT FACIALLY VIOLATE CONSTITUTIONAL SEPARATION OF POWERS PRINCIPLES.

**A.**   The Court's analysis in *Vermont Agency* is also highly significant with regard to defendant's Article II challenge. Although the Court expressed no view as to whether *qui tam* suits violate Article II, 529 U.S. at 778 n.8,[7] the same historical acceptance of *qui tam* provisions that the Supreme Court found conclusive on the issue of Article III standing also establishes the facial constitutionality of *qui tam* provisions under Article II.

---

[7] Justices Stevens and Souter dissented from the Court's ruling that the False Claims Act does not authorize *qui tam* actions against states as a statutory matter; these Justices accordingly would have reached the other constitutional questions and would have found that the historical evidence gathered by the majority "together with the evidence that private prosecutions were commonplace in the 19th century, is * * * sufficient to resolve the Article II question * * *." *Id*. at 1878.

Indeed, the full Fifth Circuit in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749, 752 (5th Cir. 2001) (*en banc*), found that the historical analysis in *Vermont Agency* answered a challenge to *qui tam* provisions under the separation of powers doctrine: "[W]e are persuaded that it is logically inescapable that the same history that was conclusive on the Article III question in [*Vermont Agency v. United States ex rel.*] *Stevens* with respect to qui tam lawsuits initiated under the [False Claims Act] is similarly conclusive with respect to the Article II question concerning this statute."

The Supreme Court's substantial reliance in *Vermont Agency* on the pedigree of *qui tam* provisions was consistent with the Court's many decisions looking to precisely this type of evidence in resolving constitutional claims. As the Court has instructed, legislation "passed by the First Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, * * * is contemporaneous and weighty evidence of its true meaning." *Wisconsin* v. *Pelican Ins. Co.*, 127 U.S. 265, 297 (1888). The Supreme Court "has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs acquiesced in for a long term of years, fixes the construction to be given its provisions." *Myers v. United States,* 272 U.S. 52, 175 (1926) (giving great weight in constitutional interpretation to the practices of the early Congresses:); accord *Marsh v. Chambers,* 463 U.S. 783, 790 (1983); *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986).

There are obviously limits to the use of history alone in interpreting the Constitution. For example, the First Congress also passed the statute struck down by the Supreme Court in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803). But, in this instance, as demonstrated above, the historical evidence from long English practice, the American colonial experience, and the early sessions of Congress utilizing the *qui tam* mechanism is overwhelming.

11

Also critical for this case is the related principle that, as the Supreme Court has instructed, the ways constitutional provisions have actually been applied and used during our Nation's history give those provisions definition.  See *Mistretta v. United States,* 488 U.S. 361, 401 (1988) ("traditional ways of conducting government * * * give meaning to the constitution"); *The Pocket Veto Case,* 279 U.S. 655, 689 (1929) ("long settled and established practice is a consideration of great weight" in constitutional adjudication).

The many *qui tam* provisions passed by Congress and signed by the President, as well as their application by the Supreme Court in numerous cases, have created an "established practice" concerning their validity.  The Supreme Court has on numerous occasions enforced *qui tam* provisions over many decades without raising doubts about their constitutionality.  See, *e.g.*, *Marvin*, 199 U.S. at 225; *United States ex rel. Marcus*, 317 U.S. at 541; *United States v. Bornstein*, 423 U.S. 303, 309 (1976); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997).[8] And, the Court has stated that it views the utilization of *qui tam* mechanisms as a legislative option for Congress: "Whether prescribed conduct is to be visited by a criminal prosecution or by a *qui tam*

