IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED

MAR 27 2009

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

MATTHEW A. PEQUIGNOT,              )
                                  )
          Plaintiff,              )
                                  )
     v.                           )          1:07cv897 (LMB/TCB)
                                  )
SOLO CUP COMPANY,                 )
                                  )
          Defendant.              )

MEMORANDUM OPINION

Plaintiff Matthew A. Pequignot ("Pequignot") has filed this

action for false patent marking under 35 U.S.C. § 292.  In the

complaint, Pequignot alleges that defendant Solo Cup Company

("Solo") falsely marked several of its products with expired

patent numbers and improperly marked other products with

conditional patent markings.  Solo has filed a Motion to Dismiss

for Lack of Subject Matter Jurisdiction, arguing that Pequignot

lacks standing to bring suit under Article III of the United

States Constitution.[1]  Alternatively, Solo argues that if

Pequignot is found to have standing to sue under § 292(b) as a

qui tam relator, maintenance of this action would violate the

constitutional separation of powers doctrine, specifically the

---

[1] Solo previously filed a Motion to Dismiss for Failure to
State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6), arguing that
the alleged violations - marking articles with expired patent
numbers or statements that the articles "may be covered" by
patents - do not constitute false marking under the statute as a
matter of law.  In a memorandum opinion, the Court denied that
motion.  See Pequignot v. Solo Cup Co., 540 F. Supp. 2d 649 (E.D.
Va. 2008).

Take Care clause of Article II, § 3.  The United States has
intervened to defend the constitutionality of 35 U.S.C. § 292(b).
For the reasons stated in open court and in this memorandum
opinion, Solo's motion will be denied.

### I. Background

Solo, a Delaware corporation with its principal place of
business in Illinois, is a manufacturer of disposable cups, lids,
plates, bowls, and utensils.  Pequignot is a licensed patent
attorney.  In his Second Amended Complaint, Pequignot alleges
that Solo has committed numerous violations of 35 U.S.C. § 292,
which prohibits false patent marking.  Specifically, Pequignot
alleges that Solo has marked various products with two patents
that have expired, U.S. Patent No. RE28,797, entitled "Lid," and
U.S. Patent No. 4,589,569, entitled "Lid for Drinking Cup."
Pequignot also alleges that Solo has marked several products with
the phrase, "This product may be covered by one or more U.S. or
foreign pending or issued patents," when those products were
neither protected by any patent nor the subject matter of any
pending patent application.

The false marking statute provides that whoever falsely
marks a product with either a patent number, the words "patent"
or "patent pending," or any other words or numbers implying that
the product is protected by a current or pending patent when it
is not, and does so with the intent of deceiving the public,

-2-

"[s]hall be fined not more than $500 for every such offense."  35
U.S.C. § 292(a).  It further states, "Any person may sue for the
penalty, in which event one-half shall go to the person suing and
the other to the use of the United States."  35 U.S.C. § 292(b).
Although Pequignot does not, and cannot, allege any
particularized injury to himself, he asserts standing based on
the literal language of the statute, and seeks the maximum amount
of the statutory fine for each alleged violation.

    In its Motion to Dismiss, Solo asserts that Pequignot lacks
standing to pursue this action under Article III of the United
States Constitution, and alternatively, that allowing him to
bring suit would violate the constitutional separation of powers
doctrine under Article II.[2]  Given the United States' interest in
enforcing the false marking statute and its stake in half of the
plaintiff's recovery should Pequignot prevail, the Court invited
the United States to respond to Solo's Motion to Dismiss.  The
United States subsequently intervened and filed a pleading
defending the constitutionality of 35 U.S.C. § 292(b).  Both
parties have submitted responses to the United States' pleading,
and the United States has filed its reply.

---

[2]Solo also argues that if Pequignot is found to have
standing to pursue this action as an assignee of harm suffered by
the United States, he cannot maintain this action as a pro se
plaintiff.  As Pequignot has since retained counsel, this
argument is moot and will not be addressed.

## II. Standard of Review.

A party invoking federal jurisdiction bears the burden of establishing its existence.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  Where, as here, the defendant has not disputed any of the facts on which jurisdiction is based, but instead contends that the Complaint fails to allege facts upon which subject matter jurisdiction would be proper, all facts alleged in the Complaint are assumed to be true.  Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

## III. Discussion.

### A. Statutory Language.

The statutory provision at issue, 35 U.S.C. § 292(b), is terse.  The preceding subsection, 35 U.S.C. § 292(a), defines the substantive false marking violations and penalty:

> . . . Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented for the purpose of deceiving the public; or
>
> Whoever marks upon, or affixes to, or uses in advertising in connection with any article, the words "patent applied for," "patent pending," or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public --
>
> Shall be fined not more than $500 for every such offense.

-4-

35 U.S.C. § 292(a).[3]  Section 292(b) then sets forth the remedial
scheme at issue here:

> Any person may sue for the penalty, in which event one-
> half shall go to the person suing and the other to the
> use of the United States.

Two salient features of § 292(b) distinguish it from the
vast majority of statutes that establish private rights of action
for violations of federal law.  First, at least facially, by
allowing "any person" to sue for false marking, § 292(b) confers
standing on anyone to sue, regardless of whether he or she has
been personally affected by the false marking.  Second, any
recovery by a private party is split, with half going to the
person bringing suit, and half going to the United States.

## B. Whether Pequignot Has Standing to Sue.

Solo argues that notwithstanding the apparently broad
language of § 292(b), Pequignot lacks standing to pursue this
action.  Solo first argues that the Court should adopt a
statutory construction that limits suits under § 292(b) to
competitors.  It then argues that even if § 292(b) allows suits
by non-competitors, Pequignot lacks standing under Article III of
the Constitution, either as a traditional plaintiff or as a qui
tam relator.

---

[3]Section 292(a) also includes language prohibiting marking a
product as protected by a particular patent without the consent
of the patentee.  Because this action does not concern such a
violation, this language is omitted here.

