# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

MATTHEW A. PEQUIGNOT,     )
    )
      Plaintiff,     )
    )    Civil No. 1:07-CV-897-LMB-TCB
v.     )
    )    **FILED UNDER SEAL**
SOLO CUP COMPANY,     )    (PUBLIC VERSION)
    )
      Defendant.     )


## DEFENDANT SOLO CUP COMPANY'S MEMORANDUM
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Jason C. White (admitted *pro hac vice*)
Robert W. Unikel (admitted *pro hac vice*)
HOWREY LLP
321 North Clark Street
Suite 3400
Chicago, IL 60654
Telephone: 312-595-1239
Fax: 312-595-2250
whitej@howrey.com

Mary C. Zinsner (VSB No. 31397)
S. Mohsin Reza (VSB No. 75347)
TROUTMAN SANDERS LLP
1660 International Drive, Suite 600
McLean, Virginia 22102
Telephone: (703) 734-4334
Facsimile: (703) 734-4340
mary.zinsner@troutmansanders.com
mohsin.reza@troutmansanders.com

Attorneys for Solo Cup Company

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 1

II. BACKGROUND AND LISTING OF UNDISPUTED FACTS ............................................. 2

    A. U.S. Patent No. RE 28,797. ................................................................................ 4

    B. U.S. Patent No. 4,589,569............................................................................... 7

    C. 2006 Confirmation of the Wallenstein & Wagner Phase-Out Policy. ............................. 10

    D. "May be Covered" Language............................................................................... 11

III. PEQUIGNOT HAS NO EVIDENCE FROM WHICH A REASONABLE JURY COULD
    FIND THAT SOLO'S ACCUSED ACTIONS WERE "FOR THE PURPOSE OF
    DECEIVING THE PUBLIC" .................................................................................... 13

    A. The Strict "Intent to Deceive" Requirement of 35 U.S.C. § 292....................................... 13

    B. Pequignot Offers Nothing to Dispute the Evidence Showing That Solo's Actions With
       Regard to the '797 Patent Number Were Taken With a Good Faith Belief, Based on
       Advice of Counsel, That Those Actions Were Legal and Appropriate. ......................... 18

    C. Pequignot Offers Nothing to Dispute the Evidence Showing That Solo's Actions With
       Regard to the '569 Patent Number Were Taken With a Good Faith Belief, Based on
       Advice of Counsel, That Those Actions Were Legal and Appropriate. ......................... 20

    D. Pequignot Offers Nothing to Dispute the Evidence Showing That Solo's Actions With
       Regard to the Conditional "May be Covered" Language Were Taken With a Good Faith
       Belief, Based on Advice of Counsel, That Those Actions Were Legal and Appropriate.23

IV. AN "OFFENSE" UNDER 35 U.S.C. § 292 IS A DECISION TO MARK FOR THE
    PURPOSE OF DECEIVING THE PUBLIC, NOT EACH PRODUCT MANUFACTURED
    WITH A MARK .................................................................................................. 25

    A. Courts Define an Offense as the Decision to Include the Marking Found to Violate the
       Statute. ...................................................................................................... 25

    B. Public Policy Dictates that the Definition of an Offense Should Remain Focused on the
       Decision to Include the Marking Found to Violate the Statute. ...................................... 29

V. AT MAXIMUM, SOLO COULD BE LIABLE FOR THREE OFFENSES.......................... 30

VI. CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*A.G. Design & Assoc., LLC. v. Trainman Lantern Co. Inc.*,
  07-cv-5158, 2009 WL 168544 (W.D. Wash. Jan. 23, 2009) ...................................................... 25

*A.G. Design*,
  2009 WL 2962206 (January 23, 2009) ................................................................................. 28

*Arcadia Mach. & Tool, Inc. v. Sturm, Ruger & Co.*, Inc.,
  227 U.S.P.Q. 665 (C.D. Cal. 1985) ..................................................................................... 16

*Arcadia Machine & Tool, Inc. v. Sturm*,
  786 F.2d 1124 (Fed. Cir. 1986) .....................................................................................*passim*

*Bibow v. Am. Saw & Mfg. Co.*,
  490 F. Supp. 2d 128 (D. Mass. 2007) ................................................................... 17, 20, 24, 27

*Brose v. Sears, Roebuck & Co.*,
  455 F.2d 763 (5th Cir. 1972) .................................................................................. 13, 17, 18, 22

*Brule Research Associates Team v. AO Smith Corporation et al.*
  (E.D. Wis.) ........................................................................................................................ 14

*Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.*,
  2006 WL 4448613 (N.D. Ala. Jan. 13, 2006),
  *aff'd in part and rev'd in part*,
  482 F.3d 1347 (Fed. Cir. 2007) ....................................................................................*passim*

*Clontech Laboratories, Inc. v. Invitrogen Corp.*,
  406 F.3d 1347 (Fed. Cir. 2005) .................................................................................. 13, 14, 26

*Douglas v. Wal-Mart Stores, Inc.*,
  No. 05-152, 2005 WL 3234629 (E.D. Pa. Nov. 30, 2005) ....................................................... 20

*DP Wagner Mfg. Inc. v. Pro Patch Systems, Inc.*,
  434 F. Supp. 2d 445 (S.D. Tex. 2006) ............................................................................ 14, 15

*Ferrara v. Benton Dickinson Co.*,
  No. 81-2140, 1983 WL 688 (E.D. N.Y. Sept. 14, 1983). ........................................................ 14

*FMC Corp. v. Control Solutions, Inc.*,
  369 F. Supp. 2d 539 (E.D. Pa. 2005) ......................................................................... 14, 15, 20

*Forest Group v. Bon Tool Co.*,
  No. 05-4127, 2008 WL 2962206 (S.D. Tex. July 29, 2008) ................................. 16, 27, 28, 30

*Heathcote Holdings Corp., Inc. v. Church & Dwight Co., Inc.*
(E.D. Texas) ............................................................................................................ 14

*High Frequency Prods., Inc. v. Wynn's Climate Sys., Inc.,*
91 F.3d 167, 1996 WL 217840, (Fed. Cir. 1996) ............................................ 17, 20

*Hoyt v. Computing Scale Co.,*
96 F. 250 (S.D. Ohio 1899) ...................................................................................... 27

*Icon Health & Fitness, Inc. v. The Nautilus Group, Inc.,*
2006 WL 753002 (D. Utah Mar. 23, 2006) .............................................................. 28

*Joy Mfg. Co. v. CGM Valve & Gauge Co.,*
730 F. Supp. 1387 (S.D. Tex. 1989) ......................................................................... 27

*Juniper Networks v. Shipley,*
No. 2009 WL 1381873 (N.D. Cal. May 14, 2009) ............................................. 13, 20

*London v. Everett H. Dunbar Corp,*
179 F. 506 (D. Mass. 1910) .......................................................................... 26, 28, 29, 30

*Mayview Corp. v. Rodstein,*
620 F.2d 1347 (9th Cir. 1980) .................................................................................. 13

*Mohawk Indus., Inc. v. Interface, Inc.,*
No. 07-212, 2008 WL 5210418 (N.D. Ga. Nov. 6, 2008) ................................... 17, 20

*Pequignot v. Arrow Fastener Company, Inc.*
(E.D. Texas) ............................................................................................................ 14

*Pequignot v. The Gillette Company et al.*
(E.D. Texas) ............................................................................................................ 14

*Precision Dynamics Corp. v. Am. Hosp. Supply Corp.,*
241 F. Supp. 436 (S.D. Cal. 1965) ............................................................................ 27

*Sadler-Cisar Inc. v. Comm. Sales Network,*
786 F. Supp. 1287, 1296 (N.D. Ohio 1991) .............................................................. 27

*Stauffer v. Brooks Bros., Inc.,*
No. 08-10369, 2009 WL 1357954 (S.D.N.Y. May 14, 2009) ................................... 20

*Taft v. Stephens Lith. & Eng. Co.,*
38 F. 28 (E.D. Mo. 1889) .................................................................................... 28, 29

*Undersea Breathing Sys., Inc. v. Nitrox Tech., Inc.,*
985 F. Supp. 752, 781 (N.D. Ill. 1997) ..................................................................... 27

*United States v. Eagan,*
   30 Fed. Rep. 498 (E.D. Mo. 1887) ........................................................ 28

*Univ. of Fla., Research Found., Inc. v. Orthovit, Inc.,*
   No. 96-82, 1998 WL 34007129, (N.D. Fla. Apr. 20, 1998) ....................... 14

*Wilson v. Singer Mfg. Co.,* 12 F. 57 (C.C. N.D. Ill. 1882) ............................ 15

## Statutes

1952 U.S.C.C.A.N. 2394; 108 Stat. 4809 ................................................... 29

35 U.S.C. § 287 ................................................................................. 11, 23

35 U.S.C. § 292 ................................................................................. *passim*

Rev.St. § 4963 ........................................................................................ 28

U.S. Comp. St. 1901 ............................................................................... 26

## Treatises

CHISUM ON PATENTS § 20.03 .................................................................. 15

NIMMER ON COPYRIGHT § 13.09 ............................................................. 15

# I. INTRODUCTION

This Court has made clear that to succeed on his false marking claims, Pequignot must prove that Solo's accused false markings were done with a specific intent to deceive the public. (*See* 3/24/08 Mem. Op. at 12.) With discovery now complete, all the evidence shows that Solo did *not* act with an intent to deceive, but, rather, with a genuine desire to follow the legally correct and commercially reasonable path specifically recommended by Solo's outside patent attorneys. Because there is a complete lack of evidence that Solo acted with the requisite intent, Solo should be granted summary judgment on each of Pequignot's three false marking claims.

