IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

F I L E D

AUG 2 5 2009

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

MATTHEW A. PEQUIGNOT,              )
                                   )
          Plaintiff,               )
                                   )
     v.                            )     1:07cv897  (LMB/TCB)
                                   )
SOLO CUP COMPANY,                  )
                                   )
          Defendant.               )

## MEMORANDUM OPINION

Before the Court are the parties' cross-motions for summary judgment.  For the reasons stated in open court, as supplemented by this Memorandum Opinion, defendant's motion has been granted, and plaintiff's motion has been denied.

### I. Background.

#### A. Introduction.

Plaintiff Matthew Pequignot ("Pequignot") has brought this qui tam action under 35 U.S.C. § 292 against defendant Solo Cup Company ("Solo"), a manufacturer of disposable cups, bowls, plates, and utensils.  Section 292 prohibits false patent marking done "for the purpose of deceiving the public," and imposes a maximum fine of $500 for each "offense," half of which goes to the plaintiff and half to the United States.  Pequignot claims that Solo has violated § 292 in three manners:

    1. Solo has marked billions of plastic cold drink cup lids with Reissue Patent No. 28,797 (the "'797 patent"), despite knowing that it expired on June 8, 1988.

2. Solo has marked billions of plastic "Traveler" lids for hot drink cups with Patent No. 4,589,569 (the "'569 patent") despite knowing that it expired on October 24, 2003.

3. Solo has marked packages for certain cups, bowls, and utensils with the phrase "This product may be covered by one or more U.S. or foreign pending or issued patents.  For details, contact www.solocup.com,"[1] despite knowing that the products were not covered by any pending or issued patents.

Solo concedes these facts as alleged, but contends that it is not liable under § 292 because it did not act "for the purpose of deceiving the public."  Both parties have moved for summary judgment on two issues: (1) whether Solo acted with intent to deceive, and (2) what constitutes an "offense" for the purpose of assessing the statutory fine.[2]

---

[1] This opinion will use the term "'may be covered' language" to refer to this phrase.

[2] The Court previously denied two motions to dismiss by Solo. First, in denying a motion to dismiss for failure to state a claim, the Court ruled that knowingly marking a product that is not protected by a current or pending patent with an expired patent number, or with the "may be covered" language, is a false marking and can violate § 292 if intent to deceive is proven. Pequignot v. Solo Cup Co., 540 F. Supp. 2d 649 (E.D. Va. 2008) ("Pequignot I").  Next, in denying a motion to dismiss for lack of subject matter jurisdiction, the Court held that despite not alleging any injury to himself, Pequignot has standing to pursue this suit on the United States' behalf as a qui tam relator, and allowing him to sue does not violate the Take Care Clause of the Constitution.  Pequignot v. Solo Cup Co., No. 1:08cv897, 2009 WL 874488, 91 U.S.P.Q. 2d 1493 (E.D. Va. Mar. 27, 2009) ("Pequignot II").

-2-

### B. Drink Cup Patents.

The cup lids at issue in the '797 and '569 patents are produced by thermoforming stamping machines.  Each machine has a "mold base" that contains between 16 and 128 "mold cavities."  A cavity contains three parts, one of which, the "inner ring," contains the patent engravings.  Every time the machine cycles — generally every four to six seconds — each mold cavity produces a lid.  The cavities can last 15 to 20 years, and sometimes longer.

### 1. The '797 Patent.

The '797 patent, which applies to certain lids for cold drink cups, issued on May 4, 1976.  Shortly afterwards, Solo added the patent number to the inner rings of the mold cavities that produce these items.

The patent expired on June 8, 1988.  There is no evidence that Solo was aware of the expiration until June 2000.[3]  At that time, Steven Smith, who had been hired in April 2000 as Solo's Director of Product Development, noticed the '797 patent number on some of Solo's lids.  Solo lacked in-house patent counsel; accordingly, Smith contacted Robert Diehl, an associate with Wallenstein & Wagner, Solo's outside intellectual property counsel, who informed him that the number reflected an expired

---

[3]Pequignot acknowledges that claims under § 292 are subject to a five-year statute of limitations, Arcadia Mach. & Tool Inc. v. Sturm, Ruger & Co., 786 F.2d 1124, 1125 (Fed. Cir. 1986), and that he cannot sue based on any markings that occurred before September 5, 2002.

patent.  A month later, Smith e-mailed Diehl, asking him whether
Solo should use the number if it built new mold cavities for the
lids.  Diehl responded that there was "[n]o need to mark the new
cavities because the patent has expired."  Smith asked, "'No need
to mark new cavities', but are we wrong in doing so?  I think we
just did."  Diehl answered, "When a patent expires you don't have
to take the old number off.  However, I'm going to do a little
research to see if the situation is different when adding an
already expired number to a product.  My gut feel [sic] is that
as long as the patent claims would have covered the product,
there isn't a problem.  I'll have a more definitive answer for
you soon."  Diehl e-mailed Smith the next day, telling him, "The
false marking of a product with a patent number does create
liability for the offender.  However, it appears liability hinges
on 'intent to deceive the public.'  Best case scenario is to
remove the number, if possible.  If not, it is important that
Solo not further any unintentional falsity in product literature
or the like.  If you want to discuss, please give me a call."

