IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| _____ ) | | |
| MATTHEW A. PEQUIGNOT, ) | | |
| ) | | |
| Plaintiff ) | | |
| ) | | |
| v. ) | 1:07cv897 (LMB/TCB) | |
| ) | | |
| SOLO CUP COMPANY, ) | | |
| ) | | |
| Defendant. ) | | |
| _____ ) | | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT SOLO CUP COMPANY'S
MOTION TO DECLARE THIS AN EXCEPTIONAL CASE
<u>AND FOR ATTORNEY FEES AND/OR COSTS</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

ARGUMENT .................................................................................................... 6

I.    Solo's Request for Fees and Expenses Under § 285 Must Be Denied Because This Is  Not an Exceptional Case ............................................................................ 6

    A.    Mr. Pequignot's Position on Intent Was Well-Supported and Pursued in Good Faith ...................................................................... 6

        1.    There Was Ample Legal Support for Mr. Pequignot's Position ................ 6

            a.    Mr. Pequignot Fairly Relied on *Clontech* ...................................... 6

            b.    Mr. Pequignot Fairly Relied on *DP Wagner* ................................. 8

            c.    This Court's March 24, 2008 Memorandum Opinion Denying Solo's First Motion To Dismiss Supported Mr. Pequignot's Argument On Intent .................................................................. 10

        2.    This Court Said That The Intent Issue Was One of "First Impression" ... 11

        3.    Solo's Further Attempts to Argue Bad Faith Are Unavailing .................. 12

            a.    The Court's Comments at the February 22, 2008 Hearing ........... 12

            b.    Solo's Advice Of Counsel Defense ............................................. 13

            c.    Solo's Assertion That Mr. Pequignot Argued for Strict Liability  15

    B.    Mr. Pequignot's Argument on the "Every Such Offense" Issue Was Well-Founded and Pursued in Good Faith ......................................... 16

        1.    Mr. Pequignot Legitimately Pursued This Action, Whether There Were Three Offenses or 50 Billion Offenses .................................... 16

        2.    Mr. Pequignot's Interpretation of "Every Such Offense" Was Supported By The Plain Meaning of the Statute, Which Controls Under Binding Supreme Court Precedent ......................................... 17

        3.    Mr. Pequignot's Interpretation of "Every Such Offense" Was Not Contrary to "More Than a Century of Case Law" .................................. 19

    C.    Solo Does Not Argue Litigation Misconduct and There Is No Conceivable Basis for Such an Argument in This Case .................................... 21

i

D.   This Court Should Deny Fees And Expenses Even If This Were An Exceptional Case ............................................................................................................... 23

E.   Solo's Requested Fees and Expenses Under § 285 Are Unreasonable ............... 23

II.   Solo's Request for Its Taxable Costs Under § 1920 and Rule 54(D) Should Be Denied 25

A.   Solo Is Not Entitled to Any Costs Under § 1920 or Rule 54(D) Because the Issues in the Case Were, By The Court's Analysis, Close and Difficult and Mr. Pequignot Proceeded in Good Faith ................................................................... 25

B.   Even Assuming That Solo Were Entitled to Some of Its Costs, It Should Not Be Awarded Costs That It Unnecessarily Incurred ................................................... 26

## INTRODUCTION

Defendant Solo Cup Company's ("Solo'"s) motion that Plaintiff Matthew Pequignot ("Plaintiff" or "Mr. Pequignot") pay "taxable costs" under 28 U.S.C. § 1920 ("Section 1920"), Fed. R. Civ. P. 54(D) and Local Rule 54(D), and all its attorneys' fees and litigation costs under 35 U.S.C. § 285 ("Section 285"), should be denied for the following reasons.

First, as explained below in Section II, no costs should be taxed under § 1920 or Rule 54(D).   Mr. Pequignot prevailed on several critical issues in the case and the other matters presented were, under the Court's analysis, close and difficult.   Mr. Pequignot defeated two motions to dismiss, establishing that Solo had engaged in conduct that violated 35 U.S.C. § 292 by falsely marking billions of its products with expired patents and by selling unpatented items in packaging saying that the items "may be covered" by one or more patents.   He also established that the *qui tam* feature of § 292 passed muster under Articles II and III of the Constitution.   As to the "for the purpose of deceiving the public" issue that was the basis for Solo's victory on summary judgment, this Court said that the issue was one of "first impression," and, under its analysis, the issue was a close and difficult one.

If, despite the closeness and difficulty of the intent issue under the Court's analysis, costs are taxed under § 1920 and Rule 54(D), the $16,236.19 sought by Solo is vastly inflated and includes items that must be excluded.   Section 1920(2), by its own terms, says that a district court can tax only costs "necessarily obtained for use in the case."   28 U.S.C. § 1920(2). Although, in the absence of additional information, it is impossible to determine the exact amount of costs that could be taxed under this standard, the amount would be less than half that claimed by Solo.

Second, as explained below in Section I, there is no basis whatsoever under the applicable standard for awarding attorneys' fees or any litigation costs to Solo. Section 285 provides an exception in patent cases to the American Rule that litigants pay their own legal fees and costs that is narrowly limited to "egregious abuse of the judicial process." *Wedgetail, Ltd. v. Huddleston Deluxe, Inc.,* No. 2009-1045, 2009 WL 2448513, at *1 (Fed. Cir. Aug. 12, 2009) (citation and quotation omitted). As such, it codifies "in patent cases the 'bad faith' equitable exception to the American Rule." *Id.* at *1 (citation omitted). "Recognizing the good faith/bad faith distinction, Congress expressly limited awards [under § 285] to exceptional cases." *Id.* (citation omitted); *see also Forest Labs, Inc. v. Abbott Labs.,* 339 F.3d 1324, 1327-28 (Fed Cir. 2003). The Federal Circuit, as a result, has made clear that "only a limited universe of circumstances warrant a finding of exceptionality in a patent case." *Wedgetail, Ltd.,* 2009 WL 2448513, at *2.[1]

Under Federal Circuit law, a case may be deemed "exceptional" in the absence of egregious misconduct – which is not present here – only where the moving party proves by <u>clear and convincing evidence</u> that "both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.,* 393 F.3d 1378, 1381 (Fed. Cir. 2005).[2] If this threshold burden is met, and a case is deemed

---

[1] Thus, in *Forest Labs*, 339 F.3d at 1328, the Federal Circuit rejected a lower court's finding of exceptionality, and noted that "[i]n interpreting § 285, we have been mindful of the limited circumstances in which an award of attorney fees is appropriate."

[2] Because of the high burden on the moving party, fees were denied in most of the cases cited in Solo's brief. D's Br. at 6-7; *see, e.g., Stephens v. Tech Int'l, Inc.,* 393 F.3d 1269, 1273 (Fed. Cir. 2004) (reversing the district court's finding of an exceptional case); *Glaxo Group Ltd v. Apotex, Inc.,* 376 F.3d 1339, 1349 (Fed. Cir. 2004) (reversing district court's award of attorney fees); *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.,* 459 F.3d 1311, 1321-22 (Fed. Cir. 2006) (affirming the district court's denial of attorney fees); *J.P. Stevens Co. v. Lex Tex Ltd., Inc.* 822 F.2d 1047, 1053 (Fed. Cir. 1987) (affirming the district court's denial of attorney fees); *Rohm & Haas Co. v. Crystal Chemical Co.,* 736 F.2d 688, 693 (Fed. Cir. 1984) (denying

2

"exceptional," then the Court must conduct a second level of analysis and determine whether an award of fees is appropriate. *See Forest Labs, Inc.*, 339 F.3d at 1327-28. As the Federal Circuit has said, "the award of attorney fees is not automatic, even for the extraordinary case. . . . The trial judge's discretion in the award of attorney fees permits the judge to weigh intangible as well as tangible factors." *Nat'l Presto Indus., Inc. v. West Bend Co*., 76 F.3d 1185, 1197 (Fed. Cir. 1996) (affirming a district court's denial of attorney fees in an "exceptional" case).