_____

[8] The Supreme Court's decision in *United States ex rel. Marcus* did not deal with any constitutional challenges to the *qui tam* mechanism, but it is quite revealing anyway for the purposes of the case at bar today.  The Supreme Court there noted the argument by the United States against recovery for a particular *qui tam* relator who had based his suit on the revelations in a criminal indictment.  The Court noted the Government's argument that "effective law enforcement requires that control of litigation be left to the Attorney General" (317 U.S. at 547).  The Court rejected that argument because it was "addressed to the wrong forum."  *Ibid.*  The Court explained that this type of policy argument could be adopted by Congress through amendment of the False Claims Act, but that Congress had not done so.  The underlying unstated premise of the Court's ruling is obviously that it was open to Congress to choose to attack fraud against the United States through *qui tam* provisions if it so desired as a policy matter, and it was also open to Congress to determine the terms under which *qui tam* suits could proceed.  And, the Court did not engage in any constitutional analysis because the Government did ***not*** argue that the Constitution limits to the Executive the right to initiate litigation on behalf of the United States.

action or by an injunction or by some or all of these remedies in combination, is a matter within the legislature's range of choice." *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441 (1957).

In short, as we have explained, the *qui tam* method for achieving public goals was well known to the Framers of the Constitution and the Members of the first sessions of Congress, and was obviously viewed by them as fully consistent with the new constitutional scheme they were creating. It would have been quite odd for the individuals who had just spent immense effort molding a new governmental structure to have enacted immediately thereafter not simply one, but a score of statutes violating that very structure.  There is no evidence that early Congresses and Presidents were troubled by the *qui tam* mechanism as a threat to the new system of government, and the Supreme Court has never given the slightest hint of a separation of powers problem.  These considerations should be highly influential for this Court today.

Further, as discussed above, the validity of the *qui tam* mechanism is not simply supported by the fact that the earliest Congresses and Presidents followed the lengthy practice in England and in the American colonial experience, and frequently used that device in legislation.  Rather, that validity is also established by the related, but separate fact that the employment of *qui tam* mechanisms by the earliest Congresses, as well as by Congress during the extreme crisis of the Civil War, and their enforcement by the Supreme Court in various cases over the decades itself provides meaning to the relevant constitutional principles.  This point cannot be emphasized too strongly given that, as the Supreme Court has observed, "because law is an instrument of governance rather than a hymn to intellectual beauty, some consideration must be given to practicalities." *Newman-Green Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 837 (1989).

**B.**  As we have demonstrated, the Supreme Court's decision in *Vermont Agency* is highly instructive here.  Nevertheless, wholly aside from the *Vermont Agency* opinion's reliance on the

pedigree of *qui tam* mechanisms, for the reasons explained below, the Court's analysis in that decision strongly supports the validity of Section 292 against a constitutional attack based on Article II. The Court's approach to the Article III standing issue makes clear that a relator does not sue as the United States, but instead sues as a private person, even though his suit helps accomplish public goals. Thus, as we now show, a relator in no way violates the constitutional separation of powers doctrine by usurping the authority of Executive Branch officers to litigate for the United States as part of the President's responsibility to "take Care that the Laws be faithfully executed" (Art. II, Sec. 3).

**1.** The Supreme Court has variously characterized the principles imposed by the separation of powers doctrine. See cases discussed in *Clinton v. Jones*, 520 U.S. 681, 699-703 (1997). The Court has pointed out that "the lines between the powers of the three branches are not always neatly defined." *Id.* at 701. However, the separation of powers doctrine does prohibit one branch from aggrandizing itself at the expense of another; and, even where, as here, such inter-branch aggrandizement is not present, the separation of powers principle might still be violated if a congressional enactment "disrupts the proper balance between the coordinate branches." *Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977). In making such a determination, "the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Ibid.*

**2.** In this instance, in passing Section 292, Congress plainly was not aggrandizing itself; this provision grants no power to the Legislative Branch. Hence, the inquiry here turns on whether, by permitting a relator to pursue an action, Section 292 impermissibly impairs the Executive from accomplishing any constitutionally assigned functions.