### 1. Construction of 35 U.S.C. § 292(b).

Solo urges the Court to avoid the constitutional question by construing § 292(b) narrowly. Under this narrow construction, a suit by a plaintiff like Pequignot, who is not a competitor of the company alleged to have engaged in false patent marking, would be barred. Solo supports this argument by citing to several decisions that have restricted false advertising suits under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), to actions by competitors. Solo argues that the Court should adopt a similar limiting construction of § 292(b). See, e.g., Made in the USA Found. v. Phillips Foods, Inc., 365 F.3d 278, 281 (4th Cir. 2004) (holding that 15 U.S.C. § 1125(a) does not authorize suits by consumers).

It is a "cardinal principle" that a court should "first ascertain whether a construction of the statute is fairly possible by which the (constitutional) question(s) may be avoided." Johnson v. Robison, 415 U.S. 361, 367 (1974) (citing United States v. Thirty-Seven Photographs, 402 U.S. 363, 369 (1971)). However, a restrictive construction of § 292(b) is not "fairly possible," because the plain language of § 292(b) states that "any person may sue for the penalty," unlike the Lanham Act, which authorizes a suit for false advertising by "any person who believes that he or she is . . . damaged by such act." 15 U.S.C. § 1125(a) (emphasis added). By its very terms, the Lanham Act

-6-

limits the scope of those who may sue under § 1125(a).  No such
limitation is present in § 292(b).  Moreover, the Lanham Act
includes a clear statement that "[t]he intent of [the Act] is . .
. to protect persons engaged in . . . commerce against unfair
competition."  15 U.S.C. § 1127.  The appellate courts narrowly
construing the Lanham Act to limit suits to competitors have
specifically relied on such statutory limitations in finding that
Congress enacted § 43(a) of the Lanham Act "without any
consideration of consumer rights of action."  Made in the USA
Found., 365 F.3d at 280 (quoting Colligan v. Activities Club of
New York, 442 F.2d 686, 692 (2d Cir. 1971)).  Solo has cited no
corresponding language in § 292, or any other evidence, to
support its argument that when Congress enacted § 292(b), it
meant to do anything other than confer a right to sue upon "any
person."  To the contrary, the language of § 292(b) grants a
right of action to "whomsoever it may please to sue, though the
plaintiff have no special interest in the subject, and may not
have sustained any actual injury."  Pentlarge v. Kirby, 19 F.
501, 503 (S.D.N.Y. 1884).[4]  Because a narrowing construction that

---

[4]In its opposition to the United States' brief, Solo cites a
recent case, Mohawk Industries, Inc. v. Interface, Inc., No.
4:07-CV-0212-HLM, 2008 WL 5210537 (N.D. Ga. Nov. 6, 2008), for
the principle that "some courts have assumed that [§ 292(b)]
requires the plaintiff to have suffered a particularized injury-
in-fact."  Def.'s Opp. to U.S. Br. 11 (emphasis in original).
However, the court in Mohawk Industries did not make such an
assumption; rather, it found that the plaintiff had suffered an
injury in fact, and as a result, explicitly declined to reach the

would deviate from the plain language of the statute simply is not "fairly possible," the Court must examine whether Pequignot has standing under Article III.

### 2. Pequignot's Standing as a Traditional Plaintiff.

Under Article III, a traditional plaintiff must meet three requirements to establish standing to sue in federal court: "injury in fact - a harm that is both concrete and actual or imminent, not conjectural or hypothetical," "causation - a fairly . . . trace[able] connection between the alleged injury in fact and the alleged conduct of the defendant," and "redressability - a substantial likelihood that the requested relief will remedy the alleged injury in fact." <u>Vermont Agency of Natural Res. v. United States ex rel. Stevens</u>, 529 U.S. 765, 771 (2000) (internal quotation marks and citations omitted).

Although Pequignot has alleged that "every person in the United States is a <u>potential</u> entrepreneur . . . [and] a <u>potential</u> competitor of SOLO CUP," Compl. ¶ 61 (emphasis added, capitalization in original), any harm to Pequignot in this regard would be the epitome of harm that is "conjectural or hypothetical," rather than "concrete and actual." <u>Vermont Agency</u>, 529 U.S. at 771. Moreover, to the extent that Pequignot alleges that he has suffered an injury simply as a result of

---

question of whether a plaintiff without an injury in fact would have standing.  See <u>Mohawk Indus.</u>, 2008 WL 5210537, at *3 n.4.

Solo's failure to follow federal law, it is well-established that "harm to . . . every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits [the plaintiff] than it does the public at large does not state an Article III case or controversy." Lujan v. Defenders of Wildlife, 504 U.S. 555, 573-74 (1992). Finally, nowhere in his opposition to Solo's motion does Pequignot even attempt to argue that he has personally suffered an injury in fact; rather, his opposition focuses on § 292(b)'s qui tam features, which are discussed extensively infra.[5] Thus, without the special standing conferred by the qui tam aspects of § 292(b), Pequignot lacks standing to sue Solo because he fails to allege any actual or imminent injury to himself.

### 3. Pequignot's Standing as a Qui Tam Relator.

Although Pequignot lacks Article III standing as a traditional plaintiff, he and the United States argue that § 292(b) confers standing on him to sue on the United States' behalf as a qui tam relator.

#### i. Qui Tam Statutes and Their History.

A qui tam statute authorizes a private person, known

---

[5]Pequignot notes that "[a]lthough Plaintiff does not concede that he has not been injured, it is Plaintiff's position that any injury to Plaintiff is redundant to the injury to the United States in this qui tam cause of action." Pl.'s Opp. 4.

alternatively as a "relator" or "informer," to bring suit on
behalf of the government and to share in the financial recovery.
The phrase <u>qui tam</u> is short for the Latin phrase "<u>qui tam pro
domino rege quam pro se ipso in hac parte sequitur</u>," meaning "who
pursues this action on our Lord the King's behalf as well as his
own." <u>Vermont Agency</u>, 529 U.S. at 768 n.1 (citing William
Blackstone, 3 <u>Commentaries on the Laws of England</u> * 160).