Pequignot's first two claims are based on allegations that Solo committed false marking by acting to phase-out its manufacturing molds engraved with two expired patent numbers – U.S. Patent No. RE 28,797 (the "'797 Patent") and U.S. Patent No. 4,589,569 (the "'569 Patent") – rather than to replace those molds all at once. The evidence shows that once Solo became aware of the '797 and '569 Patents' expirations, Solo did what any reasonable company would do – it asked its outside patent lawyers how to proceed and then followed the lawyers' directions to the letter. Pequignot's third claim is that Solo committed false marking by placing language on *all* of its packaging stating that products "may be covered by one or more U.S. or foreign pending or issued patents." The evidence shows that the "may be covered" language complained of by Pequignot was actually drafted by Solo's outside patent attorney and, at the attorney's direction, was placed on all of Solo's packaging so as to provide an accurate statement as to the possible applicability of Solo's numerous patents to various Solo products.

Because there are no facts (and Pequignot offers no evidence) supporting a claim that Solo acted "for the purpose of deceiving the public" under 35 U.S.C. § 292 (a) ("Section 292"), summary judgment is appropriate and should be granted in Solo's favor.

This case is also ripe for a determination that, even if the requisite intent could be shown (which it cannot), Solo could be found to have a committed a maximum of three "offenses" under Section 292 – one for the decision to phase-out the '797 Patent molds; one for the decision to phase-out the '569 Patent molds; and one for the decision to mark all of its packaging with the "may be covered" language. The language of Section 292, the applicable case law, and the legislative history are uniformly clear that an "offense" is a decision to mark for the purpose of deceiving the public, not each product manufactured with a patent statement. Because the "offense" issue is a matter of law for the Court to decide, and the factual record of Solo's actions and intentions is complete, this Court should resolve this issue on summary judgment.

## II. BACKGROUND AND LISTING OF UNDISPUTED FACTS

1. The two patents at issue relate to two different types of Solo products. The '797 Patent relates to clear, flat plastic cup lids that are commonly used for cold drinks, such as an iced coffee at Starbucks. (Ex. 5, 37:6-19; Ex.8.) The '569 Patent relates to plastic dome-type lids (typically called "Traveler" lids) that are commonly used on hot drinks, such as coffee at Starbucks. (Ex. 5, 38:18-24; Ex. 9.) Both types of lids are made by Solo using thermoforming stamping machines, each of which contains a mold base that holds within it a number of individual mold cavities. (Ex. 5, 12:10-14:7; Ex. 4, 24:10-25:9; Ex. 3, 28:19-30:3.)

2. The manufacturing process involves feeding a sheet of plastic into a stamping machine where it is simultaneously pressed (and/or pulled) into all of the individual cavities contained within the machine's mold base. (Ex. 5, 211:10-213:15.) Each individual mold cavity forms an individual lid, though multiple mold cavities (ranging from as few as 16 to as many as 128) will be used simultaneously in a single mold base, so that multiple lids will be created in a single stamping. (Ex. 5, 213:17-214:18; Ex. 10.) When a so-called "30-Up" stamping machine is used, 30 mold cavities are contained in the machine's mold base, and each time that machine cycles

(which typically occurs every four to six seconds), 30 individual lids are produced. (Ex. 5, 12:10-13:20.) Solo operates multiple stamping machines to produce the lids at issue and many of these machines are very old. (Ex. 3, 100:3-19; Ex. 5, 129:20-130:6; Ex. 10.) Solo had as many as ███ individual cavities that were (and/or are) used to produce the lids at issue. (Ex. 10.) The majority of these cavities presently do not contain engravings for the '797 or the '569 Patents, as Solo has diligently followed the course of action recommended by its outside counsel from 2000 through today for the removal of the patent numbers. (Ex. 10; Ex. 5, 190:13-191:14, 407:17-410:8.)

    3.  If all of the ███ mold cavities had been replaced at once, the cost to Solo would have been significant, particularly given Solo's recent financial performance. (Ex. 5, 164:18-168:7; Ex. 6,123:6-124:3; Ex. 2, 83:17-23; Ex. 25 at 14.) The material costs alone to replace the inner rings of each of the ███ mold cavities – which are used on dozens of separate stamping machines in different Solo plants – would have been more than $500,000; the material costs to replace the mold cavities in their entirety would have been more than $1,500,000. (Ex. 5,159:10-21; 164:18-165:5; 166:23-167:16; Ex. 10.)[1] These amounts do not include the additional costs that would have been incurred for business disruption, labor, production downtime, ramp-up to full production, contingency dollars, and potential vendor and engineer travel. (Ex. 3, 99:9-16.)

    4.  In addition, the above cost numbers do not account for the very real possibility of damage to the molds and/or machines (some of which are decades old), as well as unforeseen complexities during disassembly and reassembly for whole-scale mold replacement. (Ex. 3, 100:3-19; Ex. 5, 131:2-3.) The situation can be analogized to taking a bolt off an old car versus a

---

[1] Each individual mold cavity is composed of 3 pieces/parts, that must be fit together properly to create a workable cavity. The "inner ring" piece/part is the portion of the cavity that contains the '797 and/or the '569 Patent engravings. (Ex. 5, 157:19-159:9.)

new car—it could take five minutes to take a bolt off a new car, but it could take three days to take that same bolt off an old car due to corrosion or wear issues. (Ex. 3, 100:6-19.)

### A. U.S. Patent No. RE 28,797.

5. The '797 Patent issued on May 4, 1976. (Ex. 8.) Shortly thereafter, based on advice of counsel, Solo added that patent number to the cavities that are used to produce certain cold cup lids. (Ex. 6, 115:9-20.) It is undisputed that the cold cup lids fall within the scope of the '797 Patent claims. (2d Am. Compl.¶ 48; Ex. 7, 106:22-107:3.)

6. Solo used the mold cavities having the '797 Patent engraving without giving thought to the status of the '797 Patent until 2000. (Ex. 5, 5:7-11.) Stephen Smith, Solo's Director of Product Development, was hired by Solo in April 2000, and shortly thereafter noticed that some of Solo's cold cup lids included the statement "Pat. RE 28,797." (Ex. 5, 4:19-5:11; Ex. 11 at 2.) Not knowing what this statement meant, and after checking with other Solo employees, he contacted one of Solo's outside attorneys, Robert Diehl ("Diehl"), and asked what the number indicated. (Ex. 5, 45:16-46:3; 405:5-11; Ex. 11 at 2.) In response, Diehl informed Smith that the number was for a reissue patent that had expired. (Ex. 11 at 1.)

7. This preliminary exchange triggered a series of discussions between Solo and its outside counsel at IP boutique Wallenstein & Wagner – Diehl and Linda Kuczma ("Kuczma") – pursuant to which Solo sought and received legal advice on the proper course of action for addressing the existing cavities that included the patent number. (Ex. 5, 407:11-410:8; Ex. 11; Ex. 12.) In particular, continuing their dialog, Smith responded: "Robert, I can't remember if I responded to you or not, but I would like a copy of the patent for my reference. If we build new lid cavities, should we be including RE number?" (Ex. 11 at 1.) Diehl advised that because the patent had expired there was no need to mark new cavities. (Id.) Smith then inquired about what Solo should do going forward. (Id.) Diehl responded, "When a patent expires you don't have to

take the old number off. However, I'm going to do a little research to see if the situation is different when adding an already expired patent number to a product. My gut feel is that as long as the patent claims would have covered the product, there isn't a problem. I'll have a more definitive answer for you soon." (Id.)

8. The next day, Diehl emailed Smith that, "The false marking of a product with a patent number does create liability for the offender. However, it appears liability hinges on 'intent to deceive the public.' Best case scenario is to remove the number, if possible. If not, it is important that Solo not further any unintentional falsity in product literature or the like. If you want to discuss, please give me a call." (Ex. 12.)

9. During the same time as Smith's email exchange with Diehl, Solo personnel, including Smith, were having regular "IP Committee" meetings with Wallenstein & Wagner attorneys, including Kuczma. (Ex. 2, 63:16–64:9.) During these regular meetings (which continued through 2006), a host of IP-related issues were discussed, including issues relating to Solo's patents and patent marking practices. (Ex. 2, 63:16-67:15; Ex. 5, 26:1-28:13; Ex. 19.) Throughout 2000, and for many years thereafter, Smith had frequent telephone conversations with Kuczma, Diehl, and other Wallenstein & Wagner attorneys about IP-related issues. (Ex. 5, 411:10-18.) This is not surprising, given that prior to 2004, Solo had no in-house lawyers at all; and prior to 2006, Solo had no in-house IP lawyer. (Ex. 2, 67:16-68:7; Ex. 6, 77:6-80:6.) From 2000 (and through to the hiring of Doug Eveleigh as Solo's Chief IP Counsel in January 2006), Smith regularly conversed with, and heavily relied upon, Kuczma, Diehl, and the Wallenstein & Wagner lawyers about IP matters generally, and patent matters specifically. (Ex. 2, 55:20-68:8; Ex. 5, 411:10-18.)