     These e-mails in 2000 are the only documentary evidence of
the legal advice Solo received on marking products with expired
patent numbers.  However, according to testimony by Smith and
Linda Kuczma, a Wallenstein & Wagner partner who also advised
Solo, Solo had regular meetings and phone calls with Wallenstein
& Wagner attorneys regarding intellectual property, and discussed

-4-

the expired patent issue further orally.  According to Smith and
Kuczma, shortly after the exchange between Smith and Diehl in
2000, Solo, based on Wallenstein & Wagner's advice, developed a
policy under which it would not immediately replace the mold
cavities containing the '797 patent.  Rather, under the policy,
when cavities needed to be replaced due to wear or damage, the
new cavities would not include the expired patent marking.
Because the cavities can last many years, Solo continues to use
cavities today that imprint the expired patent numbers.[4]

According to deposition testimony, this policy was grounded
in two primary factors.  First, Solo's attorneys believed that it
was permissible under § 292.  Second, it was commercially
difficult and costly to replace all of the cavities at once.
Solo estimates that it would have cost over $500,000 to replace
all of the inner rings — the parts containing the patent
engravings — and $1.5 million to replace the cavities in their
entirety.[5]  According to Solo, these figures represent only the
costs of the replacement parts and not the potential costs of

---

[4]The parties dispute whether or not the majority of the
cavities presently in use contain the expired engravings.  Solo
asserts that most of the molds no longer have the markings, but
Pequignot cites a chart indicating that 1,094 out of the 1,642
cavities currently in use still have expired patent numbers.
This dispute is not one of a material fact that would preclude
summary judgment.

[5]These estimates are based on the number of cavities
containing the expired patent numbers and deposition testimony
concerning the cost of each replacement cavity.

labor, production downtime, and other factors.  Solo admits that it never conducted a formal cost analysis before developing its policy.  Rather, Solo indicated to its attorneys that a wholesale replacement of the cavities would be costly and burdensome, and the attorneys concluded that such steps were not necessary under § 292 as long as Solo took reasonable steps to replace the cavities over time and did not otherwise manifest an intent to deceive the public.

The development of Solo's policy is detailed in the deposition testimony of Smith, Diehl, and Kuczma.  The record also contains considerable evidence of the policy's implementation, including: (1) a drawing of one of the '797 lids, dated April 30, 2001, with the patent number scratched out; (2) an e-mail dated June 24, 2003 from Smith to a tooling employee, Rajenda Chauhan, asking him to confirm that the "RE Patent" (i.e., the '797 patent) number would not be engraved on any new cavities; (3) testimony by two tooling employees, Chauhan and Matthew Banach, that Smith instructed them that new cavities could not contain the expired numbers;[6] (4) testimony that no new cavities were ordered or made with the '797 patent since June 2000; (5) undisputed evidence that many of Solo's current mold

---

[6]Chauhan testified specifically that Smith gave him these instructions shortly after Smith joined the company in 2000, Chauhan Dep. 34:8-9, corroborating Smith and the attorneys' account that the policy was developed at that time.

-6-

cavities do not contain the patent numbers; (6) testimony by
Douglas Eveleigh, Solo's chief IP counsel since 2006, that he
reviewed the policy shortly after he was hired and found it
permissible; and (7) an October 26, 2006 e-mail from Eveleigh to
Banach confirming the policy and stating that its purpose was "to
conserve costs."

### 2. The '569 Patent.

The '569 patent, which covers Solo's "Traveler" lids for hot
drink cups, was issued on May 20, 1986 and expired on October 24,
2003.  Like the '797 patent, it was added to the cavities that
produced the lids shortly after the patent issued.

The evidence indicates that Solo adopted the same policy for
the expired markings on the Traveler lids that it did for lids
covered by the '797 patent.  Because Smith had begun to track all
of Solo's patents, Solo was aware of the impending expiration of
the '569 patent and took certain steps accordingly.  On January
28, 2003, Smith e-mailed Kuczma to confirm that Solo would not be
adding the '569 patent number to the new set of Traveler lid
cavities it was ordering.  Kuczma testified that she gave Solo
advice consistent with this e-mail.  On March 9, 2004, soon after
the '569 patent's expiration, Smith sent another e-mail,
instructing Solo employees that because the patent was no longer
valid, "reference to it should be removed during any outer ring
retooling," and product drawings for all Traveler lids should be

-7-

updated to remove any references to the patent.  The e-mail
further stated that the "tooling does not need to be changed all
at once," but that instead, cavities would be replaced when they
wore out.  The evidence also includes a cover sheet documenting
the agenda of an IP committee meeting on November 29, 2004.  The
agenda included an item called "Lid markings in view of expired
patents," and the sheet included a handwritten note, "remove when
re-tool," which Kuczma testified she wrote to reflect Solo's
policy, consistent with her advice.  According to undisputed
testimony, Solo did not order or make any new cavities with the
'569 engraving after the patent expired.