There is no possible theory under which this case could be deemed "exceptional." Mr. Pequignot established, as a matter of law, that Solo had engaged in conduct that violated the false marking statute. *See* March 24, 2008 Mem. Op, at 11-15 [D.E. 36] (holding that marking lids with expired patents and selling unpatented cups, bowls and utensils in packaging saying that the items "may be covered" by a pending or issued patent was false marking under § 292). He established, further, that he had standing to sue as a *qui tam* relator, as partial assignee of the United States's claim, and that there was no Article II impediment to his proceeding with the suit. *See* March 27, 2009 Mem. Op. [D.E. 105]. Thus, Solo's suggestion that there was something untoward about him proceeding without any personal injury is astounding. D's Br. at 1, 7. Although the Court ruled against him on the final element for establishing Solo's liability under § 292 – "for the purpose of deceiving the public" – this Court said the issue was one of "first impression." His argument on the intent issue was well-founded and made in good faith.

Mr. Pequignot relied on *Clontech Laboratories, Inc. v. Invitrogen Corp.*, 406 F.3d 1347 (Fed. Cir. 2005), for the proposition that "intent" under § 292 is proved by two objective criteria – the falsity of the mark (which this Court determined as a matter of law in rejecting Solo's first

---

attorney fees for an appeal); *cf. Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1244 (Fed. Cir. 1984) (remanding an award of attorney fees for further consideration and elaboration).

motion to dismiss) and the false marker's knowledge that the patent did not cover or protect the product (which Solo admitted in discovery).  In particular, Mr. Pequignot relied on the Federal Circuit's holdings in *Clontech* that the required intent "arises from" and is "established" by the false marker's knowledge, and that a false marking claim cannot be defeated by the false marker's assertion of subjective good faith or lack of intent to deceive.  Mr. Pequignot relied, further, on the fact that the <u>only</u> district court decision applying *Clontech* to expired patents, *DP Wagner Manufacturing Inc. v. Pro Patch Systems, Inc.*, 434 F. Supp. 2d 445 (S.D. Tex 2006), read *Clontech* exactly as he did, and had granted summary judgment for the plaintiff because the false marker admitted in discovery, as Solo did here, that it knew that the expired patents did not protect the products.  Mr. Pequignot also relied on this Court's March 24, 2008 Memorandum Opinion, which indicated (at 13) that, like the false marker in *DP Wagner*, under *Clontech*, Solo's intent would be determined by whether Solo lacked a good faith belief that its products were protected by a patent.

Although this Court ultimately said that the intent issue was a matter of "first impression" and adopted a different reading of *Clontech* – namely, that Solo's knowledge that its patent markings were false raised only a weak presumption of intent that could be overcome by Solo's alleged belief that it was acting appropriately because a lawyer allegedly approved its plan to replace existing molds as they wore out – Mr. Pequignot's reliance on *Clontech* and *DP Wagner* was objectively reasonable.  Not only did both cases explicitly embrace the knowledge test he relied on, but both rejected defenses that were nearly identical to Solo's winning defense here. In *Clontech*, the Federal Circuit said that the defendant's argument that it did not have intent because it did not think it was doing anything wrong was "preposterous."  406 F.3d at 1353 n.2. The *DP Wagner* court, in disposing of the same defense, cited this language from *Clontech* and

4

made clear that such a defense fell within the general rule that a claim cannot be defeated by an assertion of subjective good faith.  434 F. Supp. 2d at 457.

Mr. Pequignot's reading of § 292's "every such offense" language was similarly well-founded and objectively reasonable.  He relied on Supreme Court precedent holding that, where the plain meaning of a federal statute is clear and unambiguous, that is the beginning and end of the analysis.  In this case, the language of the statute is clear.  It defines an "offense" as the false marking on an article with the required intent, and then says that the false marker "shall" be fined "not more than $500 for every such offense."  Although this Court ultimately decided that the weight of the sparse case authority over the past 150 years pointed to an interpretation where the initial decision to embark on a course of false marking is the offense, some cases support Mr. Pequignot's argument that the false marking with intent is an offense.  Moreover, the cases as a whole embrace a range of different constructions, nearly all of which are unhinged from the language of the statute.  As a result, and given the absence of any authority from the Federal Circuit or the Eastern District of Virginia on the meaning of "every such offense," Mr. Pequignot's reliance on the plain meaning of the statute was objectively reasonable.

In addition to the objective reasonableness of Mr. Pequignot's positions, there can be no doubt that he brought this case in good faith, believed that his false marking claims were well-supported, and believed that he should win under existing law.  *See* Declaration of Matthew A. Pequignot, attached hereto as Exhibit A.  Solo, not surprisingly, has not even attempted to show that Mr. Pequignot brought this case in subjective bad faith, much less made that showing with clear and convincing evidence.  Nor has Solo proved by any standard, much less by clear and convincing evidence, that Mr. Pequignot's positions in this case were objectively baseless.

**ARGUMENT**

I.      **Solo's Request for Fees and Expenses Under § 285 Must Be Denied Because This Is Not an Exceptional Case**

      A.      **Mr. Pequignot's Position on Intent Was Well-Supported and Pursued in Good Faith**

            1.   **There Was Ample Legal Support for Mr. Pequignot's Position**

                  a.  **Mr. Pequignot Fairly Relied on *Clontech***

In *Clontech*, the Federal Circuit specifically addressed the standard for establishing the "for the purpose of deceiving the public" element of § 292.  *Clontech* is the only Federal Circuit case that directly addresses the standard of proof for the element; thus, unless it is distinguishable, it  is plainly the controlling authority.  There are at least five features of the Federal Circuit's decision that demonstrate that Mr. Pequignot's reliance on the case as controlling authority supporting his position was objectively reasonable.

First, the Federal Circuit said multiple times in its opinion that § 292's intent element is established where the false marker has sufficient knowledge that the patent marked on the product does not cover or protect the product:

- "Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true."  406 F.3d at 1352 (emphasis added; citation omitted).

- "Intent to deceive . . . is established in law by objective criteria . . . .  Thus, objective standards" control and the 'the *fact* of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there is fraudulent intent.'"  *Id.* (first emphasis added; citations omitted).

- "[I]n order to establish knowledge of falsity the plaintiff must show by a preponderance of the evidence that the party accused of false marking did not have a reasonable belief that the articles were properly marked (i.e., covered by a patent)."  *Id.* at 1352-53.

The Federal Circuit concluded its discussion by saying that whether "liability under the statute ensues" depends on whether the false marker "lack[s] a reasonable belief" that the patent covers the product. *Id.* at 1353.

Second, notwithstanding this Court's decision, there is no language in *Clontech* suggesting that the false marker's knowledge of falsity creates only a weak, rebuttable presumption of intent. Instead, as set forth above, the language of the opinion says that the requisite intent "arises from" and is "established" by the false marker's knowledge that the patent does not cover or protect the product.

Third, the Federal Circuit specifically rejected the notion that, if a false marker had knowledge that the patent did not cover the product, it could nevertheless defeat a § 292 claim by showing its alleged subjective good faith or intent not to deceive:

> Thus, under such circumstances, the mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability. Such an assertion, standing alone, is worthless as proof of no intent to deceive where there is knowledge of falsehood.