Defendant's attack on Section 292 proceeds from the assumption that the Constitution requires Congress to empower the Executive, and **only** the Executive, to file and litigate civil suits to collect penalties for violations of federal law. Defendant asserts that, because this function is constitutionally assigned exclusively to the Executive, Congress may not empower persons outside the Executive Branch to bring such suits. In addition, defendant appears to assume that, when a relator pursues a *qui tam* action, he is, like the independent prosecutor in *Morrison v. Olson*, 487 U.S. 654 (1988), acting in a governmental capacity, as a representative of the United States. Each of these premises is mistaken.[9]

Federal law frequently permits private parties to file civil actions alleging violations of federal law, even if governmental officials believe that no violation has occurred, and such common provisions obviously raise no separation of powers concerns. In many federal statutes, such as Title VII of the Civil Rights Act (42 U.S.C. § 1983) and the Sherman Antitrust Act (15 U.S.C. §§ 9, 15), Congress has provided a private right of action by which aggrieved parties may both vindicate their rights under federal law *and* help achieve public objectives such as adherence to antidiscrimination

---

[9] Several courts of appeal have rejected constitutional challenges to *qui tam* provisions in the context of the False Claims Act, although they have done so on varying theories. As noted, after the Supreme Court's decision in *Vermont Agency*, the Court of Appeals for the Fifth Circuit, sitting *en banc*, found that the history of *qui tam* provisions was "conclusive with respect to the Article II question [and] that history, although not the sole definitive argument supporting the view that the FCA's qui tam provisions do not violate Article II, is certainly a 'touchstone illuminating' their constitutionality." [Citations omitted.] See *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749, 752-53 (5th Cir. 2001) (*en banc*). The Court went on to examine the controls that the Government retains in FCA litigation, finding that the relator's "intrusion" in the Executive's Article II power was "comparatively modest." 252 F.3d at 757. Other courts of appeal have primarily relied on the controls provided by the False Claims Act in its current form over a relator's conduct of litigation. See *United States ex rel. Stone v. Rockwell Int'l Corp.,* 282 F.3d 787, 805-07 (10th Cir. 2002); *United States ex rel. Taxpayers Against Fraud v. General Electric Co.,* 41 F.3d 1032, 1041 (6th Cir. 1994); United States ex rel. Kelly v. Boeing Co., 9 F.3d 743 (9th Cir. 1993), *cert. denied,* 510 U.S. 1140 (1994); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148 (2d Cir.), *cert. denied,* 508 U.S. 973 (1993).

or antitrust laws.  The decision to afford a private right of action undoubtedly reflects Congress'

desire to ensure that individual victims are compensated for their own losses.  In addition, however,

these provisions vindicate a societal interest in deterring and punishing violations of federal law by

enlisting private individuals in the process by which Congress attempts to ensure that persons abide

by federal law.

Congress may, moreover, authorize remedies such as punitive damages to be awarded to

private parties, even though they serve no compensatory function, but are instead designed entirely

to advance the public interest in punishment and deterrence.  See, *e.g., Smith v. Wade,* 461 U.S. 30,

51 (1983) (punitive damages may be awarded in suit under 42 U.S.C. § 1983 for "reckless or callous

disregard for the plaintiff's rights, as well as intentional violations of federal law"); *Memphis*

*Community School District v. Stachura*, 477 U.S. 299, 306 n.9 (1986) ("[t]he purpose of punitive

damages is to punish the defendant for his willful or malicious conduct and to deter others from

similar behavior").[10]

Congress also has given the Executive Branch certain authority to enforce most or all of these

statutes, including through litigation that might in many respects parallel the suits brought by private

parties.  The fact that Congress has provided these alternative means of law enforcement does not

raise separation of powers problems, even though the private causes of action may, in many

applications, obstruct or conflict with the preferred strategy of the Executive (including the litigation

strategy).  As these statutes demonstrate, the fact that a private person can pursue litigation to

enforce federal statutes in no way violates the President's constitutionally assigned functions.  And

that is so because, even assuming the Constitution requires that Congress provide the Executive with