<u>Qui tam</u> actions have a long tradition in early Anglo-
American legal history, although their use has waned
significantly in recent years.  <u>See generally</u> <u>id.</u> at 774-78.[6]
These actions originated in the 13th century as a common law
means for getting private claims into royal courts, which
ordinarily only entertained matters pertaining to the Crown.  <u>Id.</u>
at 774.  During the 14th century, as the royal courts began
addressing private wrongs, these common law <u>qui tam</u> actions
became less common.  <u>Id.</u> at 775.  However, explicit <u>qui tam</u>
statutes that "allowed informers to obtain a portion of the
penalty as a bounty for their information, even if they had not
suffered an injury themselves," became more prevalent.  <u>Id.</u>
Given the lack of comprehensive law enforcement systems at the
time, <u>qui tam</u> informers played roles that today are served by
police officers, prosecutors, and regulatory officials.  <u>See</u> J.

---

[6]The Supreme Court in <u>Vermont Agency</u> provides a detailed
history of <u>qui tam</u> laws in England and the United States.  This
opinion provides a brief summary.

-10-

Randy Beck, <u>The False Claims Act and the English Eradication of</u>
<u>Qui Tam Legislation</u>, 78 N.C. L. Rev. 539, 566 (2000).

Notwithstanding the historical role <u>qui tam</u> statutes played,
they became subject to abuse. Some citizens, lured by the
promise of a financial windfall, became "professional informers."
<u>Id.</u> at 575-78 (noting that such individuals were described by
contemporaries as "varlets," "lewde," "evil," and "viperous
vermin."). In part as a result of overzealous litigation, many
"informer statutes" were repealed, and other statutes were passed
to limit their use. <u>Vermont Agency</u>, 529 U.S. at 775-76.
However, the Colonies, and later the United States, enacted
several laws that the Supreme Court has described as <u>qui tam</u>
statutes. <u>Id.</u> at 776-77. These included statutes providing
private persons with a right to sue and share in the "bounty" for
offenses such as failure to file census returns, harboring
runaway seamen, trading with Indian tribes without a license,
violating alcoholic beverage laws, and receiving stolen goods.
<u>Id.</u> at 776 n. 6.[7]

In recent years, the use of <u>qui tam</u> statutes to enforce laws
has declined dramatically. England repealed its last <u>qui tam</u>
statutes in 1951. <u>Id.</u> at 776. The Supreme Court has identified
three <u>qui tam</u> statutes that remain in force in the United States:

_____

[7]Other statutes did not provide for a private right of
action, but allowed for an informer to share in the recovery of
suits brought by the government. <u>Id.</u> at 776 n.7.

35 U.S.C. § 292, the false patent marking statute at issue here;
25 U.S.C. § 201, which authorizes a cause of action and a share
in the recovery against a person violating Indian protection
laws; and the most well-known and widely-used qui tam statute, 31
U.S.C. § 3730(b), the False Claims Act ("FCA"), which provides a
private right of action and a share in the recovery for private
persons who pursue actions alleging that the government has been
subject to fraudulent claims. Id. at 768 n. 1.[8] Pequignot has
identified what appears to be an additional remaining qui tam
statute, 17 U.S.C. § 1326, which provides a cause of action and
share in the recovery in lawsuits involving the false marking and
advertising of vessel hull designs.

### ii. Standing to Sue in a Qui Tam Action.

Because a qui tam statute does not require that the relator
suffer an injury before he or she pursues an action, the qui tam

---

[8] Vermont Agency identified a fourth qui tam statute, 25
U.S.C. § 81, which provided a cause of action and a share of
recovery for contracting with Indians in an unlawful manner.
Vermont Agency, 529 U.S. at 768 n.1. This statute, however, has
since been repealed. See Indian Tribal Economic Development and
Contracts Encouragement Act of 2000, Pub. L. 106-179, 114 Stat.
46 (2000). Vermont Agency also identified two other laws, 18
U.S.C. § 962, which provides informers with forfeitures of shares
of vessels privately armed against friendly nations, and 46
U.S.C. § 80103 (listed in Vermont Agency at its former location,
46 U.S.C. § 723), which provides informers with forfeitures of
shares of vessels taking undersea treasure from the Florida
coast. However, because neither of these laws authorizes a suit
by the informer, the Vermont Agency Court did not characterize
those statutes as qui tam statues, a distinction that this Court
adopts.

framework presents a question as to whether a relator has standing to sue under the Constitution.  In <u>Vermont Agency</u>, the Supreme Court addressed whether a <u>qui tam</u> relator under the FCA has Article III standing, and decided the question in the affirmative.  The Court ruled that a relator has standing under the doctrine of assignment, holding that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim," <u>Vermont Agency</u>, 529 U.S. at 773, and that as a result of this assignment, "the United States' injury in fact suffices to confer standing on [the relator]," <u>id.</u> at 774.  The Court went on to state that "the long tradition of <u>qui tam</u> actions," <u>id.</u>, was "well nigh conclusive with respect to . . . whether <u>qui tam</u> actions were cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process," <u>id.</u> at 777 (internal quotation marks and citations omitted).  On the basis of this reasoning, the Court held that a relator under the FCA, as a partial assignee of the government's damages claim, had standing to sue.

### iii. Whether 35 U.S.C. § 292(b) is a <u>Qui Tam</u> Statute.

Solo argues that <u>Vermont Agency</u> is distinguishable from the case at bar because § 292(b) is not truly a <u>qui tam</u> statute and therefore does not effect a partial assignment of the United States' false marking claims to Pequignot.  The overwhelming

-13-

evidence, however, supports the conclusion that § 292(b) is a _qui_ _tam_ statute, and as such, that Pequignot has standing to maintain this action.