10. In July 2000, when Smith first inquired about the "RE 28,797" number and was first advised that the patent had expired, Solo had at least ███ individual mold cavities having the '797 Patent number. (Ex. 10.) Smith and the Wallenstein & Wagner attorneys recognized that it was not commercially reasonable, given the anticipated high costs and the inevitable business disruption, to immediately replace all of the existing cavities if such immediate and whole-scale replacement was not legally necessary. (Ex. 5, 164:18-168:7; Ex. 2, 83:17-23; Ex. 1, 90:9-92:3, 158:10-161:15.) After conducting an analysis of the patent marking statutes and the sparse authority regarding Section 292, the Wallenstein & Wagner attorneys advised Solo in 2000 that all of the cold cup lid cavities did not need to be replaced immediately. (Ex. 1, 155:8-167:12; Ex. 2, 31:6-31:19, 75:7-85:9, 109:1-111:3, 114:8-124:23.) Instead, they recommended, and Solo implemented, a policy/plan whereby new cavities would be ordered without the '797 Patent number as the old cavities needed to be replaced (due to regular wear or damage), and Solo could continue to use the old cavities – those having the '797 Patent engravings – until they broke or became unusable. (Ex. 5, 14:8-15:6; 90:18-91:14; 139:12-18; 141:10-142:4; 185:20-186:5, 409:11-16; Ex. 2, 76:1-13, 202:14-22; Ex. 6, 89:21-90:23; Ex. 7, 214:18-216:15.) As Smith testified, despite the cost, if Wallenstein & Wagner had advised Solo that all the cavities needed to be replaced immediately, Solo/Smith would have followed that advice. (Ex. 5, 412:11-18.)

11. Solo diligently followed the directions of its counsel regarding the phase-out of the '797 Patent marking. Specifically, Smith ensured that Solo adhered to the policy/plan and directed the tooling group that any new cavities ordered not include the '797 Patent number. (Ex. 5, 14:8-24, 205:11-15; Ex. 4, 33:14-36:3; 37:10-38:8; Ex. 3, 53:22-56:15; see, e.g., lid drawing dated April 30, 2001, showing patent number scratched out, Ex. 13 at SC 001347; Ex. 7, 223:18-224:2.)

12. Smith continued to ensure that the policy/plan was followed over time. For instance, a June 24, 2003 email from Smith to Raj Chauhan and Tam Jones, Solo employees responsible for tooling, states: "Please confirm for me that tool drawings have been updated to reflect that the RE ['797] Patent engraving info will NOT be incorporated into any new cavities made . . . This was a carry over from some time ago, and I'm just trying to close up loose ends." (Ex. 14). As explained by Chauhan, the tool drawings for the cold cup lids were updated to remove the '797 Patent number, not all at once, but rather at the time that replacement cavities were actually ordered. (Ex. 4, 42:8-43:11; see also Ex. 3, 79:12-80:20; Ex. 14.) In keeping with the policy/plan, after June 2000, no new mold cavities were ordered or made with the '797 Patent number. (Ex. 5, 203:7-20; 419:4-7; Ex. 4, 37:10-38:8, 40:19-41:14; Ex. 13.) To this day, Solo continues to follow the phase-out plan set forth by Wallenstein & Wagner in the Fall of 2000, and Solo expects that all remaining molds with the '797 Patent engravings will be replaced in the next few years. (Ex. 5, 190:3-191:14, 427:7-428:3; Ex. 6, 98:5-17.)[2]

**B. U.S. Patent No. 4,589,569.**

13. The '569 Patent issued on May 20, 1986, and shortly thereafter, based on advice of counsel, Solo added that patent number to mold cavities that were created to produce Solo's Traveler lids. (Ex. 5, 406:1-7; Ex. 15; Ex. 6, 153:7-14.) It is undisputed that the Traveler lids

---

[2] Should the Court find that Wallenstein & Wagner's recommended phase-out policy/plan is not permitted under the false marking statute, and should the Court therefore order that Solo must incur the costs of immediately replacing all of the remaining cavities with the '797 Patent (and/or the '569 Patent), Solo will immediately take steps to make that replacement. However, given (a) that the Court's prior rulings in this matter have made clear that the ultimate question is whether Solo's actions, based on the advice of its outside patent attorneys, were taken with the "intent to deceive the public, which Solo strongly believes the evidence shows was (and is) not the case; and (b) that Pequignot has made repeatedly clear that he will pursue this action (and his money) regardless of what actions Solo might take at this time, Solo has not deviated from the phase-out policy/plan advised by Wallenstein & Wagner.

fall within the scope of the '569 Patent claims. (2d Am. Compl. ¶ 49; Ex. 2, 198:16-21; Ex. 5, 38:18-24.)

14. In part, as a result of Smith's discovery of the patent statement on the cold cup lids in June of 2000, Solo (through Smith) became diligent in monitoring the status of its patents. (Ex. 5, 93:9-94:5, 95:11-100:13, Ex. 18.) Consequently, Solo was aware of the October 24, 2003, expiration of the '569 Patent well before the expiration date. (Ex. 16; Ex. 5, 104:3-106:7.) As the expiration date approached, Smith once again consulted with Solo's outside attorneys at Wallenstein & Wagner to confirm how Solo should deal with the mold cavities having the '569 Patent number that were being used to produce the Traveler lids. (Ex. 2, 103:19-24; Ex. 16.)

15. In 2003, Solo had at least ■■ cavities that were used to make the Traveler lids. (Ex. 10.) As with the cold cup lids, replacing of all of these cavities at one time would have been an extremely expensive and disruptive effort. (Ex. 5, 164:18-168:7; Ex. 6,123:6-124:3; Ex. 2., 83:17-23; Ex. 3, 99:9-16.) Solo's outside attorney – after conducting an analysis of the patent marking statutes, the limited authority regarding Section 292 and the commercial realities faced by Solo – again recommended that Solo follow the same phase-out policy and practice that had been advised for the '797 Patent. (Ex. 2, 105:11-106: 4; 106:11-109:6, 116:5-117:13; 132:3-13, 202:14-22; Ex. 5, 108:3-10; Ex. 6, 89:21- 90:23.)

16. Solo once more followed the phase-out plan recommended by its counsel and took steps to implement that plan. (Ex. 5, 108:3-10, 172:18-177:23.) Solo actually began implementing the phase-out plan *well before* expiration of the '569 Patent. In January 2003, a full 10 months before the '569 Patent expired, Solo began ordering new cavities without the '569 Patent number because it was aware of the pending expiration of the patent: "We are getting ready to make a

new set of Traveler Lid cavities for STS, and with the 4,589,569 Traveler Lid patent expiring

5/20/2003 [sic], we will NOT add that number." (Ex. 16.)

17. The documentary record makes clear that from January 2003 through today, Solo has

consistently sought and followed the advice of its attorneys and has taken the steps necessary to

assure that the phase-out policy/plan has been implemented. For instance, a March 9, 2004 e-

mail concerning the Traveler lids from Smith to other Solo employees states:

> Per my discussion today, the Patent for Traveler Lid has expired effective
> 10/03. Patent 4,589,569 is no longer a valid Patent, and reference to it should be
> removed during any outer ring retooling.
>
> Kevin, I think we reviewed this before, but we need to ensure that the
> product drawings for ALL sizes of Traveler lids are updated to remove this
> reference. * * *
>
> TOOLING DOES NOT NEED TO BE CHANGED ALL AT ONCE. As
> tool cavities are worn, and when they are replaced, they should be replaced with
> updated tooling. We also have identified to Sales and Marketing that for those
> tools where partial tool cavities are replaced, we will have a mix of engravings.
> (Ex. 17 (emphasis in original).)

Kevin Smith, another Solo employee, responded to the email confirming that he had "whetted

[sic] out the product drawings and we will not include these when redrawing on cad." (*Id.*)

18. Further, in Smith's 2005 "Patent ID and Status Log," which he maintained to track the

status of Solo's intellectual property, including its patents, the entries for the '569 Patent (which

are indicated as covering the Traveler lid products) state, "Expired, Directed to Remove Pat #

from prints/tools." (Ex. 18.) The agenda for the November 29, 2004, IP Committee meeting

between Solo and the Wallenstein & Wagner attorneys shows the item: "Lid markings in view of

expired patents," next to which is Kuczma's handwritten note, "remove when re-tool." (Ex. 19.)

Kuczma testified unequivocally that this note, and the other emails and documents from that time

period, reflect her clear recollection that she specifically advised Smith and Solo that, upon

expiration of the '569 Patent, Solo could continue to use its old cavities – those having the '569

Patent engraving – until they broke or became unusable, at which time Solo should replace them with new ones not having the '569 Patent number. (Ex. 2, 105:11-106:4, 140:15-19, 186:23-188:1.) As Kuczma explained, she offered this advice knowing full-well that Solo would continue producing a large number of Traveler lids with the '569 Patent engraving (even after the '569 Patent expiration date) until the phase-out was complete. (Ex. 2, 186:23-187:22.)