### C. Conditional "May be Covered" Language.

The "may be covered" language originated in 2004.  Kuczma
testified that she drafted the language and that it was added to
Solo's packaging at her advice and the advice of other
Wallenstein & Wagner attorneys, who were concerned that Solo was
not giving notice to potential infringers pursuant to 35 U.S.C. §
287.[7]  An e-mail from Smith to Solo employees on September 14,
2004 confirms that the language was developed and added at this
time.

Kuczma testified that she recommended that Solo place this

---

[7]Under 35 U.S.C. § 287, if a patented product is not marked
as such, the patentee may not recover damages for any
infringement unless it can prove that the infringer had notice
that the product was patented.  Damages are only recoverable for
infringement occurring after the notice.

-8-

language on all of its packaging, including packaging for
numerous products that were not protected by any current patents
or pending patent applications, because Solo had a constantly
changing patent portfolio and it was economically impractical to
mark individual packages or items with individual patent
numbers.[8]  She further testified that because of the language's
conditional nature, she believed that it was not a false marking,
even if placed on unpatented products.  During the pendency of
this action, Solo removed the language because it found that it
was reaping no benefits and it did not want to subject itself to
further lawsuits.

Solo had a procedure for handling inquiries regarding
patents through its website, www.solocup.com.  Any such inquiries
were initially routed to Smith, and after 2006, to Eveleigh.  No
one made any inquiries regarding whether any of Solo's products
were covered by patents until Pequignot did so during the course
of this litigation.[9]

---

[8]Kuczma testified that "[i]n the course of [the attorneys']
discussions with Solo, it became apparent that the same packaging
was used for all sorts of products, some of which were patented
and some of which were not patented.  So, it was a nightmare and
economically not feasible because they had the same cartons, the
same packaging for various products.  So, that's why we attempted
or that's why we put together the language that we did."  Kuczma
Dep.  163:1-9.

[9]Pequignot did not use Solo's website to make the inquiry,
but instead called Solo's toll-free telephone number.  After
indicating the nature of his inquiry, he was told by a customer
service representative that he was being transferred.  He then

-9-

## II. Standard of Review.

Summary judgment is appropriate when, on the basis of the pleadings and evidence, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The party opposing summary judgment may not rely on mere allegations or denials in its pleadings.  Fed. R. Civ. P. 56(e).  Rather, the nonmoving party must, "by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324.  Evidence that is "merely colorable" or "not significantly probative" is insufficient to overcome a summary judgment motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

### III. Discussion.

#### A. Intent to Deceive.

##### 1. The Clontech Standard.

Whether Solo violated § 292 depends on whether it acted "for the purpose of deceiving the public."  The key legal authority

---

hung up, without mentioning his name, before he could be transferred.  Pequignot Dep. 287:16-289:11.

for evaluating intent to deceive under § 292 is set out by the

Federal Circuit in <u>Clontech Laboratories, Inc. v. Invitrogen</u>

<u>Corp.</u>, 406 F.3d 1347 (Fed. Cir. 2005), where the court stated:

> Intent to deceive is a state of mind arising when a party
> acts with sufficient knowledge that what it is saying is
> not so and consequently that the recipient of its saying
> will be misled into thinking that the statement is true.
> <u>Seven Cases v. United States</u>, 239 U.S. 510, 517-18, 36
> S.Ct. 190, 60 L.Ed. 411 (1916). Intent to deceive, while
> subjective in nature, is established in law by objective
> criteria. <u>Id.</u> Thus, "objective standards" control and
> "the <u>fact</u> of misrepresentation coupled with proof that
> the party making it had knowledge of its falsity is
> enough to warrant drawing the inference that there was a
> fraudulent intent". <u>See</u> <u>Norton v. Curtiss</u>, 57 C.C.P.A.
> 1384, 433 F.2d 779, 795-96 (1970). Thus, under such
> circumstances, the mere assertion by a party that it did
> not intend to deceive will not suffice to escape
> statutory liability. Such an assertion, standing alone,
> is worthless as proof of no intent to deceive where there
> is knowledge of falsehood. But in order to establish
> knowledge of falsity the plaintiff must show by a
> preponderance of the evidence that the party accused of
> false marking did not have a reasonable belief that the
> articles were properly marked (i.e., covered by a
> patent). Absent such proof of lack of reasonable belief,
> no liability under the statute ensues.

<u>Clontech</u>, 406 F.3d at 1352-53. The court further articulated

that "the standard is whether [plaintiff] proved by a

preponderance of the evidence that [defendant] did not have an

honest good faith belief in marking its products," <u>id.</u> at 1355,

and that "[t]he question of whether conduct rises to the level of

statutory deception is a question of fact," <u>id.</u> at 1353. On the

facts before it, it ruled that, on one of its products, the

defendant was liable because, "[b]eyond blind assertions of good

faith," it did not provide "evidence that it had an objective

-11-

good faith belief that its . . products [were] patented." Id. at 1357.

Pequignot argues that Clontech equates knowledge of falsity with intent to deceive, and that when a party marks a product as patented, knowing that it is not protected by a valid, unexpired patent, the party necessarily acts with intent to deceive. Thus, Pequignot asserts that Solo acted with intent to deceive because it admits that it marked billions of products as patented, knowing that they were not covered by valid, unexpired patents.