*Id.* at 1352.

Fourth, the false marker in *Clontech* made virtually the identical argument about its supposed subjective intent that Solo made here, and the Federal Circuit rejected the argument. Solo argued that did not have intent under § 292 when it deliberately and intentionally marked tens of billions of products with expired patents because it consulted with an attorney who allegedly approved a plan to replace existing molds as they wore out in the ordinary course of business. Similarly, Solo argued that it did not have intent when it deliberately and intentionally marked millions of packages of unpatented products with the "may be covered" language because an attorney allegedly drafted that language.

In *Clontech*, the defendant, Invitrogen, argued that its employees were not sophisticated in patent matters and, as a result, did not believe that they were doing anything wrong.   The Federal Circuit emphatically rejected the defense:

> Invitrogen has a third argument, which it contends is a blanket defense to all charges of false marking.  The argument is based on the district court's findings that employees 'unfamiliar with the patent laws' honestly believed the products to be correctly marked. . . . This of course is <u>preposterous</u>.  As we note, *supra*, the inference of intent to deceive cannot be defeated with blind assertions of good faith where the patentee has knowledge of mismarking.

*Id.* at 1352 n.2 (emphasis added).  Thus, not only did the Federal Circuit say that the required intent "arises from," and is "established" by, the false marker's knowledge and that a claim cannot be defeated by the false marker's assertions of subjective good faith (either that it did not believe it was acting illegally or falsely marked for some reason other than to deceive), but the court also labeled the same subjective good faith defense that Solo offered here as "preposterous."

<u>Fifth</u>, there is nothing in the language or reasoning of *Clontech* suggesting that its objective criteria test only applies where the question is whether a false marker is liable under § 292 for marking a product with a patent that did not read onto the product.  Nor is there anything in *Clontech* suggesting that its objective criteria test would not apply to a false marker that knowingly marked products with expired patents or knowingly marked unpatented products with language importing that the articles are patented.

### b.  Mr. Pequignot Fairly Relied on *DP Wagner*

Moreover, the position advocated by Mr. Pequignot in this case was supported by the only published district court case applying *Clontech* to expired patents, *DP Wagner Mfg. Inc. v. Pro Patch Sys., Inc.*, 434 F. Supp. 2d 445 (S.D. Tex. 2006).  The plaintiff in *DP Wagner* alleged that the defendant, Pro Patch, had falsely marked its products with expired patents and with

patents that did not read onto the products in violation of § 292. The plaintiff argued that it was entitled to summary judgment because Pro Patch, as Solo did here, admitted in discovery that it knew that the patents did not cover or protect the products. *Id.* at 456 (noting that defendant had introduced no evidence that "he had a good faith belief . . . that the '017 patent had not expired"). Pro Patch defended on two grounds, both of which were strikingly similar to Solo's defenses here, and both of which were rejected by the district court. *Id.* at 457.

First, Pro Patch argued that it did not have intent because it did not falsely mark its products for the purpose of deceiving the public, but rather because it wanted to differentiate its products and avoid the logistical difficulty of putting different markings on different products. *Id.* at 457. In rejecting this argument, the district court noted that, in *Clontech*, the Federal Circuit had made clear that a false marker's assertion that it acted for some reason other than to deceive—an assertion of subjective good faith—provides no defense where the false marker acted with knowledge that the patent did not cover or protect the product. *Id.* at 457-58.

Second, Pro Patch argued that it did not have deceptive intent because it did not understand that it was doing anything wrong. *Id.* at 457. In rejecting this argument, the district court relied on the language quoted above from *Clontech* saying that it is "preposterous" to suggest that a false marker who acted with knowledge could avoid liability on the ground that he did not know he was doing anything wrong. *Id.*

The district court then granted summary judgment for the plaintiff based on the two objective criteria from *Clontech*:

> Thus, the uncontroverted summary judgment evidence conclusively establishes the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity, and Pro Patch has failed to present any evidence that would defeat the resulting inference of fraudulent intent. DP Wagner is therefore entitled to summary judgment on its false marking claims.

*Id.* (internal quotations omitted).

Mr. Pequignot relied in good faith on the same reading of *Clontech* as the district court did in *DP Wagner*.  Based on the standard articulated by the Federal Circuit in *Clontech* and the precedent set by *DP Wagner*, Mr. Pequignot fairly argued that, in light of Solo's admissions that it knew that the patents were expired and did not protect its products and that the products that Solo marked with the "may be covered" language were unpatented, Solo's assertions of subjective good faith could not defeat Mr. Pequignot's false marking claims.  While this Court distinguished *DP Wagner* as a case where the defendant marked products with <u>both</u> expired patent numbers and patent numbers that did not cover the products at all, Aug. 25, 2009 Mem. Op. at 15 n.13, *DP Wagner* applied *Clontech*'s objective test to both kinds of false marking and never suggested that the type of false marking determines whether or how to apply *Clontech*.

### c. This Court's March 24, 2008 Memorandum Opinion Denying Solo's First Motion To Dismiss Supported Mr. Pequignot's Argument On Intent

After holding, as a matter of law, that Solo had engaged in <u>conduct</u> that constituted false marking under § 292, both by marking its products with expired patents and by using the "may be covered" language on packaging for unpatented items, this Court observed that Solo would be liable if "Pequignot can demonstrate by a preponderance of the evidence that Solo intended to deceive the public – <u>i.e.</u>, that Solo 'did not have a reasonable belief that the articles were . . . covered by a patent' or pending patent application."  March 24, 2008 Mem. Op. at 15 [D.E. 105] (quoting *Clontech*, 406 F.3d at 1353).  Thus, this Court indicated that *Clontech* was the controlling case and that the question of intent would turn on whether Solo had knowledge that the products it was marking as patented were not covered by a patent.

\* \* \*

10

In sum, the binding Federal Circuit precedent (*Clontech*), the only post-*Clontech* district court decision on point (*DP Wagner*), and this Court's earlier memorandum opinion all supported Mr. Pequignot's legal argument that Solo's intent would turn on Solo's knowledge, which it had admitted in discovery.  Indeed, this Court, at the July 2, 2009 hearing on summary judgment, said that, in light of this evidentiary record, if the Court adopted Mr. Pequignot's reading of *Clontech*, then it would have to grant summary judgment for Mr. Pequignot.  July 2, 2009 Transcript at 14:11-16, attached hereto as Exhibit B.  Although he lost on intent in this Court, Mr. Pequignot was fully justified in advancing his argument.

### 2.   This Court Said That The Intent Issue Was One of "First Impression"

To state the obvious, the fact that this Court ruled against Mr. Pequignot does not mean that his position was objectively baseless or was pursued in subjective bad faith.  Adopting such a test – namely, that any losing party pays his opponent's fees in a case under Title 35 – would be directly contrary to the American Rule, the limited exception for egregious abuses of the judicial process codified in § 285, and the body of Federal Circuit case law on § 292.

Although Mr. Pequignot reasonably believed, and still believes, that *Clontech* requires summary judgment in his favor, this Court read *Clontech* differently, finding instead, as noted earlier, that the question of intent in this case is one of "first impression." August 25, 2009 Mem. Op. at 15.  If so, then Mr. Pequignot was fully justified in arguing that the *Clontech* objective criteria test should be applied in this context as well, particularly in the absence of any language in *Clontech* to the contrary, the decision in *DP Wagner*, and the fact that intent in other misrepresentation based claims is established by knowledge of falsity.  *See Carras v. Burns*, 516 F.2d 251, 256 (4th Cir. 1975) (scienter established for securities fraud by knowledge of falsity).