---

[10] For examples of federal statutes expressly authorizing the award of punitive damages, see, *e.g.*, 15 U.S.C. § 1691e(b); 25 U.S.C. § 305e(b); 45 U.S.C. § 711(j).

some means of enforcing laws against patent mismarking, the Constitution does not require Congress to establish litigation authority to be exercised by the Executive as the only means of carrying out the law.  See *Riley*, 252 F.3d at 753 ("Although the [Take Care] Clause states that the Executive must "take Care that the Laws be faithfully executed," it does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law").  Accordingly, Congress' decision to provide more than one mechanism of enforcement does not impinge on any function that the Constitution requires the Executive Branch exclusively to perform.

In other words, to say that a function must be performed by the Executive Branch if the Government is to perform it at all does not answer the question whether the Constitution ***requires*** that the function be performed exclusively by the Government.  ***If*** the Constitution vested the responsibility for bringing a particular suit (*e.g.,* to enforce Title VII or the antitrust laws) exclusively in an official of the United States Government (as, for example, the Constitution vests the pardon power exclusively in the President), then serious constitutional questions would be raised by any Congressional attempt to vest part or all of that authority in private persons outside the Executive Branch.  But the Constitution imposes no such requirement.

For example, in analogous contexts, the Supreme Court has on occasion rejected arguments that Congress cannot authorize private persons to exercise power that would, ***if*** assigned exclusively to the Government, be carried out by Executive Branch officers.  For example, in *Currin v. Wallace*, 306 U.S. 1 (1939), the Supreme Court upheld a regulatory scheme governing agricultural marketing pursuant to which Congress provided authority for the Secretary of Agriculture to impose a regulatory regime on agricultural producers in certain areas, but that the scheme would go into effect only if the requisite number of private growers voted for it to do so.  Accord *United States v. Rock Royal Co-operative, Inc.*, 307 U.S. 533, 577 (1939).

17

Earlier, the Supreme Court sustained against constitutional attacks legislative regimes through which Congress granted authority to private parties that would, if assigned to the United States, be performed by the Executive.  Thus, the Supreme Court approved a statute assigning to a private railroad industry group the power to impose safety codes that were binding on the industry and private individuals.  *St. Louis & Iron Mountain Rwy. v. Taylor*, 210 U.S. 281, 285-87 (1908). And the Court also found that Congress could validly provide authority to groups of private miners to set binding rules governing mining claims.  *Butte City Water Co. v. Baker*, 196 U.S. 119, 127 (1905).  Accord *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568 (1985) (upholding statutory requirement that registrants under federal regulatory scheme submit compensation disputes to binding arbitration by non-government personnel with limited judicial review).

It is certainly true that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion," *Heckler v. Chaney,* 470 U.S. 821, 831 (1985), and a *qui tam* relator's suit in a case such as this can affect such prosecutorial discretion insofar as it creates a suit in a case the Attorney General has not decided to litigate.  A prosecutorial discretion argument here, however, is misplaced.

The Judicial Branch cannot compel the Executive to pursue an enforcement action that it believes is unwarranted.  See *United States* v. *Cox*, 342 F.2d 167, 171 (5th Cir.) (*en banc*) ("[i]t follows, as an incident of the constitutional separation of powers, that the courts are not free to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions"), *cert. denied*, 381 U.S. 935 (1965); *Community for Creative Non-Violence* v. *Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("[t]he power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws"); *In re International Business Machines Corp.*, 687 F.2d 591, 602 (2d

Cir. 1982) ("[t]he district court's involvement in the executive branch's decision to abandon litigation might impinge upon the doctrine of separation of powers").  A *qui tam* relator, however, lacks any power to compel government officials themselves to use federal resources to bring and pursue a Section 292 suit; the decision whether or not to litigate such a case still rests with the Attorney General.