Although it engaged in a long discussion of various qui tam actions throughout history, the Supreme Court in Vermont Agency did not precisely articulate the criteria for a _qui tam_ statute. However, scholarly literature on the subject has identified six elements of a _qui tam_ statute:

> (1) The statute defines an offense against the sovereign or proscribes conduct contrary to the interests of the public;
> (2) A penalty or forfeiture is imposed for violation of the statute;
> (3) The statute permits a civil or criminal enforcement action pursued by a private party;
> (4) The private informer need not be aggrieved and may initiate the action in the absence of any distinct, personal injury arising from the challenged conduct;
> (5) A successful informer is entitled to a private benefit consisting of part or all of the penalty exacted from the defendant; and
> (6) The outcome of the private informer's enforcement action is binding on the government.

Beck, _supra_, at 552-53 (citing Blackstone, 3 Commentaries, at *161-62).

Based on these factors, § 292(b) is a _qui tam_ statute.    It defines a wrong to the government as the false patent marking in violation of § 292(a).    It imposes a statutory penalty of up to $500 per violation.    It provides that "any person may sue for the penalty," regardless of whether or not such a person is personally harmed.    Finally, it allows the suing person to

-14-

receive half of the recovery from the suit, with the remainder going to the government.[9]

In addition, the Supreme Court and those courts that have adjudicated cases under § 292 have <u>explicitly</u> termed § 292(b) a <u>qui tam</u> statute. <u>See Vermont Agency</u>, 529 U.S. at 768 n.1 (listing § 292(b) as one of the few remaining "<u>qui tam</u> statutes [that] remain on the books"); <u>Boyd v. Schildkraut Giftware Corp.</u>, 936 F.2d 76, 79 (2d. Cir. 1991) (noting that § 292 "is enforceable by a <u>qui tam</u> remedy"); <u>Brose v. Sears, Roebuck & Co.</u>, 455 F.2d 763, 765 (5th Cir. 1972) (describing an action under § 292(b) as one by a "<u>qui tam</u> informer"); <u>Winne v. Snow</u>, 19 F. 507, 508 (S.D.N.Y. 1884) (describing the suit before it as "a <u>qui tam</u> action to recover a penalty under [the false marking statute]"). In addition, the Senate Report issued with the statute's revision in 1952 described the portion of the statute that provides for a private suit as an "informer action," a term synonymous with a <u>qui tam</u> law. S.R. 82-1979 (1952), <u>reprinted in</u> 1952 U.S.C.C.A.N. 2394, 2403. Solo has cited to no authority holding that § 292(b) is not a <u>qui tam</u> statute, and this Court has found none.

Notwithstanding this highly persuasive authority, Solo

---

[9]It is unclear whether § 292(b) meets the sixth element outlined by Beck, the binding nature of the enforcement action on the government. The parties in this action dispute whether or not a <u>qui tam</u> relator's suit would have a <u>res judicata</u> effect on future actions. This issue need not be decided because the absence of this element alone is insufficient to defeat the <u>qui tam</u> nature of § 292(b).

advances a number of arguments that § 292(b) is not a qui tam statute.  First, Solo argues that § 292(b) does not sufficiently clearly assign the rights of the United States because it does not explicitly require a relator to sue "in the name of" the United States.  However, it is well-established that specific terms of art are not required for an assignment of rights.  U.S. ex rel. Kelly v. Boeing Co., 9 F.3d 743, 748 (9th Cir. 1993). Moreover, although the other two remaining qui tam statutes identified by the Supreme Court, the FCA and 25 U.S.C. § 201, both include language stating that a suit by a private citizen is "in the name of the United States," many of the earlier statutes identified by the courts and scholars as qui tam laws did not include such language, but instead included language similar to § 292(b).  See, e.g., Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (authorizing an informer suit for harboring runaway seamen, with the recovery split "one half to the use of the person prosecuting for the same, the other half to the use of the United States," without requiring that the suit be "in the name of the United States").  Similarly, 17 U.S.C. § 1326, which provides a qui tam remedy for the false marking of vessel hull designs, does not require the suit to be "in the name of the United States."

     Solo also argues that § 292(b) is not a qui tam statute because, unlike the FCA, the plaintiff is not paid out of the

-16-

United States' recovery; rather, half of any recovery goes directly to the relator and the other half goes to the United States. This formalistic distinction is not a basis for holding that § 292(b) is not a _qui tam_ statute, as other past and present statutes that the Supreme Court has identified as _qui tam_ have provisions similar to § 292(b). See, e.g., 25 U.S.C. § 201 (providing "one half to the use of the informer and the other half to the use of the United States"); 25 U.S.C. § 81 (repealed 2000) (requiring that "one-half thereof shall be paid to the person suing for the same, and the other half shall be paid into the Treasury"). There is no authority supporting the argument that to qualify as a _qui tam_ statute, the recovery available under that statute must first go to the United States, and only then to the relator. Rather, it is the _sharing_ of the bounty that is a defining feature of a _qui tam_ statute. See Blackstone, 3 _Commentaries_, at *161 ("Sometimes one part is given to the king, to the poor, or to some public use, and the other part to the informer or prosecutor; and then the suit is called a _qui tam_ action.")

Solo also argues that § 292(b) cannot be a _qui tam_ statute because "the U.S. is not the only party that is able to demonstrate a proprietary injury." Def.'s Opp. to U.S. Br. 8. This argument is also unavailing. Although the United States must suffer some injury for a _qui tam_ action to arise, no

-17-

authority holds that it must be the <u>only</u> party to suffer an injury.  Indeed, 25 U.S.C. § 201, one of the <u>qui tam</u> statutes identified in <u>Vermont Agency</u>, provides a right to sue for the protection of Indians; this statute clearly contemplates a proprietary injury to a party other than the government.  In addition, many of the historical <u>qui tam</u> statutes cited in <u>Vermont Agency</u> addressed conduct that affected non-governmental proprietary interests, such as horse-stealing, over-charging, and receipt of stolen goods.  <u>See</u> <u>Vermont Agency</u>, 529 U.S. at 775, 777 n.6.  Solo has provided no authority for the principle that a <u>qui tam</u> statute must involve an injury that only affects the government.