19. In keeping with the policy/plan directed by Wallenstein & Wagner, after January 2003, no new mold cavities were ordered or made with the '569 Patent number engraved on them; and, as of today, more than 90% of the mold cavities used to manufacture Traveler lids do not have the '569 Patent engraving. (Ex. 5, 193:3-10; 419:8-11; Ex. 4, 40:19- 41:14, 42:8- 43:11; Ex. 3, 125:8-126:3, Ex. 13; Ex. 7, 223:18-224:2.) Solo continues to follow the phase-out plan, and Solo expects that all remaining molds with the '569 Patent engravings will be replaced in the next few years. (Ex. 5, 9:4-12, 14:8-18, 108:7-10, 147:1-16; Ex. 6, 169:2-180:16.)

### C. 2006 Confirmation of the Wallenstein & Wagner Phase-Out Policy.

20. In 2006, Douglas Eveleigh was hired as Solo's Chief IP Counsel. (Ex. 6, 77:3-78:4.) In Fall 2006, Eveleigh learned of the policy/plan for the phase-out of the '797 and '569 Patent numbers from Solo's mold cavities. (Ex. 6, 88:8-90:16; 136:14-137:5; 141:4-22.) Eveleigh performed his own legal analysis of that policy/plan; and after reviewing the relevant legal authorities, confirmed to his satisfaction that the phase-out plan was legally appropriate and was the most commercially reasonable course of action given the high cost of a whole-scale replacement of Solo's mold cavities. (Ex. 6, 20:2-22, 97:19-99:2; 99:18-100:10, 105:1-109:20, 117:4-17, 125:17-126:20; 147:16-148:16; 149:16-151:4.)

On October 26, 2006 Eveleigh emailed Matt Banach, Solo's manager of tooling:
To confirm our conversation, it is Solo's practice with respect to expired patent markings to remove such markings (including both the patent number and/or the word "Patented") as cavities are replaced (instead of all at once) in order to

conserve costs. In addition, if there is a need to expand capacity with new cavities, any such new cavities will not contain the expired patent markings. (Ex. 27 at 3.)

In response, Banach wrote, "Per our discussion, this is our policy. Do you have a list of expired patents by product base code? Additionally, a list with future patent expiration dates (by product base code) would be helpful." (*Id.*) Eveleigh replied that, "I don't have a definitive list at this time, but can get one together. For starters, see the list below, which represents those expired patent markings that I'm currently aware of: Traveler Lid: 'Pat. No. 4589569' Clear cold cup lids (626P, 9TLR, PL2, others??): 'Pat. No. RE 28797'". (Ex. 27 at 2; *see also* Ex. 6, 181:10-182:7; Ex. 5, 183:24-189:4.)

### D. "May be Covered" Language.

21. Solo's counsel had long urged it to place patent markings on all of its patented products as required for constructive notice by 35 U.S.C. § 287.[3] (Ex. 2, 34:9- 6:7; 36:2-37:7; 58:1-15; 65:21-66:20, 156:15-160:24.) This presented a problem for Solo because, given the large and ever changing number of Solo's issued and pending patents, it simply was not economically or logistically feasible for Solo to try to mark individual products and/or individual packages with individual patent numbers. (Ex. 5, 298:4-299:6; 336:5-22; 388:6-20; Ex. 2, 34:1-36:7; 162:8-163:15; Ex. 6, 210:19- 211:20, 212:11-213:8, 218:6-15.) Solo's outside counsel, believing it important for Solo to notify potential infringers of the possible existence of Solo patents for its products, recommended including the following on all if its packaging: "This product may be covered by one or more U.S. or foreign pending or issued patents. For details, contact www.solocup.com." (Ex. 2, 33:23-34:2, 176: 8-11; Ex. 5, 295:16-296:2; 311:5-24; Ex. 6, 210:19-211:20; Ex. 20.) Kuczma drafted this language herself and made sure to use the words

---

[3] 35 U.S.C. § 287 requires that a patentee mark their products with their patent numbers in order to obtain damages for any claim of patent infringement.

"may be covered," and not "is covered," because she wanted the language to be factually accurate and legally appropriate when applied to the packaging for all of Solo's products, including both products that were patented and products that were not patented. (Ex. 2, 33:23-34:2, 164:21-165: 23, 176:8-11; Ex. 20; Ex. 5, 29:9-14, 289:9-16; 312:24-313:2; Ex. 26 (examples of patents covering products contained in some of the packaging); Ex. 7, 206:19-207:12.) Tellingly, in an email dated September 14, 2004, from Smith to several other Solo employees, Smith made clear that the new "may be covered" language from Kuczma should be added to all future graphics – no product-specific decisions would be, or were, made regarding use of the new "may be covered" language. (Ex. 21; see also Ex. 5, 288:24-289:4; 289:17-21; 294:7-19; 301:7-302:17, 316:3- 317:3.)[4]

22. At all times following the placement of the "may be covered" language on all of Solo's packaging, Solo had procedures in place to assure that any calls or website inquiries regarding patent matters would be forwarded to an appropriate individual (either Smith, Kuczma or Eveleigh) for handling. (Ex. 5, 307:2-310:13; Ex. 2, 168:13-174:6; Ex. 6, 196:2-202:22.) Still today, Solo's website, www.solocup.com, permits users to email inquiries regarding patent issues to Solo; the "Contact Solo Cup" page includes a drop down menu for "Select Type of Request" that includes the choice of "Patent Information." (Ex. 22; Ex. 5, 309:13-17.)[5]

---

[4] It is undisputed that this language appears on the packaging for several products that are, in fact, "covered by one or more" U.S. patents. (Ex. 26; Ex. 7, 176:5-177:7, 201:5-15.)

[5] It is undisputed that no one has ever contacted Solo to inquire about patent coverage – with one notable exception. (Ex. 5, 309:18-310:17.) At his deposition, Pequignot admitted that, sometime after he had filed this suit, he called Solo's main contact number and asked a vague question about patent protection for products; when the Solo representative offered to transfer Pequignot to an appropriate person to have his questions addressed, Pequignot hung up (by his own admission, so that his name would not be recognized by whomever the call was being transferred to). (Ex. 7, 287:16-289:11.)

### III. PEQUIGNOT HAS NO EVIDENCE FROM WHICH A REASONABLE JURY COULD FIND THAT SOLO'S ACCUSED ACTIONS WERE "FOR THE PURPOSE OF DECEIVING THE PUBLIC"

#### A. The Strict "Intent to Deceive" Requirement of 35 U.S.C. § 292.

Under 35 U.S.C. § 292 (a) ("Section 292"),

> [w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any work or number importing that the same is patented for the purpose of deceiving the public . . . [s]hall be fined not more than $500 for every such offense.

In the most recent false marking case to be considered (and expressly affirmed) by the Federal Circuit, *Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.*, 2006 WL 4448613 at *24 (N.D. Ala. Jan. 13, 2006), *aff'd* (as to false marking claims) and *reversed* (as to other claims), 482 F.3d 1347 (Fed. Cir. 2007), the court explained:

> The threshold for establishing a successful Section 292 claim is extremely high. *Brose v. Sears, Roebuck & Co.*, 455 F.2d 763, 768 (5th Cir. 1972). . Both the language of Section 292 and the binding authority in this Circuit place on the defendants the burden to plead and produce facts demonstrating that the plaintiffs, in marking the [product with the patent number] had the specific intent to deceive the public into believing something that the plaintiffs knew to be false. *Id.* See also *Clontech Laboratories, Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1355 9 Fed. Cir. 2005) (intent is a key element under a section 292 claim); *Arcadia Machine & Tool, Inc. v. Sturm*, 786 F.2d 1124, 1125 (Fed. Cir. 1986) (mismarking must have been done for the purpose of deceiving the public); *Mayview Corp. v. Rodstein*, 620 F.2d 1347, 1359 (9th Cir. 1980) (same). In order to demonstrate an intent to deceive, the defendants must show by a preponderance of the evidence that the plaintiffs "did not have an honest good faith belief in marking its products." (*Clontech*, 406 F.3d 1347, 1355 (citing *Brose*, 455 F.2d at 768-769).)

The Federal Circuit has explained that Section 292 is not a strict liability statute; only mismarking done with a specific intent to deceive violates the provision. *Arcadia*, 786 F.2d at 1125; *Clontech*, 406 F.3d at 1352; *Central Admixture*, 2006 WL 4448613 at *24. Moreover, because the section is penal in nature, it must be strictly construed in favor of an alleged mismarker. *Juniper Networks v. Shipley*, No. 2009 WL 1381873, *3 (N.D. Cal. May 14, 2009).