Pequignot's reading of Clontech is unpersuasive. Rather than announcing a definition of intent to deceive, Clontech creates a standard of proof. Specifically, the court held that a false marking, combined with knowledge of the falsity, "warrant[s] drawing the inference that there was a fraudulent intent," and that this inference cannot be rebutted by "the mere assertion by a party that it did not intend to deceive." Id. at 1352 (emphasis added). Contrary to Pequignot's position, the Federal Circuit did not hold that this inference is irrebuttable. Indeed, Pequignot's interpretation would eliminate any distinction between intent to deceive, which § 292 requires, and knowledge of falsity, a different state of mind.[10]

---

[10]Section 292 specifically imposes a fine only when the defendant "marks upon . . . in connection with any unpatented article the word 'patent' or any word or number importing the same is patented for the purpose of deceiving the public." If Pequignot's proposed standard were correct, the phrase "for the

Moreover, to hold, as Pequignot suggests, that a party that knowingly made false patent markings is precluded from even offering evidence that it did not intend to deceive would be inconsistent with the high bar that is set for proving deceptive intent. See Brose v. Sears, Roebuck & Co., 455 F.2d 763, 768 (5th Cir. 1972) (holding that the plaintiff bears the burden to show that the defendant acted with intent to deceive); Central Admixture Pharmacy Servs. v. Advanced Cardiac Solutions, P.C., No. CV-00-2430-VEH, 2006 WL 4448613, at *24 (N.D. Ala. Jan. 13, 2006), aff'd in relevant part, 482 F.3d 1347 (Fed. Cir. 2007) (noting that "[t]he threshold for establishing a successful Section 292 claim is extremely high"); cf. Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008) ("[T]he inference [of deceptive intent] must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence[.]").[11]

Accordingly, the Court holds that under Clontech, a false marking made with knowledge of falsity creates a rebuttable

---

purpose of deceiving the public" would instead read "with knowledge that the same is unpatented," or some other similar phrase.

[11]Star Scientific involved allegations of inequitable conduct, in which intent to deceive must be proved by clear and convincing evidence, a heightened standard of proof. Nonetheless, this pronouncement on intent to deceive, although distinguishable, is informative.

presumption of intent to deceive.  To rebut this presumption, the defendant must present more evidence than a "mere assertion by a party."  Whether evidence suffices to rebut the presumption "turns on a fact-specific examination of the defendant's conduct."  Pequignot I, 540 F. Supp. 2d at 654.[12]

### 2. The Expired '797 and '569 Patents.

Under a proper reading of Clontech, summary judgment has been granted to Solo on the '797 and '569 patents for cup lids because the evidence in the record successfully rebuts the inference that Solo acted with intent to deceive.

### i. Clontech as Applied to Marking Products with Expired Patent Numbers.

Unlike in Clontech, the false markings of the '797 and '569 patents involve expired patents, rather than patents that never covered the products at all.  No court has addressed how the Clontech standard applies to allegations involving only expired

---

[12]Contrary to Pequignot's assertions, this Court did not hold, in the following statement from Pequignot I, that Clontech equates knowledge of falsity with intent to deceive:

> Whether marking with a conditional statement constitutes a culpable false marking depends on whether Pequignot can demonstrate by a preponderance of the evidence that Solo intended to deceive the public- i.e., that Solo "did not have a reasonable belief that the articles were . . . covered by a patent" or a pending patent application.

Pequignot I, 540 F. Supp. 2d at 655-56 (quoting Clontech, 406 F.3d at 1353).  This discussion of Clontech was dicta, as it was not relevant to the only issues raised in the motion to dismiss in Pequignot I – namely, whether marking products with expired patents or conditional language can constitute false marking.

-14-

patents.  As such, the question of what suffices to prove intent

to deceive under such circumstances is one of first impression.[13]

The Court finds that when, as here, the false markings at

issue are expired patents that had previously covered the marked

products, the Clontech presumption of intent to deceive is

weaker, because the possibility of actual deceit, as well as the

benefit to the false marker, are diminished.  When a product is

marked with an expired patent number, any person with basic

knowledge of the patent system can look up the patent and

determine its expiration date, reducing the potential for being

deceived.  Moreover, in the case of design patents like Solo's,

marking an article with an expired patent can work to the

marker's detriment, because public patent documents reveal all of

the previously patented design features that are now in the

public domain, thus creating a road map for anyone wishing to

legally copy the product.  See Smith Dep. 406:15-407:8.

Conversely, if a product is marked with an unexpired patent that

does not cover it at all, the prospects for deceit, and potential

advantage to the marker, are higher because it is far more

difficult for competitors and the public to determine whether the

_____

[13]In a distinguishable fact pattern, intent to deceive was
found where a defendant marked products with both expired patent
numbers and numbers of patents that did not cover the products at
all, and conceded that he made these markings to "differentiate
[his] product from potential copiers."  See DP Wagner Mfg. Inc.
v. Pro Patch Sys., Inc., 434 F. Supp. 2d 445, 457 (S.D. Tex.
2006).