### 3.   Solo's Further Attempts to Argue Bad Faith Are Unavailing

### a.   The Court's Comments at the February 22, 2008 Hearing

Solo argues that, notwithstanding *Clontech*, *DP Wagner*, and the language in the March 24, 2008 Memorandum Opinion, Mr. Pequignot should have known from this Court's comments on February 22, 2008, that Solo's "subjective intent [would be] controlling," D's Br. at 9, and that he therefore acted in bad faith in continuing with the suit.[3]   In particular, Solo says that this Court expressed skepticism at the February 22, 2008 hearing on its first motion to dismiss that Mr. Pequignot could sustain his burden of proof on intent if the evidence showed that Solo was taking its molds off line and replacing them with new ones that did not have the expired patent numbers.  *Id.* at 9 (citing Transcript of February 22, 2008 hearing, at 24-25).  Solo's argument is without merit.

Notably, Solo ignores that, a month after the hearing, on March 24, 2008, when this Court issued its written decision on the first motion to dismiss, it recited *Clontech*'s test for proving intent under § 292, not the subjective intent standard that Solo argued for and this Court ultimately applied in resolving summary judgment against Mr. Pequignot.  Moreover, even if this Court's preliminary indication, through on-the-record comments, was that it believed Solo's subjective intent would be relevant, Mr. Pequignot still would have been fully justified in arguing that the objective criteria laid out in *Clontech* should control.  Arguing that a Federal Circuit decision is controlling in a patent case, even if the district court has earlier expressed

---

[3] Solo also complains about Mr. Pequignot's settlement demands in this case, D's Br. 1, 8, but these limited negotiations do not reflect any bad faith.  Rather, Mr. Pequignot's $9 million dollar settlement offer was made early in the case while he was proceeding *pro se* and was based on his view of the strength of his case.  That view derived from his good-faith interpretation of *Clontech*, *DP Wagner*, and the plain language of the statute, as explained throughout this brief.  After it decided at the eleventh hour to defend on the supposed advice of counsel, Solo raised the issue of settlement, offering, as its opening position, "the cost of defense," which Solo now claims was a substantial amount.  Those talks never progressed.

skepticism, is not acting in bad faith, especially where the only published district court decision

supports the argument that the Federal Circuit case is on point and dispositive.[4]

### b. Solo's Advice Of Counsel Defense

Next, Solo argues that Mr. Pequignot should have abandoned his case after it announced

in April 2009 that it would raise an advice of counsel defense.  D's Br. at 10.  By that time, six

weeks before the close of discovery, Mr. Pequignot had obtained rulings from this Court

upholding the constitutionality of § 292 and confirming that he had standing to sue as a plaintiff

under § 292, and further, that he was suing Solo for conduct that violated the statute.  He also

had received amended interrogatories indicating that Solo knew that its patents were expired.

Solo's argument that Mr. Pequignot was not entitled to continue with his case in those

circumstances, without risk of sanction, is meritless.

At the time, this Court had not yet ruled on whether Solo's advice of counsel defense was

a valid defense.  Mr. Pequignot was not required to accept Solo's assertion that it was a valid

defense, even though this Court ultimately found that it was a valid defense.  But whether the

defense was valid or not, Mr. Pequignot was fully justified in completing discovery and finding

out what advice Solo actually received and, if it received advice, when the advice was received.

First, if the claimed advice of counsel turned out not to be a valid legal defense to a § 292

claim, as Mr. Pequignot believed for the reasons explained above, then there was obviously no

reason for him to abandon his case.

---

[4] Mr. Pequignot also notes that the Court expressed its skepticism after, among other things, Solo's counsel represented that it was "upwards of a ten-million-dollar investment" to replace these molds, a cost estimate that turned out to be grossly inaccurate.  Tr. at 20:2-10, attached as Ex. 3 to D's Br.  Solo's Rule 30(b)(6) designee, who testified a year after this misstatement to the Court, said that the company had never attempted to determine the cost of replacing the molds.  In its summary judgment papers, Solo represented that the material costs would be merely "more than $500,000." Solo's Mem. in Support of its Mot. Summ. J. at 3, which is a far cry from the $10 million number cited earlier.

13

Second, if the claimed advice of counsel turned out to be a valid legal defense to § 292, then Mr. Pequignot had the right to take discovery to determine whether there was a factual basis for the defense. In other words, even if the defense was, in theory, legally valid, it would be of no assistance to Solo unless supported by the evidence. And, in any event, Mr. Pequignot was permitted to make his record and preserve his argument that he should prevail under the *Clontech/DP Wagner* knowledge-based test that he believed, and still believes, is the law.

In fact, as this Court acknowledged at the summary judgment hearing on July 2, 2009, Mr. Pequignot did establish facts in discovery under which he would prevail if the knowledge test applied. Moreover, as Mr. Pequignot's summary judgment opposition set out in detail, discovery also revealed evidence that Mr. Pequignot believed contradicted Solo's assertions concerning the advice it claims to have received and when it received that advice. *See* Mr. Pequignot's Opposition to Solo's Motion for Summary Judgment [D.E. 189, at p. 11-20], also attached hereto as Exhibit C. We attach this material not to reargue the summary judgment motion, but to emphasize the good faith, and well-supported, basis for Mr. Pequignot's argument that, even if he lost on the legal standard for intent, a summary judgment ruling for Solo would still be inappropriate, because the facts were hotly disputed.[5]

---

[5] We provide just one example of the facts in dispute here. Although the Court held that, according to Mr. Smith and Ms. Kuczma, the policy to continue false marking until molds wore out was developed in 2000 based on advice from Ms. Kuczma's firm, Aug. 25, 2009 Mem. Op. at 4-5, Mr. Pequignot believed that the record was to the contrary about when the advice was given, if it was given at all. Mr. Diehl testified that he could recall no communications with Solo in 2000 other than his e-mails saying that marking with expired patents gives rise to liability under § 292 (PA-0030, Diehl Tr. at 113), and Ms. Kuczma could not recall giving any advice related to the '797 patent during this time frame (PA-0075, Kuczma Tr. at 73). Nor could Mr. Smith recall when Ms. Kuczma spoke to him about patent marking, although he speculated that it might have been at an IP Committee meeting. (PA-0145-0146, Smith Tr. at 136-37). However, the only IP Committee Meeting agenda reflecting a discussion of this topic is from November <u>2004</u>. Thus, there was <u>no</u> evidence showing that the advice was given in 2000 and Mr. Pequignot believed that the absence of any such proof, at a minimum, created a genuine

Moreover, even if the evidence were clear that Solo received the advice of counsel it claimed, there was evidence from which a reasonable juror could infer that Solo, nevertheless, had a subjective intent to deceive.  Under applicable law, where there are competing inferences that can be drawn from the facts, the matter is not suitable for resolution on summary judgment and is appropriately submitted to the jury.  *See Columbia Union College v. Clarke*, 159 F.3d 151, 165 (4th Cir. 1998) (reversing a grant of summary judgment where a fact finder could reasonably infer from the undisputed facts either that the institution was or was not "pervasively sectarian"). Here, Solo argued that it did not have intent to deceive because it put in place a plan to stop false marking 15-20 years in the future.  But there was a different inference that could be drawn from the facts, if they were as Solo claimed.  Solo was told by its lawyer that false marking with expired patents was illegal and it decided not to stop immediately, but rather to continue the practice for 15-20 years.  Mr. Pequignot believed that a reasonable juror could infer from these facts, whether the plan was attorney approved or not, that Solo had subjective intent to deceive for the 15-20 years during which it was deliberately continuing to falsely mark.  Thus, for all these reasons, Mr. Pequignot was fully justified in continuing to press forward with his case.