Significantly for this discussion, the Supreme Court in *Vermont Agency* declined to rely on a theory that a *qui tam* relator has standing simply because he is the "statutorily designated agent of the United States * * *."  529 U.S. at 772.  The Court instead explained that it must find standing for a relator to keep a portion of the recovery from a defendant in a *qui tam* action, and concluded that there is such standing because of "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor.  The [False Claims Act] can reasonably be regarded as effecting a partial assignment of the Government's damages claim."  *Id*. at 773 (footnote omitted).

This reasoning shows that a *qui tam* relator does **not** sue as the United States or as its statutorily designated agent.  Rather, a relator sues because a partial assignment has been made to him by Congress pursuant to the constitutional Property Clause, and he is thus not suing as the United States.  For this reason, his suit does not unconstitutionally interfere with the discretion of Executive Branch officers to decide whether to litigate as the United States.

In other words, for purposes of a proper separation of powers analysis, it is critical to recognize that, although a relator may sue for and in the name of the United States Government, he is not the Government itself, and is not a legal representative of the United States.  In particular, in litigation, a relator does not appear — and is not reasonably understood to appear — as the United States.  Although the judgment ultimately entered in a *qui tam* action may have preclusive effect in a subsequent suit brought by the United States, the relator's legal and factual representations (for

19

example, in pleadings and at oral argument) are not those of the United States, may be contradicted by representations made by attorneys for the United States, and are not binding on the United States. Thus, although Congress intended for *qui tam* suits to serve the Government's interests (both by bringing money into the Treasury and by deterring future unlawful conduct), the Supreme Court has recognized that the relator's primary purpose in filing the suit is to acquire money for himself.  See *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U.S. 939, 949 (1997) ("As a class of plaintiffs, *qui tam* relators are different in kind than the Government.  They are motivated primarily by prospects of monetary reward rather than the public good").

This distinction is important because, unlike an official or attorney for the United States, neither the relator nor his attorney is legally or ethically required, in the conduct of the *qui tam* litigation, to subordinate the relator's interests to those of the United States in the event the two conflict.  Nor does the relator have an agency relationship with the Government, or with the United States.  In the litigation, the relator — like other private parties — must deal with the Government as a third party, for example, in the context of discovery requests.  And, if choices in the litigation must be made relating to governmental privileges (*e.g.*, state secrets or executive privilege), those choices are for the Government of the United States alone, and not for a *qui tam* relator.

For this reason, this case is fundamentally different from *Morrison v. Olson*, 487 U.S. 654 (1988).  Because the prosecutor in that case was assigned the function of representing the United States itself in a criminal prosecution, Congress could not – at least not without raising the most serious separation of powers questions – have assigned that responsibility to a private party outside the Executive and not subject to Executive control.

As explained already, the relator in a *qui tam* case, by contrast, pursues civil litigation and is not a government official and does not represent the United States.  See *Riley*, 252 F.3d at 755.

Only the Executive, and not the relator, has the power to decide whether the United States will bring suit.  The fact that a relator sometimes files a *qui tam* action "in the name of the Government" (31 U.S.C. § 3730(b)(1)), is a procedural practice that in no way alters this analysis.  The use of the term "*ex rel.*"  in itself distinguishes *qui tam* suits from actions that are truly brought by the United States Government.  That caption alerts all concerned to the fact that the suit is actually being carried on by a party other than the Government itself.  Habeas corpus actions brought by state prisoners in federal court, for instance, have often been styled "*United States ex rel. [State Prisoner] v. [State Warden]*."  See, *e.g., United States ex rel. Jennings v. Ragen,* 358 U.S. 276 (1959); and cases cited in *Townsend v. Sain,* 372 U.S. 293, 310 & nn. 7 and 8 (1963).

We further note that another statute permits private parties whose only relationship to the Federal Government is contractual to bring legal actions in the name of the United States.  See, *e.g.*, the Miller Act, 40 U.S.C. § 270b(3)(A) (permitting suits by subcontractors against general contractors with the United States "in the name of the United States for the use of the person bringing the action."). Such legal actions, like the government contracts they enforce, serve the public interest even though the plaintiff is not actually litigating as a representative of the United States.