Additionally, Solo argues that the United States' lack of ability to control a relator's litigation under § 292(b) undermines the <u>qui tam</u> nature of the statute.  A number of federal appellate courts have held that the government's ability to exert control over the litigation is evidence of a <u>qui tam</u> statute, and have noted that the FCA provides the government with such control.  <u>See</u> <u>Stalley v. Methodist Healthcare</u>, 517 F.3d 911, 918 (6th Cir. 2008), <u>Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.</u> 524 F.3d 1229, 1234 (11th Cir. 2008); <u>United Seniors Ass'n, Inc. v. Philip Morris USA</u>, 500 F.3d 19, 25 n.8 (1st Cir. 2007), <u>Stalley v. Catholic Health Initiatives</u>, 509 F.3d 517, 522 (8th Cir. 2007).  Solo is correct that § 292(b)

-18-

lacks the FCA's "procedural safeguards," which include mandatory notice to the government of a qui tam lawsuit, an express provision allowing the government to intervene and take over the litigation if it wishes, and clearly defined settlement and dismissal rights for the government. See 31 U.S.C. § 3730. However, the Supreme Court in Vermont Agency did not suggest that a lack of government control precludes a law's status as a qui tam statute.[10] To the contrary, none of the other American qui tam statutes, past or present, have contained procedural safeguards akin to the FCA's. See, e.g., 25 U.S.C. § 201; 25 U.S.C. § 81 (repealed 2000).[11] Moreover, the FCA itself contained only minimal procedural safeguards when it was first enacted, with additional ones added over time. See Beck, supra, at 556-65.[12] In addition, even the appellate courts that have

_____

[10]Safeguards are more relevant to the analysis of whether a qui tam statute violates the Take Care Clause of Article II, as discussed infra.

[11]Although the First Circuit called procedural safeguards "typical of qui tam statutes," United Seniors, 500 F.3d at 25, it failed to identify any other qui tam statutes containing procedural safeguards.

[12]The original FCA, enacted in 1863, contained only one safeguard: once the suit was filed, it could "not be withdrawn or discontinued without the consent, in writing, of the judge of the court and district attorney, first filed in the case, setting forth their reasons for such consent." Act of Mar. 2, 1863, ch. 67, § 4, 12 Stat. 696, 698 (1863). After the act became subject to abuse by informers who prosecuted cases based on evidence the government already had, Congress amended the FCA to require an informer, upon filing the case, to provide notice to the government and disclose all of his evidence, and to allow the government sixty days to investigate and decide whether to

called procedural safeguards relevant to the qui tam analysis have not called this factor dispositive. See United Seniors, 500 F.3d at 25 (merely stating that the absence of procedural safeguards "suggest[s] that the private plaintiff is meant to be the real party in interest"). Even if the presence of procedural safeguards is relevant, their absence from § 292(b) is insufficient to outweigh the factors that support its status as a qui tam statute.

Solo's argument that § 292(b) is not a qui tam statute boils down to a theory that if a statute does not contain all of the features of the FCA, it cannot be a qui tam statute.[13]  This

---

intervene and take control of the suit. See Beck, supra, at 560; Act of Dec. 23, 1943, ch. 377, 57 Stat. 608 (1943). The 1943 revisions also allowed a court to dismiss a qui tam FCA suit if the suit was based on evidence that the government already possessed. See Beck, supra, at 560; 57 Stat. at 609. In 1986, following several scandals in government procurement, the FCA was amended to increase the financial incentives for qui tam relators to bring suits. See Beck, supra, at 561. The 1986 amendments also allowed the government to dismiss or settle the action notwithstanding the objections of the relator, but only after the relator received a hearing. See False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153 (1986). The 1986 amendments also added the requirement that the relator's complaint had to be served on the government under seal, and allowed the government to move for extensions of time in choosing whether or not to intervene. Id.

[13]Along these lines, Solo also argues that § 292(b) is more analogous to a provision of the Medicare Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b)(3)(A). The MSP statute empowers Medicare to seek reimbursement from primary insurers who are responsible for paying for certain health care costs, and establishes a private right of action for damages. Four circuit courts have held that the MSP statute is not a qui tam statute and that only plaintiffs who suffer an injury in fact may sue.

argument cannot be reconciled with the numerous statutes -
including § 292(b) itself - that the Supreme Court has labeled
qui tam despite lacking many of the FCA's features.[14]  Section
292(b) contains many, though not all, of the FCA's salient
features, including a wrong to the government, universal
standing, and a shared recovery.  Together with the overwhelming
authority explicitly describing § 292(b) as a qui tam statute,
these factors are more than sufficient to conclude that § 292(b)
is indeed a qui tam statute, and therefore, that Pequignot has
Article III standing, as a partial assignee of the government's
claims, to sue Solo for violations of § 292.[15]

---

See Stalley, 517 F.3d at 913, Stalley, 524 F.3d at 1231; United
Seniors, 500 F.3d at 26, Stalley, 509 F.3d at 519.  However, the
MSP statute is distinguishable from § 292(b).  First, the MSP
statute in no way indicates that it provides a universal right to
sue but merely "establish[es] . . . a private cause of action for
damages."  42 U.S.C. § 1395y(b)(3)(A).  The MSP statute also
provides no provision for a recovery shared by the relator and
the government.  Finally, unlike § 292(b), the MSP statute was
not described by the Supreme Court in Vermont Agency as a qui tam
statute.

[14]Indeed, the logical corollary to Solo's argument that §
292(b) is not a qui tam statute is that none of the purported qui
tam statutes the Court cited are truly qui tam laws.