This case involves rare false marking claims premised on an allegation that Solo failed to remove – with sufficient speed – its patent markings from a product manufacturing line after the

patent expired.[6] Perhaps not surprisingly, prior to the multiple false marking cases filed by Pequignot (and his lawyers) since late 2007,[7] Solo is not aware of any reported case with a claim based *solely* on this "expired patent"-type of false marking claim. Indeed, to Solo's (and even to Pequignot's) knowledge, only three modern, pre-Pequignot false marking cases ever have even mentioned expired patents - *Arcadia Machine & Tool, Inc. v. Sturm, Ruger & Co., Inc.*, 786 F.2d 1124 (Fed. Cir. 1986); *FMC Corp. v. Control Solutions, Inc.*, 369 F. Supp. 2d 539 (E.D. Pa. 2005) and *DP Wagner Mfg. Inc. v. Pro Patch Systems, Inc.*, 434 F. Supp. 2d 445 (S.D. Tex. 2006) ; and in each of these cases, the determination of whether there was false marking turned on whether or not the alleged mismarker had acted with a specific intent to deceive the public.[8]

In *Arcadia*, the Federal Circuit reviewed a Section 292 claim after "[t]he district court determined that there was no issue of fact that [defendant] had . . . included expired patents on the labels on boxes used to ship thousands of firearms to customers from 1973 to the present but nevertheless concluded as a matter of law that § 292 had not been violated." *Arcadia*, 786 F.2d at 1125. The Federal Circuit affirmed the grant of summary judgment, stating:

---

[6] The vast majority of false marking claims are premised upon an allegation that a party applied a patent marking with knowledge that the marked product was not, in fact, covered by the patent. *See, e.g., Clontech*, 406 F.3d at 1350 ("Below, the parties disputed whether [defendant's specific] products were falsely marked. In particular, the parties contested whether the patents at issue covered [defendant's] library products . . . "); *Univ. of Fla., Research Found., Inc. v. Orthovit, Inc.*, No. 96-82, 1998 WL 34007129, *32 (N.D. Fla. Apr. 20, 1998); *Ferrara v. Benton Dickinson Co.*, No. 81-2140, 1983 WL 688, *2 (E.D. N.Y. Sept. 14, 1983). Importantly, the Federal Circuit's decision regarding possible intent in *Clontech* dealt with a "not covered"-type of false marking case, not an "expired patent"-type case. *Clontech*, 406 F.3d at 1352, 1352-53.

[7] *Pequignot v. Arrow Fastener Company, Inc.* (E.D. Texas); *Pequignot v. The Gillette Company et al.* (E.D. Texas); *Brule Research Associates Team v. AO Smith Corporation et al.* (E.D. Wis.); *Heathcote Holdings Corp., Inc. v. Church & Dwight Co., Inc.* (E.D. Texas).

[8] As this Court noted regarding marking an article with an expired patent - "[i]n sum, the spare authority interpreting § 292 (a) provides little guidance on the issue now before the Court. The meaning of "unpatented article" [with respect to expired patents] is, in all respects, a question of first impression." 3/24/08 Memorandum Opinion at 5-6.

As a general proposition, there can be no violation of Section 292 absent an evidentiary showing that the false marking was "for the purpose of deceiving the public." * * *

With respect to the 1978 label, as well as the other two, it was found, on the basis of affidavit evidence from the father and son management of Ruger and others . . . that whatever errors appeared in the labels were inadvertent, the result of oversight, or caused by patent expirations. * * *

Paramount is the court's finding and conclusion that Arcadia had totally failed, after at least nine months of discovery, to produce any evidence of intent to deceive the public. [*Arcadia*, 786 F.2d at 1125.]

In *FMC Corp.*, the court similarly rejected a false marking claim based on FMC's placement of an expired patent number on its product label. The court explained:

Although CSI suggests that FMC's "motive" for erroneously including that [expired] reference is to give the false impression that defendant's product is protected by patent, CSI has failed to establish with evidence any improper motive by FMC for continuing to include the patent number for bifenthrin on the label for its Talstar products. * * *

[T]he burden of proof on intent of a Section 292 offense rests on the party making the charge. CHISUM ON PATENTS § 20.03[7][c][vii]. Scant authority exists as to "whether continued use of a patent number on an article after expiration of the patent constitutes culpable mismarking." *Id.* FMC's patent on bifenthrin expired in 1997. This Court finds no reason why FMC may not display its patent number to inform the public of where to acquire the informational and teaching *quid pro quo* that underlies the granting of patent protection. Moreover, in the absence of a scintilla of evidence that FMC acted with intent to deceive, one might conclude that CSI's conduct here-the deliberate copying of FMC's label-is "more unconscionable and unworthy than the plaintiff's." *See* NIMMER ON COPYRIGHT § 13.09[B]. [*FMC Corp.*, 369 F. Supp. 2d at 584.][9]

_____

[9] Unlike *Arcadia* and *FMC Corp.*, *DP Wagner* involved a combination of both "not covered"- and "expired patent"-type false marking claims. *DP Wagner*, 434 F. Supp. 2d at 451-53. The district court found that the defendant's decision to apply numerous patent numbers to products – to "differentiate [his] product from potential copiers"– knowing that some of those patents did not cover the marked products and that some of those patents were expired, was made "for the purpose of deceiving the public." *Id.* at 457. In a significantly older case, *Wilson v. Singer Mfg. Co.*, 12 F. 57 (C.C. N.D. Ill. 1882), the court also found no violation for defendant's marking of its articles with an expired patent number. According to the *Wilson* court, because "the expired status of the patents was readily apparent to anyone familiar with the legal term of a patent," there was no basis to find that the markings "were affixed in the manner stated for the purpose of deceiving the public." *Id.* at 58 (*quoted in* 3/24/08 Memorandum Opinion at 5 n.4).

Importantly, reliance on advice of counsel has been found to negate an inference of intent to deceive the public. In *Forest Group v. Bon Tool Co.*, No. 05-4127, 2008 WL 2962206, *5 (S.D. Tex. July 29, 2008) , for example, the court found that a Section 292 defendant lacked the requisite intent to deceive because it acted in good faith reliance on advice of counsel. In fact, the court found such reliance appropriate until two separate district courts construed the patent claims to make it clear that the patent did not cover the products it was marked on, and a separate opinion of counsel had been received by defendants stating that the products were not covered by the patent claims - only at that point did defendant's decision to continue to mark its product constitute intent to deceive under Section 292. *Id.*; *see also Arcadia Mach. & Tool, Inc. v. Sturm, Ruger & Co.*, Inc., 227 U.S.P.Q. 665, 656 (C.D. Cal. 1985) (no intent to deceive found on summary judgment based, in part, on the defendant's reliance on advise of counsel.)

In this case "of first impression" involving only an "expired patent"-type claim, this Court has recognized that Pequignot must do more than merely prove that Solo was aware that some products would continue to be produced with the expired '797 Patent and/or '569 Patent numbers during the period that Solo's molds with patent engravings were being replaced. Like the plaintiff in *Arcadia,* Pequignot must come forward with evidence (not merely allegation or innuendo) to show that Solo's decision to phase-out its molds (rather than replace them all at once, to spread out the cost), per the express advice of Solo's outside patent lawyers, was undertaken "for the purpose of deceiving the public." (3/24/08 Mem. Op. at 12.)[10]

---

[10] Though Pequignot recently suggested that his cause of action based on the "may be covered by" language is a "not covered"-type of false marking claim; in reality that cause of action does not neatly fall into any clear category of false marking claim. Indeed, in *Arcadia*, the only prior case known to Solo that involved a false marking claim based on similar conditional language, the Federal Circuit flatly stated that, "The 1984 label, which was changed to read 'may be manufactured under,' was properly found by the district court ***not to be deceptive in any way.***" *Arcadia*, 786 F.2d at 1125 (emphasis added). Regardless, as with the "expired patent"-type of

While intent is an issue of fact, summary judgment is not only appropriate, but necessary, where, as here, there is no evidence to support a finding that the defendant acted with an intent to deceive the public. *See Central Admixture*, 482 F.3d at 1359 (affirming grant of summary judgment on false marking claim where no evidence of actual intent to deceive); *Arcadia*, 786 F.2d at 1125 (affirming summary judgment for defendant where plaintiff had no proof on element of intent to deceive); *High Frequency Prods., Inc. v. Wynn's Climate Sys., Inc.*, 91 F.3d 167, 1996 WL 217840, *3 (Fed. Cir. 1996) (same); *Mohawk Indus., Inc. v. Interface, Inc.*, No. 07-212, 2008 WL 5210418, *6 (N.D. Ga. Nov. 6, 2008) (summary judgment is appropriate where plaintiff fails to produce evidence to rebut defendant's good faith explanation for false marking); *Bibow v. Am. Saw & Mfg. Co.*, 490 F. Supp. 2d 128, 128-29 (D. Mass. 2007) .

At this late stage, after months of extensive and expensive discovery, mere speculation and/or or self-serving attempts by Pequignot or his lawyers to spin a yarn of deception is simply insufficient to warrant a trial. As the *Bibow* court explained:

> Plaintiff's opposition to the Motion for Summary Judgment amounts to mere speculation that a jury might perhaps conclude that Defendants' employees are being disingenuous in stating that the error in the press release was inadvertent. This type of conjecture is insufficient to justify denial of a well-supported motion for summary judgment. A bald assertion of intent to deceive falls far short of sufficient evidence to survive summary judgment in a case brought under § 292. [*Bibow*, 490 F. Supp. 2d at 129.]