-15-

marking is false, particularly if the patent is complex.[14]  Thus, although some presumption of deceptive intent exists when a product is knowingly marked with an expired patent, that presumption is weaker than when a product is marked with an unexpired patent that does not cover the product.[15]

### ii. Whether Solo Acted With an Intent to Deceive.

Because Solo admits that it knowingly marked its lids with expired patents, a weakened presumption of intent to deceive applies.  However, this presumption is definitively rebutted by evidence that Solo acted not for the purpose of deceiving the public, but in good faith reliance on the advice of counsel and out of a desire to reduce costs and business disruption.

A party's good faith belief is relevant to determining whether it acted with intent to deceive.  See Clontech, 406 F.3d at 1355 (holding that a plaintiff must show that a defendant "did

---

[14]It is noteworthy that in Clontech, the patents at issue were for sophisticated molecular biology products.

[15]Solo made similar arguments in its Motion to Dismiss for Failure to State a Claim, asserting that marking a product with an expired patent could not be a false marking, in part because of the smaller possibility of deceit and minimal benefit to the marker.  The Court disagreed.  Pequignot I, 540 F. Supp. 2d at 654.  That holding remains unchanged; if a party falsely marks an article with an expired patent with actual intent to deceive, § 292 is violated.  However, at the summary judgment stage, where Solo's liability turns on whether it intended to deceive, the absence of any reason to deceive strongly suggests that no such intent existed. See Matsushita, 475 U.S. at 596-97 (holding that the "absence of any plausible motive to engage in the conduct charged" was "highly relevant" to determining whether summary judgment should have been granted in a civil conspiracy case).

-16-

not have an honest good faith belief in marking its products"). In addition, good faith reliance on the advice of counsel can be a defense to allegations of intent to deceive. <u>See</u> <u>Arcadia Mach. & Tool v. Sturm, Ruger & Co, Inc.</u>, No. CV84-5197MRP, 1985 WL 5181, at *2 (C.D. Cal. June 25, 1985), <u>aff'd</u>, 786 F. 2d 1124 (Fed. Cir. 1986).[16]

Solo has provided considerable "actual evidence" — far more than "mere assertions" — showing that it did not intend to deceive the public. It has provided unrebutted, sworn testimony by Diehl, Kuczma, and Smith that Solo, pursuant to counsel's advice and due to concern over the costs and disruption from replacing all of the mold cavities at once, formulated a policy under which cavities with expired numbers would be replaced as they wore out or were damaged. It has provided additional unrebutted evidence that this policy was implemented and followed, including the sworn testimony of Banach and Chauhan, numerous e-mails and updated tool drawings, and testimony by Eveleigh that he reviewed and re-approved the policy after being hired as Solo's IP counsel in 2006.

The undisputed evidence also shows that Solo was genuinely

---

[16]Although <u>Clontech</u> and <u>Arcadia</u> are distinguishable in that in those cases, the defendants' "good faith belief" and "advice of counsel" concerned whether their patents actually covered the articles in question, whereas Solo admits to knowing that its products were not covered by the patents at issue, the Court finds that the advice Solo received from its counsel is nonetheless relevant to whether it intended to deceive.

-17-

concerned about following the advice of counsel and adhering to the law.  It was Smith, Solo's Director of Product Development, who originally raised the marking issue to Diehl in 2000.  It was Smith who followed up with Diehl a month later.  It was Smith who, after being informed by Diehl that there was "[n]o need to mark the new cavities," asked Diehl whether Solo was "wrong in doing so."  It was Smith who repeatedly contacted Solo's tooling personnel to confirm that they were updating the drawings and not ordering any new cavities with expired numbers.  There is not a scintilla of evidence that Solo ever ignored its counsel's advice or, more importantly, manifested any actual deceptive intent. There is also no evidence that Solo had any desire to keep the expired numbers on the lids for any reason other than to avoid the costs and disruption of a wholesale replacement.  Kuczma's deposition on this point is telling:

> Solo didn't come to me and say, you know, "We want a way to keep this number on our products."  They didn't come to us and ask, "How can we maintain this on our products?"  We were talking to them about this patent is going to expire [sic].  So we need to remove it from the products.  How can we do that, you know, in an organized, you know — a sense that made — in a way that made sense in a business way and still within, you know, the scope of the law.

Kuczma Dep. 116:20–117:5.  In sum, all of the evidence in the record shows that Solo genuinely acted in conformity with its understanding of the law as explained to it by its counsel.

Although Pequignot argues that there are disputes of

-18-

material fact that preclude summary judgment in Solo's favor, all of the alleged disputes are either entirely speculative, or immaterial to whether Solo acted with actual intent to deceive the public.

For example, Pequignot focuses on the lack of any formal legal memoranda or records of research memorializing the advice given by Wallenstein & Wagner, the lack of clarity regarding exactly when the advice was given, and the fact that Diehl, Kuczma, and Eveleigh cannot remember the names of any cases they researched. What is at issue, however, is not the quality of Wallenstein & Wagner's advice or recordkeeping, the manner in which advice was given, or witnesses' ability to remember cases they researched nearly a decade ago. On the only relevant question — whether Solo intended to deceive — these issues are immaterial.[17] Pequignot also points out that Solo did not do a detailed analysis of the cost of replacing all of the cavities at once. At most, this suggests that Solo's policy not to replace the cavities immediately may not have saved much money. The lack of a major economic benefit is not evidence that Solo acted with intent to deceive.