### c.  Solo's Assertion That Mr. Pequignot Argued for Strict Liability

Finally, Solo argues that Mr. Pequignot acted in bad faith by advocating for a strict liability standard under § 292.  D's Br. at 8-9.  As Mr. Pequignot has made clear on several occasions, that is simply not true.  Pl's Reply in Further Support of Mot. for Summ. J. at 6, 9-12 [D.E. 196]; July 2, 2009 Tr. at 8-9.  In fact, Mr. Pequignot argued on summary judgment that the intent element of § 292 was established because Solo admitted in discovery that it knew that the

---

dispute of material fact on whether the policy was attorney approved. If Ms. Kuczma did not bless the policy until 2003 or 2004 when the '569 patent was expiring (which Mr. Pequignot also contests), Mr. Pequignot believes, at a minimum, that Solo's subjective intent in adopting the policy, pursuant to which it has deliberately and intentionally falsely marked billions of products with patents it knew did not protect its products, would at least be a question of fact.

patents that it was marking on its products were expired, that the expired patents did not protect its products, and that its packaging marked with the "may be covered" language contained unpatented products.  Pl's Mem. in Support of Mot. Summ. J. at 15-19 [D.E. 185].  Just because intent will almost always be established under the *Clontech* knowledge standard where a false marker puts an expired patent on a product knowing that the patent is expired does not mean that intent is not an element, or that § 292 is a strict liability statute for expired patents.  All it means is that knowledge of falsity, and therefore intent under *Clontech*, is almost always present when the false marker knows the patent has expired.

**B.      Mr. Pequignot's Argument on the "Every Such Offense" Issue Was Well-Founded and Pursued in Good Faith**

Solo also argues that this case is exceptional because "Pequignot ignored more than a century of case law consistently and clearly establishing that an 'offense' under Section 292 is a <u>decision</u> to pursue an intentionally deceptive course of conduct involving false marking . . . ."  D's Br. at 8.  Solo's argument does not come close to meeting its burden of proving by clear and convincing evidence Mr. Pequignot's bad faith or that he pursued objectively baseless claims for several reasons.

**1.      Mr. Pequignot Legitimately Pursued This Action, Whether There Were Three Offenses or 50 Billion Offenses**

Solo's argument makes the mistaken assumption that Mr. Pequignot would somehow not be justified in pursuing this action if there were only three offenses, as this Court ultimately found.  In fact, Mr. Pequignot, as a *qui tam* relator, could legitimately pursue this action, both in order to stop Solo from engaging in false marking and to achieve the maximum appropriate fine, even if there were only a limited number of offenses.  The fact that this Court held that there were just three offenses does not make this case exceptional.  Nor does it even make Solo the

prevailing party, because if Solo had lost on liability, there would have been offenses for which a fine was mandatory.

Ironically, in responding to Mr. Pequignot's argument that adopting Solo's "initial decision to engage in a course of false marking" theory would take the teeth out of § 292, Solo asserted in its opposition to Mr. Pequignot's motion for partial summary judgment that, even if the resulting fine would not be sufficient to deter false markers, relators could still pursue other remedies, such as an injunction. D's Opp. to P's Mot. for Summ. J. at 29 [D.E. 195].  Solo cannot have it both ways, by first arguing that the Court should limit the number of offenses under § 292 because other remedies are available, and now arguing that, because the Court limited the interpretation of "every such offense," Solo has achieved a complete victory, and the suit could not have been brought in good faith.

> **2. Mr. Pequignot's Interpretation of "Every Such Offense" Was Supported By The Plain Meaning of the Statute, Which Controls Under Binding Supreme Court Precedent**

Mr. Pequignot relied on the plain meaning of the statute in asserting that every false marking is a separate offense.  He was fully justified in doing so.  Under binding Supreme Court law, a statute's language is the starting point for determining its meaning, and the end when the language is clear, as Mr. Pequignot believed it was here:  "[W]e have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Barnhart v. Sigmon Coal Co*., 534 U.S. 438, 461-62 (2002) (citation and quotation omitted); *see also 14 Penn Plaza LLC v. Pyett*, 129 S. Ct. 1456, 1472-73 (2009) (reversing trial court ruling which disregarded plain meaning of text, holding that court cannot substitute its view of policy for the legislation which was passed by Congress).

Section 292(a) defines the prohibited conduct, or "offense," as "marking upon, or affixing to . . . any unpatented article the word 'patent' or any word or number importing that the same is patented" with the requisite intent.  The statute then says that the false marker "shall be fined not more than $500 for <u>every such offense</u>."  (Emphasis added.)  The plain meaning of the language, as Mr. Pequignot argued in the summary judgment proceedings, is clear and unambiguous.  Every false marking on an article with intent is an "offense" for which the false marker "[s]hall be fined not more than $500."  Neither Solo, nor the Court in its August 25, 2009 opinion, seriously attempts to demonstrate how the language means something else.

Moreover, even though Solo now says that "offense" means a "decision to pursue an intentionally deceptive course of conduct,"  D's Br. at 8, in its summary judgment papers, it conceded that an "offense" is defined in the statute as "the marking of an unpatented article with the intent to deceive the public."  D's Mem. in Supp. of its Mot. For Summ. J. at 25 [D.E. 166]; D's Opp'n to P's Mot. For Summ. J. at 22 [D.E. 195].  We make this point because it demonstrates the strength of the plain meaning argument, the lack of any real counter-argument regarding the language of the statute, and the good-faith basis for Mr. Pequignot's reliance on the plain meaning of the language.

Indeed, at the hearing on February 22, 2008, before the parties had briefed the "every such offense" issue and this Court, presumably, had read only the language of the statute, this Court apparently assumed that it would apply a fine for every false marking.  To this end, the Court said that the fine was discretionary and that "you could have like one billionth of a cent per item in a case of this sort where I assume there are millions of Solo cups."  February 22, 2008 Tr. at 33.  Although the Court ultimately chose to give the statute a different meaning, this passage illustrates the reasonableness of Mr. Pequignot's understanding of the statute's plain meaning.

18

Needless to say, it would be extraordinary to label a case as "exceptional," and therefore potentially worthy of awarding fees to the prevailing party, because the losing party pursued a suit based on the plain meaning of a federal statute. This is especially true here because, in this case, there was no controlling precedent by the Federal Circuit, or the Eastern District of Virginia, on the meaning of "every such offense." Instead, there was a smattering of decisions from other jurisdictions, some of which were decided under an earlier and materially different version of the statute, that offered a range of interpretations.

### 3. Mr. Pequignot's Interpretation of "Every Such Offense" Was <u>Not</u> Contrary to "More Than a Century of Case Law"

Contrary to Solo's hyperbole, Mr. Pequignot did not ignore "more than a century of case law consistently and clearly establishing that an 'offense' under Section 292 is a <u>decision</u> to pursue an intentionally deceptive course of conduct involving false marking . . . ." D's Br. at 8 (emphasis in original). Instead, within the sparse authority, the cases interpret "every such offense" in very different ways, thus making it inconceivable that Mr. Pequignot's argument, based on the plain language of the statute and supported by some case law, could possibly be the basis for deeming this an "exceptional" case.