Hence, a *qui tam* relator is not interfering with the President's constitutionally assigned functions because the relator is not suing as the United States.  And, although his successful suit benefits himself as well as the United States Treasury, in that sense (and in other relevant respects) a relator is no different from other private plaintiffs who sue under federal statutes on their own behalf, but simultaneously vindicate public purposes.

For these reasons, *qui tam* provisions do not prevent the Executive Branch from accomplishing its constitutionally assigned functions.  And there is nothing in the Constitution that

categorically forbids the use of the *qui tam* mechanism or requires affirmative authorization from the Executive Branch before the suit can go forward.

Defendant here has nevertheless hypothesized that the *qui tam* provisions of Section 292(b) might nevertheless impermissibly intrude on the Executive's constitutional functions in a case — unlike this one — in which the Executive wishes to intervene and take the litigation in a different direction, such as by dismissing it.  As noted at the outset of this brief, that concern would raise serious constitutional issues.  That is a question, however, that this Court should not address, because this is not a case in which the Government has attempted to participate on behalf of the United States in any way other than to defend the constitutionality of Section 292.[11]

Because the Government has not attempted to take over this litigation, or otherwise prevent the relator from pursuing it, the Court should not address whether in such an event a *qui tam* action under Section 292 would be unconstitutional. This Court should not decide a constitutional question that is not before it; indeed, doing so is the precise opposite of the Supreme Court's admonition that the federal courts should rule on constitutional issues only when they absolutely must do so.  See *Public Citizen v. United States Department of Justice*, 491 U.S. 440, 465-66 (1989).  Here, the only

---

[11]  Although the United States has not attempted to participate in this civil action other than to defend the constitutionality of Section 292, the Government has the necessary tools to participate if it wishes by virtue of other applicable statutes and rules, which include: (1) the right to be notified of the filing of the *qui tam* complaint, 35 U.S.C. § 290; (2) the right to appear in the *qui tam* litigation, 28 U.S.C. §§ 517 and 518, and to intervene if the relator cannot adequately represent the interests of the United States, Fed. R. Civ. P. 24(a)(2); and (3) the right to veto a settlement by the *qui tam* plaintiff in cases in which the United States has intervened as a party by withholding its consent to a voluntary dismissal, *id.* 41(a)(1)(A)(ii). The Government also possesses additional rights that may be employed with court approval: (1) the right to intervene upon a showing that the government's claim "shares with the main action a common question of law or fact," *id.* 24(b); and (2) the right to a protective order staying the relator's discovery upon a showing that it would interfere with the Government's investigation or prosecution arising out of the same facts, *id.* 26(c). The applicability of those provisions to a *qui tam* action under Section 292 are not at issue in this case, however.

question presented is whether, consistent with the requirements of Article II, a private party may initiate a *qui tam* action without Executive Branch authorization or involvement. Because nothing in Article II categorically forecloses such a result, Section 292 is not unconstitutional on its face, nor is there any basis to conclude that it is unconstitutional as applied to the facts of this case. Accordingly, defendant's constitutional challenge under Article II should be rejected.

## CONCLUSION

For the foregoing reasons, defendant's challenge to the constitutionality of 35 U.S.C. § 292 should be rejected.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

DANA BONETE
Acting United States Attorney


_____/s/_____
STEVEN E. GORDON
Assistant United States Attorneys
Justin W. Williams United States Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: 703-299-3817
Steve.Gordon@usdoj.gov

_____/s/_____
JOYCE R. BRANDA
DOUGLAS N. LETTER
MICHAEL D. GRANSTON
GORDON A. JONES
Civil Division, U.S. Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-0473
gordon.jones@usdoj.gov
Attorneys for United States of America

DATED: December 11, 2008