[15]In a supplemental brief, Solo argues that the assignment
rationale under which qui tam standing was allowed in Vermont
Agency should not apply to § 292(b) because § 292(b) purports to
assign to relators a governmental interest that is only sovereign
in nature - an interest arising from a violation of law - rather
than proprietary, as in the case of the FCA, where the government
suffers a concrete financial injury.  Although some scholars have
argued that the government can assign only proprietary, and not
purely sovereign, interests, see Myriam E. Gilles,
Representational Standing: U.S. ex rel. Stevens and the Future of

-21-

**C. Whether § 292 Violates the Constitutional Separation of Powers.**

Solo next argues that allowing Pequignot to sue on behalf of the United States as a qui tam relator violates the constitutional separation of powers, specifically the "Take Care" Clause of Article II, which requires that the President "shall take Care that the Laws be faithfully executed." U.S. Const. Art. II § 3. This provision, which grants the Executive Branch the power to enforce federal law, is part of the scheme of separation of powers, in which Congress passes laws, the President enforces them, and the judiciary interprets them. See, e.g., Riley v. St. Luke's Episcopal Hospital, 252 F.3d 749, 760 (5th Cir. 2001) (calling the Take Care Clause "a crucial bulwark to the separation of powers").

The separation of powers can be violated in two basic ways. One involves the "aggrandizement of one branch at the expense of the other," Buckley v. Valeo, 424 U.S. 1, 122 (1976), such as when Congress impermissibly retains the power to control the removal of Executive Branch officials. See Myers v. United States, 272 U.S. 52 (1925). Another occurs when a law, despite no inter-branch aggrandizement, "disrupts the proper balance between the coordinate branches" by "prevent[ing] [one of the

---

Public Law Litigation, 89 Cal. L. Rev. 315, 342-44 (2001), the Supreme Court made no such distinction in its discussion of assignment in Vermont Agency, and this Court declines to adopt this distinction.

-22-

branches] from accomplishing its constitutionally assigned functions." Nixon v. Adm'r Gen. Servs., 433 U.S. 425, 443 (1977). This second category has also been described as "impermissibly undermin[ing]" the role of one of the branches. Commodity Futures Trading Comm'n v. Schor 478 U.S. 833, 856 (1986).

Solo argues that § 292(b) impermissibly undermines the Executive Branch because it assigns the ability to enforce the government's claims for false patent marking to qui tam relators without providing the Executive Branch with the ability to control a relator's litigation. Specifically, Solo argues that Article II is violated because the Executive Branch does not retain "sufficient control" over a § 292 qui tam suit. The source for the "sufficient control" standard is Morrison v. Olson, 487 U.S. 654 (1988), in which the Supreme Court, by a 7 to 1 majority, rejected an Article II challenge to a law establishing an independent counsel to investigate wrongdoing by certain Executive Branch officials. In upholding the statute's constitutionality, the majority held that the statute provided the Executive with "sufficient control . . . to ensure that the President is able to perform his constitutionally assigned duties." Morrison, 487 U.S. at 696. In particular, the Morrison Court found that the Executive Branch retained the power to appoint the independent counsel as well as to remove him or her

-23-

for good cause, to define the independent counsel's jurisdiction, and to set Justice Department policies by which the independent counsel had to abide. See id.

As in the standing analysis, case law discussing the False Claims Act is relevant to an evaluation of § 292(b). In Vermont Agency, the Court explicitly declined to decide the question of whether the qui tam provisions of the FCA violate Article II. See Vermont Agency, 529 U.S. at 778 n. 8 ("[W]e express no view on the question whether qui tam suits violate Article II, in particular the Appointments Clause of § 2 and the 'take Care' Clause of § 3."). Two justices, however, expressed their view that "[t]he historical evidence summarized by the Court . . . together with the evidence that private prosecutions were commonplace in the 19th century . . is also sufficient to resolve the Article II question." Id. at 801 (Stevens and Souter, JJ., dissenting).

A number of circuit courts, however, have squarely addressed Article II challenges to the FCA. All have affirmed the law's constitutionality, although based on differing rationales. The Fifth Circuit's holding was the most sweeping. Like Justices Stevens and Souter, the Fifth Circuit found it "logically inescapable that the same history that was conclusive on the Article III question in [Vermont Agency] with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with

-24-

respect to the Article II question concerning this statute."
Riley, 252 F.3d at 752.  The court also distinguished the
Morrison "sufficient control" test, holding that it was "simply
not dispositive" of a challenge to the FCA because the FCA
presented fewer Article II problems than the independent counsel
statute, given that (1) a qui tam plaintiff, unlike the
independent counsel, does not actually act as the United States
but only in its name, and (2) a qui tam suit is merely a civil
action, whereas the independent counsel in Morrison had the power
to initiate criminal prosecutions, a central executive function.
Id. at 755-56.  Additionally, the court noted that the Executive
Branch maintains control over FCA qui tam actions because of the
law's provisions that require that the United States receive
notice of the lawsuit; allow it to take over the case within 60
days of notification or intervene after the 60-day period upon a
showing of good cause; dismiss or settle a case over the
objections of the relator; and stay discovery if it learns that
the action could interfere with a government investigation or
prosecution.  Id. at 753-54.

The Second, Sixth, and Ninth Circuits have also found that
the FCA does not violate Article II.  However, they rested their
holdings more directly on the control mechanisms available to the

government, rather than on historical justifications.[16]  See <u>U.S.</u>
<u>ex. rel. Kelly</u>, 9. F.3d at 755 (finding that "the Executive
Branch exercises at least an equivalent amount of control over
<u>qui tam</u> relators as it does over independent counsels"); <u>U.S. ex.</u>
<u>rel. Taxpayers Against Fraud v. Gen. Elec. Co.</u>, 41 F.3d 1032,
1041 (6th Cir. 1994) (finding that "the <u>qui tam</u> provisions . . .
do not contradict the constitutional principle of separation of
powers [because] . . . [t]hey have been crafted with particular
care to maintain the primacy of the Executive Branch in
prosecuting false-claims actions"); <u>U.S. ex rel. Kreindler v.</u>
<u>United Techs.</u>, 985 F.2d 1148, 1155 (2d. Cir. 1993) (holding that
the <u>qui tam</u> provisions "do not usurp the executive litigating
function because the statute gives the executive branch
substantial control over the litigation").