Indeed, the need for Pequignot to now come forward with real, positive evidence of Solo's supposed intent to deceive the public is particularly acute and important. As eloquently explained by the Fifth Circuit in *Brose,* when affirming the dismissal of a Section 292 claim: "It is at this point that the law – perhaps out of distaste for blood money suits – compels a positive showing [of intent to deceive]. For here not only are objective physical facts involved. Here are

---

claim, this Court has made clear that to succeed on his claim regarding the conditional language Pequignot needs to offer proof that Solo's decision to use the conditional language was "for the

questions of motive, purpose and attitudes." *Brose*, 455 F.2d at 768 (as quoted in *Central Admixture*, 2006 WL 4448613 at *24 n.26).

**B. Pequignot Offers Nothing to Dispute the Evidence Showing That Solo's Actions With Regard to the '797 Patent Number Were Taken With a Good Faith Belief, Based on Advice of Counsel, That Those Actions Were Legal and Appropriate.**

Pequignot alleges that Solo should be found liable for false marking of the '797 Patent solely because Solo did not replace all of its mold cavities having the '797 Patent engraving immediately after Smith learned of the patent's expiration in June 2000. However, Pequignot does not (and can not) dispute that upon being informed by Solo's outside attorneys that the '797 Patent had expired, Smith asked for, and received, explicit advice from those attorneys as to the actions that Solo should take to remove the '797 Patent number from its mold cavities. (Ex. 1, 155:8-167:12; Ex. 2, 31:6-31:19, 75:7-85:9, 109:1-111:3, 114:8-124:23.) The correspondence and sworn testimony are clear that Solo's lawyers, Kuczma and Diehl, specifically told Smith that, based on the law, and in view of the replacement costs and inevitable business disruption, Solo could continue to use its existing mold cavities (with the '797 Patent engraving) until they were damaged or worn, at which time Solo should replace them with cavities without the '797 Patent number. (Ex. 5, 14:8-15:6; 90:18-91:14; 139:12-18; 141:10-142:4; 185:20-186:5, 409:11-16; Ex. 2, 76:1-13, 202:14-22; Ex. 6, 89:21-90:23.) Kuczma and Diehl further informed Smith that if Solo ordered any new molds, Solo should make certain that they not include the '797 Patent number. (Ex. 2, 76:1-13, 202:14-22; Ex. 6, 89:21-90:23; Ex. 5, 14:8-15:6; 90:18-91:14; 139:12-18; 141:10-142:4; 185:20-186:5, 409:11-16.)

The evidence shows that Kuczma and Diehl formulated this advice in the Fall of 2000 based on their review of the language of Section 292, their analysis of the sparse legal authority

purpose of deceiving the public." (3/24/08 Mem. Op. at 15.)

concerning "expired patent"-type marking issues, their understanding of Solo's business, and their belief that the plan was commercially reasonable, wholly legal, and non-deceptive in every way. (Ex. 1, 155:8-167:12; Ex. 2, 31:6-31:19, 75:7-85:9, 109:1-111:3, 114:8-124:23.) Smith took his lawyers' advice and implemented the phase-out plan that they recommended. (Ex. 5, 14:8-24, 205:11-15; Ex. 4, 33:14-36:3; 37:10-38:8; Ex. 3, 53:22-56:15; see, e.g., cold cup lid drawing dated April 30, 2001, showing patent number scratched out, Ex. 13 at SC 001347; Ex. 7, 223:18-224:2.) The evidence, including testimony, emails, meeting notes, and product drawings all make clear that Smith executed the plan to the letter. (Ex. 14; Ex. 5, 203:7-20; 419:4-7; Ex. 4, 37:10-38:8, 40:19-41:14, 42:8-43:11; Ex. 3, 79:12-80:20; Ex. 13.) Pequignot cannot dispute that Solo has already replaced a large number of its cold cup lid cavities pursuant to this plan; and since Solo was advised by the lawyers on how to handle the replacements, not a single cavity has been created with the '797 Patent number on it. (Ex. 5, 203:7-20; 419:4-7; Ex. 4, 37:10-38:8, 40:19-41:14; Ex. 13.) Smith testified that, at all times, Solo attempted to do the right thing with regard to the '797 Patent by asking their attorneys for advice about the right way to proceed and then acting on the advice with a reasonable belief that their attorneys' action plan was sound. (Ex. 5, 409:2-410:8.) At no time did anyone at Solo have any specific desire to leave the '797 Patent number on Solo's cold cup lid products. (Ex. 5, 405:19-24.)

Pequignot has not offered any evidence suggesting (let alone showing) that Solo acted with an intent to deceive the public. It is beyond dispute that Solo acted on the explicit advice of its outside counsel that Solo could phase-out the '797 Patent number during regular replacement, rather than replacing all the cavities at once. Instead, Pequignot's discovery responses and deposition testimony make clear that he will suggest an "intent to deceive the public" merely by pointing to Solo's knowledge of the '797 Patent's expiration and speculating that there was

deceptive intent (and/or that there wasn't *really* any advice from outside counsel, or that Solo *really* wanted to scare away competitors, etc.). (Ex. 7, 234:14-20, 147:8-156:22, 278:1-8, Ex. 23 at 7-9; Ex. 24 at 2-3.) Mere speculation, however, is insufficient to demonstrate a genuine and actionable intent to deceive. *See Bibow*, 490 F. Supp. 2d at 129.

Unlike other *qui tam* plaintiffs who similarly had nothing but rank speculation and naked allegations of intent to deceive and had their cases tossed at the motion to dismiss stage, *see Stauffer v. Brooks Bros., Inc.*, No. 08-10369, 2009 WL 1357954, *5 (S.D.N.Y. May 14, 2009); *Juniper*, 2009 WL 1381873, *4; *Douglas v. Wal-Mart Stores, Inc.*, No. 05-152, 2005 WL 3234629, *7 (E.D. Pa. Nov. 30, 2005), Pequignot has been given the opportunity to conduct discovery in an effort to find any evidence that Solo acted for the purpose of deceiving the public. Yet, with discovery now complete, Pequignot has nothing more than innuendo and bald assertions about the alleged intent to deceive. This is not enough to avoid summary judgment. Like the courts in *Arcadia, Central Admixture, FMC Corp., High Frequency Prods., Mohawk* and *Bibow*, this Court should act as the gatekeeper and should stop Pequignot from seeking a payday based on "mere speculation that a jury might perhaps conclude that Defendants' employees are being disingenuous . . . ." *Bibow*, 490 F. Supp. 2d at 129.

### C. Pequignot Offers Nothing to Dispute the Evidence Showing That Solo's Actions With Regard to the '569 Patent Number Were Taken With a Good Faith Belief, Based on Advice of Counsel, That Those Actions Were Legal and Appropriate.

As with the '797 Patent, Pequignot alleges that Solo committed false marking of the '569 Patent solely because Solo did not replace all of its mold cavities having the '569 Patent engraving immediately upon the patent's expiration in October 2003. Once again, the correspondence and the sworn testimony show that Kuczma specifically told Smith that Solo could and should follow the same plan and procedure that had been established for the '797

Patent: Solo could continue to use its existing Traveler lid mold cavities (with the '569 Patent engraving) until they were damaged or worn, at which time Solo should replace them with mold cavities without the '569 Patent number. (Ex. 2, 105:11-106: 4; 106:11-109:6, 116:5-117:13; 132:3-13, 202:14-22; Ex. 5, 108:3-10; Ex. 6, 89:21- 90:23.) Kuczma testified that her advice about the '569 Patent engravings was based on Kuczma's review of the language of Section 292, her analysis of the sparse authority concerning "expired patent"-type marking issues, her understanding of Solo's business, and her belief that the plan was commercially reasonable, wholly legal, and non-deceptive in every way. (Ex. 2, 105:11-106:4, 140:15-19, 186:23-188:1.)

The evidence again shows that Smith continued to follow his lawyers' advice and elected to replace the cavities only when they became damaged or worn in the ordinary course of Solo's operations, to avoid the substantial monetary and business disruption costs of replacing all the Traveler lid mold cavities at once. (Ex. 5, 193:3-10; 419:8-11; Ex. 4, 40:19- 41:14, 42:8- 43:11; Ex. 3, 125:8-126:3, Ex. 13.) The evidence, including emails, meeting notes, product drawings, and purchase orders, makes it clear that Smith again executed the plan of action to the letter. (Ex. 13, Ex. 16, Ex. 17, Ex. 18, Ex. 19, Ex. 27.) In fact, documents show that several months *before* the '569 Patent expired, Solo ordered new Traveler lids *without* the '569 Patent number, even though Solo was legally entitled to include the patent number at that time. (Ex. 16.)

Pequignot cannot dispute that Solo has now replaced virtually all of its Traveler lid mold cavities pursuant to the phase-out plan; and Pequignot cannot dispute that since Smith was advised by the lawyers on how to handle the mold cavity replacement, not a single mold cavity has been created with the '569 Patent number on it. (Ex. 10, Ex. 13.) The evidence further shows that Wallenstein & Wagner's advice, and Solo's plan and practice to phase-out the mold

cavities having the '569 Patent engraving, was considered and approved as reasonable, legal, and appropriate by Eveleigh in 2006. (Ex. 6, 20:2-22, 97:19-99:2; 99:18-100:10.)