The evidence Pequignot cites to show actual intent to

---

[17]Moreover, given the lack of virtually any case law, before this case, addressing whether marking a product with an expired patent violated § 292, it is unsurprising that Wallenstein & Wagner did not prepare detailed memoranda.

deceive is threadbare.  For example, in 2006, Eveleigh,
discussing a different, newly-patented product, wrote in an e-
mail that "adding the word 'patented' to literature (in addition
to any marking on the product) is nice to have as it will give
others additional notice of our patent and make them think twice
about copying the product."  The unremarkable fact that Solo's IP
counsel was aware of the advantages of marking a new product with
a valid patent is irrelevant to whether Solo had an intent to
deceive when it adopted its policy regarding the '797 and '596
lids.  Similarly, that Solo's website, until recently, contained
images of lids showing the expired patent numbers also is not
evidence of deceptive intent.  The web pages themselves did not
mention the patents, the markings in the images were barely
legible, and the unrebutted testimony is that the lids in the
images were randomly taken from Solo's inventory and not chosen
because they contained the patent markings.

On these facts, there is not "a scintilla of evidence that
[Solo] acted with intent to deceive."  FMC Corp. v. Control
Solutions, Inc., 369 F. Supp. 2d 539, 584 (E.D. Pa. 2005).  Solo
has successfully rebutted the Clontech presumption, and Pequignot
has offered nothing more than speculation in return.  Summary
judgment has therefore been granted to Solo.

### 3. Conditional "May Be Covered" Language.

For similar reasons, summary judgment has also been granted

-20-

to Solo on the issue of whether it intended to deceive when it marked its packages with the "may be covered" language.

The Court has held the "may be covered" language, if knowingly placed on an article that is not covered by a current or pending patent, is a false marking that violates § 292 if done with intent to deceive, because it "clearly suggests that the article is protected by the patent laws," and "potential inventors and consumers cannot readily confirm whether the article is protected." Pequignot I, 540 F. Supp. 2d at 655.  In effect, the conditional statement "functions as a de facto 'no trespassing' sign." Id.

It is undisputed that Solo knowingly placed this language on products that were never covered by any patents or pending applications.  Although this makes the question of intent to deceive a closer call than in the case of the '797 and '596 patents, Solo has successfully rebutted the Clontech presumption. The evidence, including Kuczma's testimony and Smith's e-mail of September 14, 2004, establishes that the language was added at the suggestion of Solo's outside counsel, not at the initiative of any Solo employee or officer, and that it was added so that Solo would arguably provide notice to potential infringers of Solo's actual, valid patents.  There is also undisputed testimony by Kuczma and Smith that the decision to place the language on all of Solo's packaging, rather than only on packaging of

-21-

products known to be covered by valid patents or patent
applications, was made because the alternative was too difficult
from a logistical and financial perspective. It is also
undisputed that Solo had procedures on its website and phone
lines to handle any inquiries, and that no one, other than
Pequignot, ever made any such inquiries. Moreover, before
Pequignot I, no court had expressly ruled that conditional
language such as that used here constituted a false marking under
§ 292. In short, there is no evidence to support the view that
counsel's advice about this sort of language, and Solo's
following that advice, was unreasonable or intended to deceive
the public in any way. Accordingly, when Solo marked its
packages with the conditional "may be covered" language, it did
not act with intent to deceive the public.

### B. Damages and the meaning of "offense."

Because the Court has granted summary judgment to Solo on
the intent question, there is no need to address the meaning of
"offense" in the damages provision of § 292. However, the
parties have moved for a determination of the issue. Because a
decision about this issue could significantly effect the
incentives for _qui_ _tam_ actions such as this one, the Court has
addressed the damages issue and has granted summary judgment in
Solo's favor.

The false marking statute states, in relevant part, "Whoever

-22-

marks upon . . . any unpatented article, the word 'patent' or any word or number importing that the same is patented for the purpose of deceiving the public . . . [s]hall be fined not more than $500 <u>for every such offense</u>." 35 U.S.C. § 292(a) (emphasis added). Pequignot argues that each falsely marked article constitutes an "offense," and therefore that Solo, if found to have acted with intent to deceive, committed billions of offenses. Solo, conversely, argues that an "offense" is only committed when a party makes a distinct decision to falsely mark, and therefore that it committed at most three offenses — two when it decided not to immediately stop marking the cold drink and Traveler lids once their patents expired, and one when it decided to add the "may be covered" language to its packaging.

The Court adopts Solo's position, which is supported by the vast majority of case law addressing damages under § 292. In the seminal case on the subject, the First Circuit, interpreting an earlier but similar version of the false marking statute, held:

> [A] plaintiff, in order to recover more than a single penalty, must go further than to prove the marking of a number of unpatented articles. The proof must be sufficiently specific as to time and circumstances to show a number of distinct offenses, and to negative the possibility that the marking of the different articles was in the course of a single and continuous act.