As this Court is aware, the case law on the "every such offense" issue is not uniform. There are, undoubtedly, a number of cases that adopt a "continuous offense" theory and find only one offense. But, contrary to Solo's claim, most of these cases do not hold that only the initial "decision" can constitute an offense. So far as Mr. Pequignot is aware, there is one district court since 1844 that specifically referred to a "decision" before this Court did so on summary judgment, and that was the Southern District of Texas in *Forest Group, Inc. v. Bon Tool Co.*, 2008 WL 2962206 (S.D. Tex. July 29, 2008), a case that has been appealed, is fully briefed in the Federal Circuit and scheduled for oral argument on October 7, 2009. And, even *Forest*

19

*Group* stated that there could be more than one offense if there was evidence that the company placed separate orders for its falsely marked goods, a distinction that runs counter to this Court's holding that only the initial decision to begin a course of false marking with a particular patent is an offense. *See id*. at *6 n.9.

Moreover, in *London v. Everett Dunbar Corp.*, 179 F. 506 (1st Cir. 1910), the case cited by this Court as the genesis of the "continuous offense" theory, the First Circuit did not hold that an "offense" was the initial <u>decision</u> to embark on a course of false marking.  Instead, for reasons not stemming from the language of the statute, but from a policy concern no longer applicable because of the 1952 amendment to the statute, *London* held that it could not be presumed "that each act of marking was so separated from the others as to constitute a distinct offense."  *Id.* at 508-09.  It went on to say that, if the plaintiff could prove that there were separate acts of marking, such as one in June and one in July, then there could be multiple fines.  *Id.* at 509.  In the present case, Solo falsely marked different products, over a period of a decade, using different machines, with individual molds, in plants in different states.  *Cf. Precision Dynamics Corp. v. Am. Hosp. Supply Corp*., 241 F. Supp. 436, 447 (S.D. Cal. 1963) (holding that inclusion of a false patent marking in three different publications meant that there were three offenses).

Several court, however, have concluded that each false marking on an article constitutes an offense.  *See, e.g., Enforcer Prods., Inc. v. Birdsong*, at 20-21, No. 1-93-CV-1701-CC (N.D. Ga. Jan. 5, 1996); *Pentlarge v. Kirby*, 19 F. 501, 502-03 (S.D.N.Y. 1884); *Tompkins v. Butterfield*, 25 F. 556, 560-61 (D. Mass. 1885); *French v. Foley*, 11 F. 801, 802, 804 (S.D.N.Y. 1882).

In addition to cases supporting a continuous offense theory, and cases supporting Mr. Pequignot's, there are cases that adopt a middle ground approach, either by finding "breaks" in

the continuous offense, or by holding that an offense is false marking for a particular period of time.  For example, in *Krieger v. Colby*, 106 F. Supp. 124, 131 (S.D. Cal. 1952), the court followed *London* and held that where "patented" tags were affixed to eight shipments of caps, there were eight separate offenses.  In *Icon Health & Fitness, Inc. v. The Nautilus Group, Inc.*, 2006 WL 753002, at *7 (D. Utah Mar. 23, 2006), the district court rejected the notion of a single continuous offense.  It held, instead, again without any connection to the language of the statute, that the defendant had committed one offense for each week that it engaged in false marking. *See also Brose v. Sears, Roebuck & Co.,* 455 F.2d 763, 766 n.4 (5th Cir. 1972) (indicating that there could be a separate offense for each day or week that the defendant false marked).

The point of reviewing the sparse authority is not to quarrel with this Court's conclusion that the weight of the case law points in the direction of a continuous offense theory, although we do disagree, but rather to point out that courts have taken different views, ranging from *Bon Tool* to *Birdsong*, with other approaches in between (*i.e., London, Krieger, Icon, Brose*).  In those circumstances, with no binding authority in this district, other than the Supreme Court's repeated direction to follow the plain meaning of a federal statute, Mr. Pequignot was fully justified in arguing for the theory supported by the plain language of the statute.

### C.    Solo Does Not Argue Litigation Misconduct and There Is No Conceivable Basis for Such an Argument in This Case

There is an additional narrow category of cases that, in theory, could be classified as "exceptional," involving egregious misconduct at the PTO and in resulting litigation, such as withholding relevant documents during discovery, and making misrepresentations to the court. *See, e.g., Mathis v. Spears*, 857 F.2d 749, 750-51 (Fed. Cir. 1988) (affirming a finding of exceptionality where the plaintiff had failed to disclose relevant information to the PTO, conducted a misleading simulation at trial, and withheld relevant documents that were only

21

uncovered after the defendant was granted a court order to search the plaintiff's files); *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1027 (Fed. Cir. 2008) (affirming a finding of exceptionality where a party had made repeated false claims during discovery, trial, and post-trial that it did not participate in developing an industry standard).

This case, of course, does not involve the PTO and even Solo does not say that Mr. Pequignot engaged in litigation misconduct. Instead, Solo describes certain acts that it labels as "litigation tactics," D's Br. at 11-13, but none constitutes misconduct and none even approaches the egregious type of misbehavior that might justify a finding of exceptionality.

Solo's list of "litigation tactics" shows just how unexceptional the litigation of this case was in the sense that both parties made motions, some of which were granted, and some of which were denied, and requested discovery, some of which was allowed, and some of which was not. It could hardly be called litigation "misconduct" that Mr. Pequignot: while acting *pro se*, moved to amend the complaint to include additional claims against Solo (a motion that the Court granted in part and denied in part) [D.E. 40]; while acting *pro se*, attempted to narrow the issues for trial by serving requests for admission carefully tailored to the issues of whether Solo violated § 292 and the number of offenses that it committed; before undersigned counsel was involved, called Solo's main telephone number as part of his factual investigation into whether Solo had a mechanism for answering the public's questions about its patent markings; and mistakenly exceeded this Court's page limit for summary judgment briefs because his counsel misunderstood local practice [D.E. 182]. Moreover, the fact that Solo defeated some of Mr. Pequignot's motions or blocked some of his discovery does not mean that he engaged in misconduct. It means that the parties engaged in the usual back-and-forth of litigation during which Mr. Pequignot's position was often ultimately adopted by the Court, including when the

Court denied Solo's two motions to dismiss [D.E. 37, 106], granted Mr. Pequignot's motion to compel [D.E. 138], denied Solo's motion to compel [D.E. 153], and ordered Solo to revise its numerous motions to seal [D.E. 204].

> **D.  This Court Should Deny Fees And Expenses Even If This Were An Exceptional Case**

Solo is not entitled to any fees or costs under § 285 because it has absolutely failed to prove by clear and convincing evidence that Mr. Pequignot pursued this case in subjective bad faith and that his claims were objectively baseless.  But if the Court determines that this is an "exceptional" case, it would then have to decide whether an award of fees is appropriate. Here, as noted already, Mr Pequignot was a proper plaintiff, suing for conduct that violated § 292.  He lost on an issue that this Court branded one of "first impression."  There is nothing egregious about such a suit and it is not an appropriate one for awarding fees and expenses.

> **E.  Solo's Requested Fees and Expenses Under § 285 Are Unreasonable**

If the Court determines that fees and expenses should be awarded, then Solo should be awarded only a fraction of the grossly excessive amounts it claims.

As an initial matter, Mr. Pequignot should not be required to reimburse Solo for its legal fees related to the two motions to dismiss [D.E. 36, D.E. 105], or the two motions to compel [D.E. 138, 153] on which Mr. Pequignot prevailed.  Nor should Mr. Pequignot have to pay for Solo's legal fees relating to written discovery or depositions because all of the discovery taken by Mr. Pequignot was narrowly tailored to the issues in the case—namely, whether Solo was falsely marking its products, which products it was falsely marking, how many products it falsely marked and whether Solo knew that the products that it was marking as patented were in fact not protected by a patent.  In addition, after Solo indicated that it would raise an advice of counsel defense, Mr. Pequignot conducted discovery to determine what the alleged advice was and when

and how it was given to Solo.  By contrast, the discovery that Solo directed at Mr. Pequignot had no relation to the issues in the case, such as the irrelevant issues of whether he had been injured by Solo's false marking practices, the extent of his work product in investigating Solo's false marking and his investigation into other companies' false marking practices.