    Finally, the Tenth Circuit took a fact-specific approach to
an Article II challenge to the FCA, and held that "at least where
the government intervenes, the <u>qui tam</u> provisions of the FCA do
not violate the separation of powers by transgression of the Take
Care Clause." <u>U.S. ex. rel. Stone v. Rockwell Int'l Corp.</u>, 282
F.3d 787, 806 (10th Cir. 2002).  In <u>Stone</u>, the government
initially declined to intervene in the <u>qui tam</u> action, but later

---

[16]These three decisions all predated <u>Vermont Agency</u>, in
which the Court announced that the long history of <u>qui tam</u> laws
was "well nigh conclusive" on the issue of Article III standing,
and in which two justices held that this history was similarly
conclusive on the Article II question.

-26-

did so.  Given that the government intervened and was "a full and active participant in the litigation as it jointly prosecuted the case," the court was "unconvinced . . . that the presence of a qui tam relator . . . so hindered the Government's prosecutorial discretion as to deprive the Government of its ability to perform its constitutionally assigned responsibilities."  Id. at 806.

Solo argues that § 292(b) cannot be constitutional because, unlike the FCA, § 292(b) fails to provide the Executive Branch with sufficient control over the litigation.  Unlike the FCA, § 292(b) does not require that the government receive notice of the litigation.  Moreover, § 292(b) does not provide the government with the ability to "take over" the litigation from the relator, or to settle or dismiss it over the relator's objection.  Nonetheless, this Court finds that as applied to the facts of this case, § 292(b) does not violate Article II.

First, like Justices Souter and Stevens and the Fifth Circuit, the Court finds the long history of qui tam statutes, including many passed by the First Congress soon after the signing of the Constitution, see, e.g., 1 Stat. 131, 133, highly persuasive as to their constitutionality.  Qui tam statutes were part of a long-accepted practice dating back centuries.  It is unlikely that the framers would have written a Constitution that outlawed this practice, and then immediately passed several qui tam laws that unconstitutionally encroached on Executive Branch

-27-

power before the ink on the Constitution was even dry.  Of
course, passage by the First Congress is not dispositive as to
the constitutionality of a law.  See Marbury v. Madison, 5. U.S.
(1 Cranch) 137 (1803) (striking down provisions of the Judiciary
Act of 1789, 1 Stat. 80).  However, legislation "passed by the
First Congress assembled under the Constitution, many of whose
members had taken part in framing that instrument . . . is
contemporaneous and weighty evidence of its true meaning."
Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 297 (1888),
overruled in part on other grounds by Milwaukee County v. M.E.
White Co., 296 U.S. 268 (1935).  The long history of qui tam
actions strongly supports a finding of their constitutionality.

Second, it is not necessary for § 292(b) to meet the
demanding standard applied by the Supreme Court in Morrison to
withstand an Article II challenge, given that the intrusion of §
292(b) into Executive Branch power is minor in comparison.  See
Riley, 252 F.3d at 755 (holding that "the Morrison control test .
. . is simply not dispositive of [a challenge to the FCA], as it
involves an entirely different lawsuit and requires entirely
different control mechanisms.").  A qui tam relator under §
292(b) pursues a civil action, not a criminal one.[17]  Because

---

[17]There is, concededly, some confusion as to whether § 292
is criminal or civil.  The Federal Circuit has described § 292 as
"suppl[ying] a civil fine," Clontech Labs., Inc. v. Invitrogen
Corp., 406 F.3d 1347, 1352 (Fed. Cir. 2005), and other courts
entertaining actions by private parties under § 292(b) have

civil actions do not "cut[] to the heart of the Executive's
constitutional duty to take care that the laws are faithfully
executed," the Executive Branch need not wield the same level of
control over civil litigation as over criminal prosecutions.  See
Riley, 252 F.3d at 755.  This principle is particularly
compelling in the area of patent law, where private parties
routinely litigate matters concerning the validity,
enforceability, and infringement of patents.  Quite simply,
enforcement of the substantive provisions of § 292 is not the
type of executive function whose delegation to an authority not
controlled by the Executive Branch would presumptively raise
serious Article II questions.  Moreover, the actual power wielded
by a relator under § 292(b) pales in comparison to that granted
to the independent prosecutor in Morrison.  The independent
counsel was given "full power and independent authority to
exercise all investigative and prosecutorial functions and powers
of the Department of Justice."  Morrison, 487 U.S. at 662.  In
stark contrast, a qui tam relator under § 292(b) can maintain

---

stated that it is not a criminal statute.  See Filmon Process
Corp. v. Spell-Right Corp., 404 F.2d 1351, 1355 (D.C. Cir. 1968);
Sippit Cups, Inc. v. Michael's Creations, Inc., 180 F. Supp. 58,
61 (E.D.N.Y. 1960).  In contrast, the Second Circuit has stated
that patent mismarking under § 292 is a "criminal offense."
Boyd, 936 F. 2d at 79.  This Court understands § 292(a) as
defining a criminal offense, with § 292(b), the qui tam portion
of the statute, providing a civil remedy.  This interpretation is
consistent with a 1952 Senate Report stating that the statute is
"an ordinary criminal action as well as an informer action."
S.R. 82-1979 (1952), reprinted in 1952 U.S.C.C.A.N. 2394, 2403.

only one type of suit - an action for false patent marking - and must do so at his own expense. Finally, § 292(b) does not bar the government from initiating its own action, criminal or civil, to enforce the substantive false marking provisions of § 292(a). By comparison, in <u>Morrison</u>, once a matter was referred to an independent counsel, the Attorney General and Justice Department were required to suspend all investigations and proceedings regarding that matter. <u>See id.</u> at 662-63. For all of the above reasons, the Court concludes, as applied to the enforcement of proper use of patent markings, that the constitutional mandate that the Executive Branch "take care that the laws be faithfully executed" can be satisfied with a significantly lesser degree of control than the Supreme Court required in <u>Morrison</u>.