As Smith testified, at all times Solo attempted to do the right thing with regard to the '569 Patent by asking its attorneys for advice as to the right way to proceed and then by acting on the received advice with a reasonable and genuine belief that their attorneys' recommended plan was sound. (Ex. 5, 318:3-15; 409:2-410:8.) At no time did Smith (or anyone else at Solo) have any specific desire to leave the '569 Patent number on Solo's Traveler lid products – for the purpose of deceiving the public or otherwise. Leaving the '569 Patent number (and the '797 Patent number) on Solo's products after expiration is actually disadvantageous for Solo, as it gives competitors a roadmap for copying Solo's products. (Ex. 5, 406:15-407:8, Ex. 6, 147:16-148:6.)

Once more, Pequignot does not really dispute these facts. Instead, Pequignot's discovery responses and deposition testimony make clear that he will suggest an "intent to deceive the public" merely by pointing to Solo's knowledge of the '569 Patent's expiration and then speculating that there must have been deceptive intent. (Ex. 7, 234:14-20, 278:1-8; Ex. 23 at 7-9; Ex. 24 at 2-3.) Speculation and innuendo do not become evidence no matter how many times they are repeated and no matter how many theories they are wrapped around. Pequignot has had discovery and, with it, his opportunity to try to extract "blood money" from Solo. *Brose*, 455 F.2d at 768 (as quoted in *Central Admixture*, 2006 WL 4448613 at *24 n.26). Given that he cannot come forward with the required "positive evidence" of any improper "motive, purpose and attitude[]" of Solo, this case is ripe for summary judgment. *Id.*

**D. Pequignot Offers Nothing to Dispute the Evidence Showing That Solo's Actions With Regard to the Conditional "May be Covered" Language Were Taken With a Good Faith Belief, Based on Advice of Counsel, That Those Actions Were Legal and Appropriate.**

Pequignot does not (and can not) dispute that the "may be covered" language was drafted by Solo's outside lawyer, Kuczma. (Ex. 2, 33:23-34:2, 164:21-165: 23, 176:8-11; Ex. 20; Ex. 5, 29:9-14, 289:9-16; 312:24-313:2.) Pequignot cannot dispute that Kuczma advised Smith to place this language on the packaging for all of Solo's products in order to assure that *some* notice was being given of Solo's patent rights pursuant to 35 U.S.C. § 287, as many of Solo's products are covered by in-force patents at any given time. (Ex. 21; *see also* Ex. 5, 288:24-289:4; 289:17-21; 294:7-19; 301:7-302:17, 316:3- 317:3.) Kuczma testified that she drafted this language and asked Solo to place it on all packaging after it became apparent from her discussions with Smith (and others at Solo) that, given the large and ever changing number of Solo's issued and pending patents, it simply was not economically and/or logistically feasible for Solo to try to mark individual packages and/or products with individual patent numbers. (Ex. 2, 33:23-34:2, 164:21-165: 23, 176:8-11; Ex. 20; Ex. 5, 29:9-14, 289:9-16; 312:24-313:2.) Kuczma explained that she crafted the language – "This product may be covered by one or more U.S. or foreign pending or issued patents. For details, contact www.solocup.com." – to be accurate and non-deceptive. (*Id.*) She made sure to use the words "may be covered" and not "is covered" because she knew that the language would be applied to all products, including some that were patented at a particular time and some that were not. (Ex. 2, 33:23-38:23, 156:15-168:12.)

The evidence is clear, once more, that Smith took Kuczma's advice and ordered that the conditional language be placed on all Solo packaging. (Ex. 21; *see also* Ex. 5, 288:24-289:4; 289:17-21; 294:7-19; 301:7-302:17, 316:3- 317:3.) Smith and Kuczma both testified that when this language was added to Solo packaging, procedures were established to assure that any

inquiries about patent information would be sent to the correct person(s) for handling and response. (Ex. 5, 307:2-310:13; Ex. 2, 168:13-174:6; Ex. 6, 196:2-202:22.)

The evidence shows that Kuczma's conditional language, and Solo's practice of placing it on all of its packaging, was considered and approved as accurate, legal, and appropriate by Eveleigh in 2006. (Ex. 6, 190:19-197:1, 205:14-208:6.) As the deposition testimony confirms, at no time did Smith, Eveleigh, or anyone else at Solo have any belief that any member of the public (or any competitor) would be misled or deceived in any way by the conditional language and invitation to contact Solo for more details. (Ex. 5, 316:2-319:16; Ex. 6, 215:14-216:24.)

Pequignot admits that he has no evidence that the conditional language (or the '797 Patent and '569 Patent engravings) has deceived or misled anyone, has quelled competition in any way, has resulted in any increase in prices, or has had any negative impact upon anybody. (Ex. 7, 171:2-178:5, Ex. 23 at 10-11; Ex. 24 at 5.) Once more, Pequignot cannot offer any evidence to suggest (let alone prove) that Solo acted with an intent to deceive when it decided, based on the explicit advice of its counsel, combined with genuine concern for accuracy, to place the conditional language on all of its packaging. Instead, Pequignot's discovery responses and deposition testimony make clear that he will argue an "intent to deceive the public" merely by pointing to Solo's knowledge that some of its products were not patented and then speculating that there must have been deceptive intent embedded in the decision to put the conditional language on the packaging for all of its products, including the unpatented products. (Ex. 7, 234:6-20, Ex. 23 at 7-9; Ex. 24 at 2-3.) Again, a self-serving theory is not evidence, and Pequignot should not be permitted to put Solo through the expense and uncertainly of a trial based on "mere speculation that a jury might perhaps conclude that Defendants' employees are being disingenuous . . . ." *Bibow*, 490 F. Supp. 2d at 129.

## IV. AN "OFFENSE" UNDER 35 U.S.C. § 292 IS A DECISION TO MARK FOR THE PURPOSE OF DECEIVING THE PUBLIC, NOT EACH PRODUCT MANUFACTURED WITH A MARK

Regardless of whether the Court grants Solo summary judgment finding no "intent to deceive," this case is ripe for a determination that, at most, Solo could be found to have a committed three "offenses" under Section 292 – one for the decision to phase-out the '797 Patent molds; one for the decision to phase-out the '569 Patent molds; and one for the decision to mark all Solo packaging with the "may be covered" language. The language of Section 292, the legislative history, and the applicable case law are uniformly clear that an "offense" under the false marking statute is a decision to mark "for the purpose of deceiving the public," not each product manufactured with a patent statement. Because the "offense" issue is a matter of law for the Court to decide, and because the factual record of Solo's three accused decisions is complete, this issue should be resolved on summary judgment. *E.g., A.G. Design & Assoc., LLC. v. Trainman Lantern Co. Inc.*, 07-cv-5158, 2009 WL 168544, at *3 (W.D. Wash. Jan. 23, 2009).

### A. Courts Define an Offense as the Decision to Include the Marking Found to Violate the Statute.

Under the Section 292, an offense is committed only if two requirements are met: (1) an unpatented article is marked, and (2) the marker acts with intent to deceive the public. The statute expressly distinguishes between "articles" and "offenses," and it makes clear that it is the commission of an "offense" that results in the assessment of a fine, not the mere marking of individual articles.[11] Courts have consistently recognized this and have interpreted an offense to be a decision to mark, rather than each individual product marked.

---

[11] The current version of Section 292 reads, in pertinent part:
> (a) Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented *article*, the word "patent" or any word or number importing that the same is patented for the purpose of deceiving the public. . . Shall be fined not more than $500 for every such *offense*. (emphasis added)

In the most frequently cited case on this issue, *London v. Everett H. Dunbar Corp*, 179 F. 506, 508 (D. Mass. 1910) , the First Circuit articulated how to determine the amount of the penalty when the alleged false marking appears on numerous individual articles.[12] The court reasoned that the underlying purpose of "the statute must be read as making the fraudulent purpose or intent to deceive the public the gravamen of the offense, and the marking as the overt act whereby the intent is made manifest . . . [i]t can hardly have been the intent of Congress that penalties should accumulate as fast as a printing press or stamping machine might operate." *Id.*, 179 F. at 508.[13] In determining the number of "overt acts," *London* held that where the marking is part of a single, continuous act, there is "but one offense. . . and only a single penalty is recoverable, though more than one article may have been marked." *Id.* at 507.

To recover for more than a single offense, *London* held that there must be specific proof "show[ing] a number of distinct offenses, and to negative the possibility that the marking of the different articles was in the course of a single and continuous act." *Id.* Further, *London* held that the burden is on the party claiming false marking to prove that all actions are not part of the same continuous act because there is "no presumption that each act of marking was so separated from the others as to constitute a distinct offense." *Id.* at 508-09.

In decisions going back more than 100 years, courts have consistently adopted both the "offense" definition and the underlying rationale of *London*:

---

Had the statute intended to assess a fine for each article, it would have stated "Shall be fined for more than $500 for every such *article*."

[12] The Federal Circuit has followed the *London* decision. *See Clontech*, 406 F.3d at 1352.

[13] The statute at issue stated:

> Who, in any manner, marks upon or affixes to any unpatented article the word "patent," or any word importing that the same is patented, for the purpose of deceiving the public, shall be liable, for every such offense, to a penalty of not less than one hundred dollars, with costs. . . . [U.S. Comp. St. 1901, p. 3388.]