<u>London v. Everett H. Dunbar Corp.</u>, 179 F. 506, 508 (1st Cir. 1910). In reaching this conclusion, the court cited the text of the statute and its penal nature, noting that "the statute must

-23-

be read as making the fraudulent purpose or intent to deceive the public as the gravamen of the offense." Id. It also voiced concerns that an alternative interpretation could result in disproportionate penalties, stating: "if we construe the statute to make each distinct article the unit for imposing the penalty, the result may follow that the false marking of small or cheap articles in great quantities will result in the accumulation of an enormous sum of penalties, entirely out of proportion to the value of the articles . . . It can hardly have been the intent of Congress that penalties should accumulate as fast as a printing press or stamping machine might operate." Id.

Nearly all the courts that have addressed this issue have followed London, either explicitly or implicitly.[18]  Conversely,

---

[18]See A.G. Design & Assocs. v. Trainman Lantern Co., No. C07-5158RBL, 2009 WL 168544, at * 3 (W.D. Wash. Jan. 23, 2009) (finding that a defendant that falsely marked 15,000 lanterns over three years committed only "a single continuous offense"); Forest Group, Inc. v. Bon Tool Co., No. H-05-4127, 2008 WL 2962206, at *5-6 (S.D. Tex. July 29, 2008) (finding only one false marking offense when the defendant "made only one separate, distinct decision to mark its stilts after it knew the stilts did not meet all the claims of [the patent at issue]"); Bibow v. Am. Saw & Mfg. Co., 490 F. Supp. 2d 128, 129 n. 1 (D. Mass. 2007) (opining that "[i]t is doubtful that the statute ever intended to create such a lucrative game of 'gotcha!'" by imposing a fine for each time a press release was "seen in some medium"); Undersea Breathing Sys., Inc. v. Nitrox Techs., Inc., 985 F. Supp. 752, 781 (N.D. Ill. 1997) (fining the defendant $500 for a single decision to mark flyers); Sadler-Cisar Inc. v. Comm. Sales Network, 786 F. Supp. 1287, 1296 (N.D. Ohio 1991) (holding that a defendant was liable for only one offense when falsely marking a device because "continuous markings over a given time constitute a single offense"); Joy Mfg. Co. v. CGM Valve & Gauge Co., 730 F. Supp. 1387, 1399 (S.D. Tex. 1989) (finding only one false marking

Pequignot has cited only one case after 1885 in which a court —
without citing any authority or engaging in any legal analysis —
imposed a fine for each falsely marked item. See <u>Enforcer</u>
<u>Prods., Inc. v. Birdsong</u>, No. 1-93-CV-1701-CC, at 20-21 (N.D. Ga.
Nov. 29, 1995) (unpublished), <u>aff'd</u>, 98 F.3d 1359 (Fed. Cir.
1996) (fining defendants $50 for each flea trap product or
product packaging falsely marked). In light of the consistent
authority to the contrary, <u>Enforcer Products</u> is not persuasive.[19]

While conceding that <u>London</u> does not support his position,
Pequignot makes a number of arguments in favor of his preferred
construction. None, however, provide sufficient grounds for
deviating from the well-settled <u>London</u> line of cases.

First, Pequignot maintains that the word "offense" refers to
the term "unpatented article," arguing that the use of the word
"such" before "offense," the singular "article" instead of
"articles," and the modifiers "any" and "every" suggest that each
and every false marking of an "unpatented article" is its own
"offense." However, the statute also expressly differentiates

---

offense when the defendant marked an advertising brochure that
was printed multiple times).

[19]One court has found a middle ground, assessing the $500
maximum statutory fine for each week during which the defendant
committed false marking. <u>See</u> <u>Icon Health & Fitness, Inc. v. The</u>
<u>Nautilus Group, Inc.</u>, No. 1:02CV109TC, 2006 WL 753002, at *7 (D.
Utah Mar. 23, 2006); <u>see also</u> <u>Brose</u>, 455 F.2d at 766 n. 4
(suggesting that a court could limit the damages by assessing the
fine for each day or week the marking occurred).

between an "article" and an "offense."   Thus, the <u>London</u> court's
interpretation — that only a marking coupled with an
intentionally deceptive decision constitutes an "offense" — is at
least as plausible as the one suggested by Pequignot.

Next, Pequignot argues that <u>London</u> is not persuasive because
it was decided under a pre-1952 version of the statute that
imposed a <u>minimum</u> penalty of $100 per offense, rather than the
current version's $500 <u>maximum</u> fine.   See <u>London</u>, 179 F. at 507.
Under Pequignot's argument, the concerns about disproportionate
fines that motivated the <u>London</u> court are no longer relevant
because a court can now limit the total damages by minimizing the
amount of the per-offense fine, which the <u>London</u> court could not.
This argument, however, is unpersuasive because courts after 1952
have continued to apply <u>London</u> and its rationale.   Moreover,
notwithstanding a court's discretion to reduce an award, the
specter of significant, disproportionate fines would still loom
large in a false marking case if Pequignot's construction were
adopted.