Nor should Mr. Pequignot have to pay for more than a hundred hours of legal fees that Solo expended for its lawyers to consider, draft and revise its repeated motions to seal.  In July 2009 alone, after this Court admonished Solo to limit its motions to seal to only the most confidential material, Howrey attorney Deanna Keysor billed 55 hours at $490 per hour reconsidering Solo's impermissibly broad designations of confidentiality and drafting a revised motion to seal.  Solo's attorneys Robert Unikel, Jason White, Mary Zinsner, and Mohsin Reza also billed time to these efforts in July 2009. *See* Exs. G & H to Jason White's Declaration (Howrey and Troutman Sanders bills for July 2009).

Moreover, as a general matter, Mr. Pequignot should not have to pay for Solo's decision to defend the case in an inefficient and cost-insensitive matter.  Four attorneys at Howrey (Mr. White, Mr. Unikel, Ms. Keysor, and Mr. Sherwin) and one attorney at Troutman Sanders (Ms. Zinsner) consistently billed substantial amounts of time to this matter, and numerous other attorneys and paralegals billed lesser amounts of time.  These attorneys charged very high rates and Solo frequently had multiple attorneys doing the same work.  Its representation in its brief that it had only one attorney conduct meet and confer calls is demonstrably false.  D's Br. at 16. Its lawyers' bills show that Solo regularly had two or three attorneys on the phone during the meet and confer calls. *See, e.g.*, Exs. G & H to Jason White Declaration (legal bills showing that Mr. Sherwin, Mr. White and Ms. Zinsner participated in the April 10, 2009 meet and confer call; that Mr. White and Ms. Zinsner participated in the April 20, 2009 meet and confer call; that Mr.

Unikel, Mr. White, and Ms. Zinsner participated in the April 28, 2009 meet and confer call; that

Mr. Unikel, Mr. White, and Ms. Zinsner participated in the April 30, 2009 meet and confer call).

II.     **Solo's Request for Its Taxable Costs Under § 1920 and Rule 54(D) Should Be Denied**

     A.     **Solo Is Not Entitled to Any Costs Under § 1920 or Rule 54(D) Because the Issues in the Case Were, By The Court's Analysis, Close and Difficult and Mr. Pequignot Proceeded in Good Faith**

In addition to Solo's claims for attorney fees and expenses under § 285, Solo also asserts

claims for taxable costs under § 1920 and Rule 54(D).  Those claims should be denied.  It is not

the law that Solo is automatically entitled to shift its costs to Mr. Pequignot so long as it is the

prevailing party and not guilty of misconduct and Mr. Pequignot is able to pay.  D's Br. at 3.

Rather, as Solo's own authority recognizes, this Court must consider other factors, including the

excessiveness of the requested costs, the limited nature of Solo's victory, and the closeness and

difficulty of the issues decided.  *See, e.g., Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 446

(4th Cir. 1999), ("[w]e have recognized additional factors to justify denying an award of costs,

such as their excessiveness in a particular case, the limited value of the prevailing party's

victory, or the closeness and difficulty of the issues decided."); *see also Teague v. Bakker*, 35

F.3d 978, 996 (4th Cir. 1994) (listing factors to be considered, including closeness and difficulty

of the issues); *Kohus v. Toys R Us, Inc.*, 282 F.3d 1355, 1357 (Fed. Cir. 2002) (Federal Circuit

follows regional circuit on issues of taxable costs).  Moreover, this Court has "'considerable

discretion' in deciding whether to award costs." *Fells v. Va. Dep't of Transp.*, 605 F. Supp. 2d

740, 742 (E.D. Va. 2009).

Costs should not be awarded because Mr. Pequignot prevailed on most significant issues,

but lost on a question that this Court said was one of "first impression" and, therefore, close.  In

three instances, the Court agreed with Mr. Pequignot's positions on § 292, in two instances it did

not, and on multiple occasions the Court viewed the issues presented as difficult ones of first impression.  As for the cross motions for summary judgment, while Mr. Pequignot continues to believe that his motion advocated a straightforward application of *Clontech*'s standard for determining whether § 292's intent requirement had been met and following the plain meaning of § 292 in determining the number of offenses, Solo contends that the motions involved "rare false marking claims" involving "novel" and "difficult" issues, D's Br. at 16-17, and the Court has said that the motions raised issues of first impression, August 25, 2009 Memorandum Opinion at 15 [D.E. 207].  In light of the fact that both the Court and Solo have indicated that the issues were difficult, and the good faith with which Mr. Pequignot has proceeded, Mr. Pequignot respectfully requests that the Court exercise its discretion not to tax costs.

> **B.     Even Assuming That Solo Were Entitled to Some of Its Costs, It Should Not Be Awarded Costs That It Unnecessarily Incurred**

In any event, Solo should not be awarded all of its claimed costs. The Court may tax costs "necessarily obtained for use in the case." 28 U.S.C. § 1920(2).   "The concept of necessity for use in the case connotes something more than convenience . . . ." *Cherry*, 186 F.3d at 449. "Costs should be limited to those reasonably necessary at the time they were incurred." *Fells*, 605 F. Supp. 2d at 742. (internal quotations omitted).  Solo's submitted bill of costs contains numerous items that were for the convenience of Solo's counsel and were not necessary for the litigation of this case, including the cost of videotaping Mr. Pequignot's deposition, obtaining expedited transcripts, ancillary transcription services and *pro hac vice* application fees for lawyers who never appeared in Court.  Thus, to the extent that the Court grants Solo's request for costs, all of those unnecessary costs should be excluded.

**Videotaping.**  Solo has requested $1,540 for videotaping Mr. Pequignot's deposition, as well as $2,901.90 for stenographic transcription of the same deposition.  But, the Court's

Guidelines on taxation of costs provide that videotaping of depositions is non-taxable "unless an authorizing order or stipulation provides for taxing of these costs," and no such order or stipulation exists in this case.   Moreover, even if this Court taxes the cost of videotaping depositions, that would "not necessarily entitle [the prevailing party] to recover the costs of <u>both</u> transcribing and videotaping" a deposition. *Cherry*, 186 F.3d at 449 (emphasis in original).   In *Cherry*, the defendant argued that videotaping the deposition was necessary to enhance its chances of effectively impeaching the witness at trial.   The Fourth Circuit rejected that argument, observing that "the concept of necessity for use in the case connotes something more than convenience or duplication to ensure alternative methods for presenting materials at trial." *Id.* Because Solo did not need both a transcript and a videotape of Mr. Pequignot's deposition, it should not be awarded both costs.

Moreover, Solo's assertion notwithstanding, the fact that Mr. Pequignot had the depositions of Solo's officers and employees videotaped, D's Br. at 5, does not mean that it was "necessary" for Solo to videotape Mr. Pequignot's deposition.   Mr. Pequignot videotaped the depositions that he noticed because Solo refused to say whether it would produce the deponents for testimony at trial and Mr. Pequignot needed the option of presenting their testimony to the jury by videotape.   By contrast, Solo knew that Mr. Pequignot, the plaintiff, would be at trial. Nor would having a videotape of his deposition for impeachment purposes be a "necessary" cost to Solo, as the Fourth Circuit held in *Cherry*.   186 F.3d at 449.   Solo's request to be reimbursed $50 for a copy of the videotape of Stephen Smith's deposition should similarly be denied.