In addition, despite the lack of control mechanisms in § 292(b) itself, the Executive Branch is not without the ability to assert its interests in a § 292(b) <u>qui tam</u> action. The clerks of federal courts are required to notify the Director of the United States Patent and Trademark Office of <u>any</u> patent suits within one month of their filing. <u>See</u> 35 U.S.C. § 290. The United States may intervene in a <u>qui tam</u> action, either as of right, <u>see</u> Fed. R. Civ. P. 24(a)(2), or with a court's permission, <u>see</u> Fed R. Civ. P. 24(b). If the United States intervenes and the <u>qui tam</u> relator attempts to voluntarily dismiss the case, it cannot do so without a court order if the United States does not consent. <u>See</u>

-30-

Fed. R. Civ. P. 41(a)(1)(A)(ii) (allowing dismissal without a
court order only if "all parties who have appeared" sign a
stipulation of dismissal). Finally, the United States may apply
for a protective order if the relator's action interferes with a
government investigation or prosecution. See Fed. R. Civ. P.
26(c). Although these mechanisms concededly do not rise to the
same level of government control provided by the FCA, the FCA's
strict safeguards are not required because, as discussed supra, §
292(b) represents a minimal intrusion onto Executive Branch
power.

Finally, it is preferable that constitutional challenges be
adjudicated as applied. See U.S. v. Raines, 362 U.S. 17, 22
(1960) (cautioning that "[t]he delicate power of pronouncing an
Act of Congress unconstitutional is not to be exercised with
reference to hypothetical cases"); see also Tennessee v. Lane,
541 U.S. 509, 531 (2004) (holding that because a statute was
constitutional as applied to the "class of cases" implicated by
the matter before it, the Court "need[ed to] go no further").
Although Solo has raised concerns regarding separation-of-powers
issues that might arise if the government desired to litigate a §
292(b) action in a different manner than the qui tam relator, the
Court need not decide whether such a fact pattern would pose
constitutional problems, because that is not the case here.
Although the United States has not intervened as "a full and

-31-

active participant in the litigation," <u>Stone</u>, 282 F.3d at 806, it
has intervened to defend the constitutionality of § 292(b) and
Pequignot's ability to sue Solo.  That the Executive Branch, the
very entity Solo alleges has been "impermissibly undermined," has
intervened and expressed no objection to the manner in which
Pequignot has prosecuted his suit - and has actually supported
Pequignot's action in all respects - is additional persuasive
evidence that separation-of-powers principles have not been
violated here.  It is unnecessary to decide whether, on different
facts, Article II might be violated.  On the record before the
Court, there is no constitutional violation.[18]

### IV. Conclusion.

It is likely an accident of history that § 292(b) survives
as one of only a few remaining <u>qui tam</u> statutes in American law,
given that the overwhelming majority of these statutes have been
repealed.  Unlike false claims against the government, misuse of
a patent marking does not involve a proprietary injury to the
United States that must be vindicated through the actions of
private prosecutors; rather, the injury to the United States is
only to its sovereignty.  To the extent that there is any real
injury caused by false marking, it is to competitors of the

---

[18]Likewise, it is unnecessary to decide whether
constitutional issues might arise if, as Solo hypothesizes,
multiple relators brought multiple § 292(b) actions for the same
underlying violations.

entity abusing patent markings.  Congress could easily provide such competitors with a private right of action without enacting a <u>qui tam</u> statute.[19]  The only practical impact of the <u>qui tam</u> provisions of § 292(b) appears to be its potential to benefit individuals, such as the plaintiff in the case at bar, who have chosen to research expired or invalid patent markings and to file lawsuits in the hope of financial gain.

To the extent that Solo, and other potential defendants in § 292(b) actions, believe that the law is unwise, they are not without recourse to seek its revision.  The history of the FCA, and <u>qui tam</u> actions in general, indicates that when these actions have been subject to abuse by profit-seekers with little public motivation, legislatures, both in the United States and England, have reacted.  Indeed, in the aftermath of a Supreme Court decision broadly interpreting the FCA, <u>U.S. ex rel. Marcus v. Hess</u>, 317 U.S. 537 (1943), Congress swiftly revised the FCA to limit <u>qui tam</u> actions substantially.  <u>See</u> Beck, <u>supra</u>, at 556-61.  However, any arguments against § 292(b) based on policy concerns are "addressed to the wrong forum."  <u>Id.</u> at 547.  As the Fourth Circuit stated regarding the FCA,

> [P]erhaps Congress should have taken note of the

---

[19]Indeed, the vast majority of actions brought under § 292 throughout its long history appear to have been brought by competitors or others who could allege an injury to themselves as a result of the false marking.  <u>See</u>, <u>e.g.</u>, <u>Mohawk Indus.</u>, 2008 WL 5210537, at *3.

-33-

possibility that [defendants] would be harassed by
vexatious <u>qui tam</u> suits in federal courts. Perhaps it
did, but decided that the benefits of the <u>qui tam</u>
scheme outweighed its defects. In any event, we have no
inclination or power to delve into the wisdom of the
balance Congress struck . . . Congress has let loose a
posse of ad hoc deputies . . . [Defendants] may prefer
the dignity of being chased only by the regular troops;
if so, they must seek relief from Congress.

<u>U.S. ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.</u>,

961 F.2d 46, 49 (4th Cir. 1992).

For the above reasons, the defendant's Motion to Dismiss
will be denied, by an Order to be issued with this opinion.

Entered this 27th day of March, 2009.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge

-34-