- *Hoyt v. Computing Scale Co.*, 96 F. 250 (S.D. Ohio 1899) ("while the plaintiff treats each marking as a separate cause of action, . . . it is a question whether the continuous markings of a day or given time would constitute more than a single cause of action - . . . I am inclined to the opinion that it would constitute but one cause of action");

- *Precision Dynamics Corp. v. Am. Hosp. Supply Corp.*, 241 F. Supp. 436 (S.D. Cal. 1965) (inclusion of false patent statement in two publications constituted two offenses; reproduction in a catalogue constituted a third offense);

- *Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F. Supp. 1387, 1399 (S.D. Tex. 1989) (the court found only one offense, where the marking was included in numerous advertisements);

- *Sadler-Cisar Inc. v. Comm. Sales Network*, 786 F. Supp. 1287, 1296 (N.D. Ohio 1991) (the decision to falsely mark one product line resulted in only one offense because each marking of the product was continuous);

- *Undersea Breathing Sys., Inc. v. Nitrox Tech., Inc.*, 985 F. Supp. 752, 781 (N.D. Ill. 1997) (penalizing defendant $500 for decision to mark flyers, not for each flyer printed);

- *Bibow v. Am. Saw & Mfg. Co.*, 490 F. Supp. 2d 128, 129 n.1 (D. Mass. 2007) (rejecting the notion that each individual marking constitutes and offense, the court held "[i]t is doubtful that the statute ever intended to create such a lucrative game of 'gotcha!'");

- *Forest Group, Inc. v. Bon Tool Co.*, 05-4127, 2008 WL 2962206, at \*5-6 (S.D. Tex. July 29, 2008) ("the evidence indicates that Forest made only one separate, distinct decision to mark its stilts after it knew the stilts did not meet all the claims of the '515 Patent" so there is only one false marking offense) (currently on appeal to the Fed. Cir.);

- *Forest Group, Inc. v. Bon Tool Co.*, 05-4127, 2008 WL 4376346, at \*3 (S.D. Tex. Sept. 22, 2008) (section 292 provides for a penalty, not a damages award, that was set by Congress, "and it is not the role of this Court to decide whether the amount is adequate");

- *A.G. Design*, 2009 WL 2962206, at *5-6 (Jan. 23, 2009) (the decision to include a patent number on 15,000 products made over several years constituted a single offense).[14]

Some of the above decisions were based not only on the language of the false marking statute, but also on an analysis of similar statutes. For example, several of the above decisions cite to *Taft*, where the court analyzed the false copyright marking statute.[15] *Taft v. Stephens Lith. & Eng. Co.*, 38 F. 28 (E.D. Mo. 1889). Specifically, the accused false marker printed over 10,000 copies with a copyright symbol. The court rejected the claim of 10,000 offenses and held that because there was only one decision to make the copies and the copying was performed in a continuous nature, there was only one offense. *Id.* Further, in *Eagan* the court found that the number of offenses under a false voter registration law was based on the decision to falsely list names, not on the number of names listed. *United States v. Eagan*, 30 Fed. Rep. 498 (E.D. Mo. 1887) (cited by *Taft*). Thus, even though the defendant falsely listed multiple names, there was only one offense because the false listing of names was done in a continuous nature. *Id.*

---

[14] This court noted that "[p]laintiff's interpretation logically makes sense when considering other violations in our legal system. For example, counterfeiting laws do not apply to every bill counterfeited; rather only to the act of illegally producing or tendering the counterfeit bills. Moreover, theft of one thousand dollar bills from a man's wallet would only constitute a single offense of theft." *Id.*

Solo has only found only one published decision that has deviated from common law precedent. In *Icon Health & Fitness, Inc. v. The Nautilus Group, Inc.*, 2006 WL 753002 (D. Utah Mar. 23, 2006), the court followed the *London* line of cases and held that an offense is based on the decision to mark, not based on each marked product. However, the court ignored the continuing offense doctrine and, instead, created a new time-based approach to counting offenses. There is no legal support for this theory in the statute or the case law, and Pequignot's own lawyers even agree that *Icon* is not sound law. *Brief for Hletko as Amicus Curiae Supporting Appellants, Forest Group, Inc. v. Bon Tool Co.*, 2009 WL 434203 (No. 09-1044).

[15] The statue at issue stated: "every person who shall insert or impress such notice, or words of the same purport, in or upon any book, map, chart, musical composition, print, cut, engraving, or photograph, or other article for which he has not obtained a copyright, shall be liable to a penalty of one hundred dollars, recoverable, one-half for the person who shall sue for such penalty, and one-half to the use of the United States." Rev.St. § 4963.

Significantly, Congress has never altered the language of the false marking statute to overrule the accepted, common law view of an "offense" as the decision to mark, rather than each product manufactured with a mark. In fact, despite the host of cases (described above) establishing that an "offense" under Section 292 is the marking *decision*, when Congress amended the statute in 1952 and again in 1994, it did not amend the language assessing a maximum fine of $500 per "offense," and Congress certainly did not include any language suggesting that the "offense" case law was wrong and/or establishing that the maximum fine could assessed be for each "article." (1952 U.S.C.C.A.N. 2394; 108 Stat. 4809.)

Thus, under *London* and its progeny, an "offense" is a decision to mark "for the purpose of deceiving the public," not each product manufactured with a patent statement.

## B. Public Policy Dictates that the Definition of an Offense Should Remain Focused on the Decision to Include the Marking Found to Violate the Statute.

Allowing a per-product penalty of up to $500 would turn Section 292 into a potential lottery ticket for enterprising patent attorneys, such as Pequignot, and other private litigants who have not been injured in any way. While this Court has determined that virtually any person has standing to sue for false marking, Congress has placed a limit on the amount that may be recovered by explicitly restricting any award to a maximum of $500 "for every such offense," rather than to a maximum $500 award for every such *article*. For over a century, courts have held true to this limit and have refused to interpret the statute in a way that creates a windfall for *qui tam* plaintiffs. *See* Section VI(A); *see also Taft*, 38 F. at 29 ("Plaintiff is not suing for the value of his services, or for injury to his property, but simply to make a profit to himself out of the wrongs of others, and when a man comes in as an informer, and that attitude alone asks to have a half million dollars put into his pocket, the courts will never strain a point to make his

labors light, or his recovery easy.") The balance struck by Congress should not be disturbed in this action.

## V. AT MAXIMUM, SOLO COULD BE LIABLE FOR THREE OFFENSES

It is undisputed that Solo made three, and only three, decisions concerning the patent markings now-complained of: one decision to follow the advice of Wallenstein & Wagner and phase-out the '797 Patent molds, rather than replacing those molds at one time; one decision to follow the advice of Wallenstein & Wagner and phase-out the '569 Patent molds, rather than replacing those molds at one time; and one decision to follow the advice of Wallenstein & Wagner and place the "may be covered" language drafted by Kuczma on all Solo packaging. Accordingly, under the plain language of Section 292 and the clear prescriptions of *London* and its progeny, at most, Solo can be found liable for three false marking "offenses." *E.g.*, *Forest Group*, 2008 WL 2962206 at \*6; *A.G. Design*, 2009 WL 168544 at \*3. Of course, liability ultimately depends upon a showing that each of these decisions was made "for the purpose of deceiving the public" – a showing that Pequignot cannot make on the evidentiary record.

## VI. CONCLUSION

For the reasons stated above, Solo requests that the Court grant summary judgment that Solo has not committed any acts of false marking under Section 292, and even if a violation of Section 292 could be proven, Solo could be found to have a committed a maximum of three "offenses" under Section 292.

Dated: June 12, 2009                    Respectfully submitted,

/s/ Mohsin Reza
Mary C. Zinsner (VSB No. 31397)
S. Mohsin Reza (VSB No. 75347)
TROUTMAN SANDERS LLP
1660 International Drive, Suite 600
McLean, Virginia 22102
Telephone: (703) 734-4334

Facsimile: (703) 734-4340
mary.zinsner@troutmansanders.com
mohsin.reza@troutmansanders.com

Attorneys for Solo Cup Company

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of June, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the counsel listed below. I further certify that I will send by electronic mail the unredacted version to the following:

> Ellen D. Marcus, Esquire
> Zuckerman Spaeder LLP
> 1800 M Street, N.W.
> Washington, D.C. 20036
> Telephone: (202) 778-1800
> Facsimile: (202) 822-8106
> Email: emarcus@zuckerman.com
>
> Mia K. Poston, Esquire
> Pequignot + Myers, LLC
> 1636 R Street, NW
> Third Floor
> Washington, D.C. 20009
> Telephone: (202) 328-1200
> Facsimile: (202) 328-2219
> Email: mposton@pmiplaw.com
>
> *Counsel for Plaintiff*
>
> Steven E. Gordon
> United States Attorney's Office
> 2100 Jamieson Ave.
> Alexandria, VA 22314
> Telephone: (703) 299-3700
> Email: steve.gordon@usdoj.gov
>
> *Counsel for United States of America*

> /s/ Mohsin Reza
> Mary C. Zinsner (VSB No. 31397)
> S. Mohsin Reza (VSB No. 75347)
> Attorneys for Solo Cup Company
> TROUTMAN SANDERS LLP
> 1660 International Drive, Suite 600
> McLean, Virginia 22102
> Telephone: (703) 734-4334
> Facsimile: (703) 734-4340
> mary.zinsner@troutmansanders.com
> mohsin.reza@troutmansanders.com