Pequignot also cites the evolution of the statute, arguing
that two changes were meant to clarify that the fine should be
imposed on a per-article basis: (1) an 1870 revision that changed
the language from "shall be liable for such offense" to "shall be

-26-

liable for <u>every</u> such offense" (emphasis added);[20] and (2) the

1952 change from a $100 minimum fine to a $500 maximum — a

revision that, according to Pequignot, was intended to

effectively overrule <u>London</u> by providing courts with discretion

to fashion an appropriate per-article fine.[21]  However, there is

nothing, other than pure speculation, to indicate that either of

these revisions had anything to do with whether an "offense" is

per article or per decision.[22]  Moreover, Congress has had ample

opportunity since <u>London</u> in 1910 to change the word "offense" to

"article," or to otherwise make it crystal-clear that <u>London</u> is

wrong, but has not done so.  Against the backdrop of numerous

decisions following <u>London</u>, this is persuasive evidence that

<u>London</u> is correct.  <u>See</u> <u>Norfolk Redev. & Hous. Auth. v.</u>

<u>Chesapeake & Potomac Tel. Co. of Va.</u>, 464 U.S. 30, 35 (1983) ("It

is a well-established principle of statutory construction that

'[t]he common law . . . ought not to be deemed repealed, unless

---

[20]<u>See</u> Patent Act of 1870, ch. 230, § 39, 16 Stat. 198, 203
(1870) (amending statute); Patent Act of 1842, ch. 263, § 5, 5
Stat. 543, 544 (1842) (original statute).

[21]<u>See</u> Act of July 19, 1952, ch. 950, § 292, 66 Stat. 792,
814 (1952).

[22]Pequignot has not cited to any legislative history
regarding the 1870 revision.  Regarding the 1952 amendment, the
Senate report stated, in relevant part, "The minimum fine, which
has been interpreted by the courts as a maximum, is replaced by a
higher maximum."  S. Rep. No. 82-1979 (1952), <u>as reprinted in</u>
1952 U.S.C.C.A.N. 2394, 2424, <u>available at</u> 1952 WL 3180.  This
legislative history reveals nothing about how courts are to
construe the term "offense."

the language of a statute be clear and explicit for this
purpose.'" (quoting <u>Fairfax's Devisee v. Hunter's Lessee</u>, 11 U.S.
(7 Cranch) 603, 623 (1812))).

Pequignot also attempts to bolster his position by citing
cases interpreting other statutes as providing for separate
violations or offenses per article or product.  <u>See</u>, <u>e.g.</u>, <u>United
States v. Mirama Enters.</u>, 387 F.3d 983, 989 (9th Cir. 2004)
(finding that a manufacturer's failure to report a defect in
thousands of juicers constituted thousands of violations of the
Consumer Product Safety Act); <u>United States v. Reader's Digest
Ass'n</u>, 662 F.2d 955, 966 (3d Cir. 1981) (holding that each
mailing of a simulated check was a separate violation of an FTC
order under the Federal Trade Commission Act).  This argument is
unavailing for two reasons.  First, Solo has cited contrary
authority that interprets other analogous statutes as imposing
fines per decision, not per article.  <u>See</u> <u>Taft v. Stephens Lith.
& Engrav. Co.</u>, 38 F. 28, 29 (E.D. Mo. 1889) (finding, in a <u>qui
tam</u> action, only one offense of false copyright marking where the
defendant printed 10,000 copies); <u>see also</u> <u>A.G. Design</u>, 2009 WL
168544, at *3 (noting that "counterfeiting laws do not apply to
every bill counterfeited; rather only to the act of illegally
producing or tendering the counterfeit bills," and that "theft of
one thousand dollar bills from a man's wallet would only
constitute a single offense of theft").  Second, the previously

-28-

cited case law dealing specifically with § 292 itself is far more relevant and persuasive than case law concerning other statutes.

Finally, if Pequignot's construction were adopted, § 292 would allow plaintiffs who have suffered no injury to pursue potentially lucrative recoveries against companies like Solo that have caused no actual injury to anyone.  Given the qui tam posture of this litigation, public policy concerns mitigate in favor of the construction urged by Solo.  See Taft, 38 F. at 29 ("Plaintiff is not suing for the value of his services, or for injury to his property, but simply to make profit to himself out of the wrongs of others; and when a man comes in as an informer, and in that attitude alone asks to have a half million dollars put into his pocket, the courts will never strain a point to make his labors light, or his recovery easy.").

For all the above-stated reasons, the Court adopts the holding in London that an "offense" under 35 U.S.C. § 292 is a distinct decision by a defendant to falsely mark.  Accordingly, even if Solo were found to have acted with an intent to deceive, it would be liable for at most three offenses of false marking.[23]

---

[23]In his reply brief, Pequignot asks that even if the Court finds in favor of Solo on the meaning of "offense," it should nonetheless enter summary judgment in his favor that Solo has falsely marked at least 21,757,893,672 articles with expired patent numbers or the "may be covered" language.  Because this argument was raised for the first time in a reply brief, and because the Court finds that the number of falsely marked articles is irrelevant, summary judgment on this point is denied.

## IV. Conclusion.

For the reasons discussed in this Memorandum Opinion, as well as those stated in open court, summary judgment has been granted to the defendant in all respects, and denied to the plaintiff in all respects.

Entered this 25th day of August, 2009.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

-30-