**Expedited Transcripts.**   Solo also should not be allowed to shift to Mr. Pequignot the costs that it incurred by ordering expedited service for transcripts because the service was never necessary and it would be unfair to punish Mr. Pequignot for Solo's decision to litigate this case

27

in a spare-no-expense style.  Assuming the Court determines to award Solo some of its costs, this Court's official standard rate for transcripts should be applied.  *See Synergistic Int'l, LLC v. Korman*, 2007 WL 517676, at *3 (E.D. Va. Feb. 8, 2007) (refusing to reimburse for expedited transcript fees and, instead, applying the Eastern District's official Court Reporter standard rate); *Cofield v. Crumpler*, 179 F.R.D. 510, 516 n.7 (E.D. Va. 1998) (noting that Clerk correctly disallowed expedited fees).  In the Eastern District of Virginia, the rate for an original transcript is $3.65 per page.  "Maximum Transcript Fee Rates," available at http://www.vaed.uscourts.gov/formsandfees/fees.htm.  Thus, at most, Solo would be entitled to $3.65 per page for each transcript.[6]

Solo does not specify in its papers the per-page rate that it seeks to have imposed on Mr. Pequignot.  However, it is evident from Solo's submission that the rate that it seeks is many multiples of the Court's standard rate.  For example, the transcript of Linda Kuczma's deposition is 212 pages long, and the bill for that transcript that Solo has attached to its papers is for $1,475.20, which equals $6.96 per page.[7]  This amount apparently reflects a "1-day expedite" rate, which was entirely unnecessary as Ms. Kuczma's deposition was held on May 7, 2008, more than a month before the summary judgment briefs were due.  *See Synergistic Int'l LLC*, 2007 WL 517676, at *2-3 (rejecting expedited service for transcripts of depositions occurring 47 days and 14 days before the prevailing party filed its summary judgment brief).  Solo similarly seeks reimbursement for the transcription of Matthew Banach's and Raj Chauhan's depositions

---

[6] Excluding the word indices, each deposition consisted of the following number of pages: Pequignot (341), Healy (243), Eveleigh (236), Stephen Smith on May 20 and 21 (434), Banach (159), Chauhan (114), Kuczma (212), Diehl (211).
[7] In addition to the 212-page transcript, there is a 42-page word index included within that total invoice cost, which as explained *infra* at 29-30, is not taxable.

at an exorbitant rate of more than $10 per page ($1,698.35 and $1,167.75 for the 150-page Banach transcript and the 114-page Chauhan transcript).[8]

Even the two depositions that occurred latest in this case did not require expedited transcription services. Solo ordered Mr. Pequignot's deposition transcript on an expedited basis, but his testimony as a *qui tam* relator was not relevant to any issue in the case, much less any issue presented on summary judgment. Moreover, it was Solo who proposed extending the discovery period for the depositions of Mr. Pequignot and Ms. Healy, primarily because of Ms. Healy's travel schedule. In any event, the apparent $8.61 per-page charge for Ms. Healy's deposition transcript is exorbitant. It would be unfair for Mr. Pequignot to be forced to bear the cost of expedited transcripts for the later depositions where Solo was responsible for their timing.

**Ancillary Transcription Services.** Even if the Court determines to shift some of Solo's costs for transcripts to Mr. Pequignot, those costs should not include ancillary costs beyond the cost of the transcript itself, at the Court's standard per-page rate. *See Centennial Broadcasting, LLC v. Burns,* No. 6:06cv006, 2007 WL 1839736, at *2 (W.D. Va. 2007) (holding that costs to be excluded include "condensed version of the transcripts, word indices, ASCII discs, e-transcripts, exhibit copying and delivery charges"); *Jefferson v. Briner, Inc.,* 2006 WL 2850648, at *1 n.3 (E.D. Va. Sept. 29, 2006) (noting that the Clerk rejected costs for ASCII transcription disks); Clerk Guidelines (providing that "computer diskettes" of depositions are not taxable). Solo's bill of costs includes expedited delivery charges, "Litigation Support CD-Roms," exhibit charges, videotape charges and rough disk charges. It also includes charges for word indices. For example, Solo seeks to impose on Mr. Pequignot the cost of his deposition transcript for 395

---

[8] As an explanation for the high invoice costs for the Banach and Chauhan depositions, it appears that Solo may have been charged twice for these transcripts. If that is the case, Solo may not pass that cost on to Mr. Pequignot.

pages at an apparent rate of $7.10 per page, yet the transcript itself is only 341 pages, and the rest is a word index.  Moreover, the court reporter invoices include the cost of word indices, although the invoices do not identify the amount of that cost.   The word index was not a necessary expenditure but only for the convenience of counsel.  *See Wetmore v. MacDonald Page & Co.*, 2008 WL 4723135, at *2 (D. Me. Oct. 6, 2008) (disallowing cost of word index). Solo should not be permitted to shift that charge or any other ancillary charge to Mr. Pequignot.

**Unexplained Costs.**  Finally, Solo has submitted Troutman Sanders legal bills to Solo as evidence of additional transcript costs, but has not submitted the original invoices for these expenditures.  Because the bills do not indicate the transcripts for which the charges were incurred, the Court cannot determine whether the charges were necessary and Mr. Pequignot should not be compelled to pay them.

**Unnecessary *Pro Hac Vice* Admission Fees.**  Solo's request for reimbursement of the $150 that it paid for the *pro hac vice* applications of Mr. Sobieraj, Mr. Lydigsen and Mr. Eveleigh should also be denied because the expenses were unnecessary.   As far as Mr. Pequignot knows, neither Mr. Sobieraj nor Ms. Lydigsen even came to a hearing in this case, much less made an appearance at one.   Furthermore, while Mr. Eveleigh, Solo's in-house counsel, attended several hearings, he never spoke at any hearing nor did he appear on the briefs in this case.

## CONCLUSION

For the foregoing reasons, Solo's motion for fees and costs should be denied in its entirety.

Dated:  September 21, 2009                    Respectfully submitted,

                                              /s/ Ellen D. Marcus_____
                                              Ellen D. Marcus (Virginia Bar. No. 44314)
                                              emarcus@zuckerman.com
                                              Carl S. Kravitz (admitted *pro hac vice*)
                                              ckravitz@zuckerman.com
                                              Jane M. Ricci (admitted *pro hac vice*)
                                              jricci@zuckerman.com
                                              ZUCKERMAN SPAEDER LLP
                                              1800 M Street, N.W., Suite 1000
                                              Washington, D.C. 20036
                                              (202) 778-1800 (telephone)
                                              (202) 822-8106 (facsimile)


                                              Mia K. Poston (Virginia Bar No. 68548)
                                              mposton@pmiplaw.com
                                              Pequignot + Myers, LLC
                                              1636 R Street, N.W., Third Floor
                                              Washington D.C.  20009
                                              (202) 328-1200 (telephone)
                                              (202) 328-2219 (facsimile)

                                              Attorneys for Plaintiff Matthew A. Pequignot

31

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2009, I electronically filed Plaintiff's Opposition to Defendant Solo Cup Company's Motion to Declare This an Exceptional Case and For Attorney Fees and/or Costs with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF.

/s/ Ellen D. Marcus_____
Ellen D. Marcus (Virginia Bar. No. 44314)
emarcus@zuckerman.com
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 778-1800 (telephone)
(202) 822-8106 (facsimile)

*Attorney for Plaintiff Matthew A. Pequignot*